Eric J. Firstman (SBN: 111534)
efirstman@meyersnave.com
Ian Johnson (SBN: 208713)
ijohnson@meyersnave.com
MEYERS NAVE
1999 Harrison Street, 9th Floor
Oakland, California 94612
Telephone: (510) 808-2000
Facsimile: (510) 444-1108

*Attorneys for Plaintiff East Bay Community
Energy Authority*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| EAST BAY COMMUNITY ENERGY AUTHORITY, a California Joint Powers Authority,<br><br>        Plaintiff,<br><br>    v.<br><br>EDWARDS SOLAR II, LLC, a Delaware limited liability company,<br><br>        Defendant. | Case No.<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT (28 U.S.C. § 2201)** |

For its Complaint, Plaintiff East Bay Community Energy Authority ("EBCE"), by and through its attorneys Meyers Nave, alleges as follows:

## THE PARTIES

1.      EBCE is a California Joint Powers Authority ("JPA") established as of December 1, 2016.  EBCE's mission is to deliver electric power at competitive costs to the communities it serves and, in the process, to assist those communities in reducing greenhouse gases, developing local renewable resources, stimulating local job creation, promoting personal and community ownership of renewable resources, and promoting long-term electric rate stability and energy reliability for residents and businesses.

2.      EBCE's constituent jurisdictions include County of Alameda, City of Albany, City of Berkeley, City of Dublin, City of Emeryville, City of Fremont, City of Hayward, City of Livermore, City of Newark, City of Oakland, City of Piedmont, City of Pleasanton, City of San Leandro, City of Tracy, and City of Union City.  EBCE is governed by a board of directors ("Board") made up of elected representatives from each of these jurisdictions.  As of June 2023, EBCE provided electric power to approximately 650,000 customers.

3.      EBCE is informed and believes, and on that basis alleges, that Defendant Edwards Solar II, LLC ("Edwards") is a Delaware limited liability company headquartered in New York, New York.[1]

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and because there is complete diversity of citizenship between EBCE, on the one hand, and Edwards and its members, on the other.

5.      This Court has personal jurisdiction over Edwards because Edwards keeps offices in California, does significant business in California, maintains a continuous and systematic presence in California, and agreed in the Renewable Power Purchase Agreement ("PPA") at issue

---

[1] Edwards changed its name to Edwards Solar 1B, LLC, in or around September 2020.  To avoid confusion, EBCE uses Edwards, which is the name appearing in the contract at issue.  *See* Exh. A (Renewable Power Purchase Agreement, with redactions) at pdf p. 1.

COMPLAINT FOR DECLARATORY JUDGMENT (28 U.S.C. § 2201)

to submit itself to the jurisdiction of this Court.  *See* Exh. A (Renewable Power Purchase Agreement, with redactions) at § 15.1 ("The Parties agree that any suit, action or other legal proceeding by or against any Party with respect to or arising out of this Agreement shall be brought in the federal courts of the United States or the courts of the State of California sitting in the County of Alameda, California.").

6.      Venue is proper in this Court because EBCE and Edwards agreed that any suit, action or proceeding with respect to or arising out of the PPA should proceed in the County of Alameda, California.  *See id*.

7.      An actual case or controversy exists between EBCE and Edwards regarding their respective rights and obligations under the PPA.

## GENERAL ALLEGATIONS

### Background to the PPA and Edwards' Breach of the PPA

8.      Terra-Gen, LLC ("Terra-Gen") is Edwards' parent company and conducts business for and as Edwards interchangeably in the name of Terra-Gen.

9.      In 2017, Terra-Gen was selected by the United States Air Force to develop a solar photovoltaic power project on Edwards Air Force Base ("Project").  This led to negotiations and planning for the Project in cooperation with the Air Force, representatives of the San Manuel Band of Mission Indians ("SMBMI"), and state and county officials.

10.      A preliminary (2017) and final (January 2020) Environmental Impact Report ("EIR") details the lease of 4,000 acres of Air Force land for construction of the Project, to include a 10 to 14-mile generation tie-line, with Project "off-takers" (*i.e.*, buyers) identified as investor-owned utilities, municipalities, other energy off-takers "and/or" Edwards AFB.  By agreement with the SMBMI, Terra-Gen agreed to avoid construction in thirteen areas of the leased land, with the result that the Project would cover 3,701 buildable acres and produce approximately 672 megawatts ("MW") of power.  EBCE alleges on information and belief that this level of generation was sufficient to satisfy all contractual off-takers.

11.      In September 2019, EBCE and Edwards entered into the PPA.  *See* Exh. A.  In simplest terms, the PPA provided that Edwards (as "Seller") would "develop, design, permit,

COMPLAINT FOR DECLARATORY JUDGMENT (28 U.S.C. § 2201)

construct, own, and operate" a solar generating facility on certain denominated APNs ("Assessor Parcel Numbers") on Edwards Air Force Base and then sell 100 MW of power to EBCE (as "Buyer") at a fixed price for 15 years.  *See id.* at pdf pp. 1-3 and 8.

12.     Throughout 2019, 2020 and 2021, Terra-Gen reported that the Project was on schedule to meet its contractual milestones, including a commercial operation date of December 31, 2022.  As late as November 24, 2021, Darren Kelly and Don Vawter, for "Terra-Gen, LLC," stated to EBCE in an official project status report that "Seller is on target to meet all remaining milestones prior to or by the current expected completion dates," that "[t]he project 90% Site Plan is currently under internal engineering review," and that there were "[n]o changes currently expected [] to the generating facility and Site Description."

13.     On or about February 18, 2022,  Terra-Gen advised EBCE that Terra-Gen had decided to reduce the Project's buildable acreage to 2,645 buildable acres producing only 420 to 480 MW.  EBCE alleges on information and belief that this level of production was insufficient to fulfill the contracts of the Project's various off-takers.

14.     On February 18, 2022, Terra-Gen stated that it reduced the Project's size because its site investigations undertaken between May and September 2021 indicated that complying with Terra-Gen's agreement with the SMBMI could result in higher-than-anticipated excavation costs in certain areas.  EBCE alleges on information and belief that Terra-Gen therefore decided simply to "cull out" two off-takers – EBCE being one of them – and to honor the remaining power purchase agreements.

15.     Following its initial notice on February 18, 2022, Terra-Gen advised EBCE in varying terms that "Edwards Solar II will not be built" and that Terra-Gen was not building EBCE's "share of the Project."

16.     For example, on July 6, 2022, in Terra-Gen's Quarterly Report for the Project, Terra-Gen stated to EBCE, "As previously communicated to Buyer, due to permitting limitations, Seller does not have access to sufficient buildable land to construct the Facility described in Exhibit A of the PPA.  As a result, the Facility is not expected to be constructed."

17.     Later, on November 23, 2022, Edwards wrote to EBCE, stating, "Buyer has been

advised repeatedly for the past ten months, well in advance of the Guaranteed Construction Start Date, that due to permitting limitations, Seller is unable to construct the Facility described in Exhibit A of the PPA.  As set forth in Sections 11.1, 11.2 and Exhibit B of the PPA, the contemplated remedy for this inability to construct the Facility or any other Event of Default prior to the Commercial Operation Date is Buyer's right to receive a Damage Payment."

18.    Following Edwards letter of November 23, 2022, EBCE pursued its rights under the PPA's provisions for resolving disputes.  *See* Exh. A at § 15.2 ("Dispute Resolution").  This process included a meeting between the parties and then a mediation administered by JAMS in July 2023.  The matter was not resolved.

**The Case or Controversy**

19.    Contrary to Terra-Gen's assertions, Terra-Gen built the precise facility defined in the PPA, *i.e.*, one constructed on the specifically-denominated APN's and capable of generating 100 MW (and far more).  Terra-Gen achieved commercial operation of the Facility and is selling power generated by the Facility, but has refused and continues to refuse to sell power to EBCE in breach of the PPA.

20.    EBCE contends that Edwards is contractually obligated to sell power to EBCE under the terms set forth in the PPA and to pay liquidated damages for missed deadlines per the terms of the PPA.  EBCE further contends that Edwards has no legally cognizable justification for its failure to do so.  EBCE is informed and believes, and on that basis alleges, that Edwards denies these contentions.

21.    EBCE contends that it is not required to treat Edwards repudiation of the PPA as a material breach and may instead, in its sole discretion, wait until the time for performance has arrived.  EBCE is informed and believes, and on that basis alleges, that Edwards denies this contention.

22.    EBCE contends that EBCE, upon an Event of Default by Edwards, has the right under PPA § 11.2(b), to elect to declare an "Early Termination" of the PPA and to recover a "Termination Payment" (not the smaller "Damage Payment" as contended by Edwards).  EBCE is informed and believes, and on that basis alleges, that Edwards denies this contention.

23.     EBCE contends that EBCE's right to declare an "Early Termination" of the PPA, and to recover a "Termination Payment," is a wholly optional right that "shall not otherwise act to limit any of [EBCE's] rights or remedies if [EBCE] does not elect a Terminated Transaction as its remedy for an Event of Default by [Edwards]."  Exh. A § 11.3.  EBCE is informed and believes, and on that basis alleges, that Edwards denies this contention.

24.     EBCE contends that EBCE, upon an Event of Default by Edwards, has the right "to exercise any other right or remedy available at law or in equity," which remedies include damages for breach of contract.  Exh. A § 11.2(e).  EBCE is informed and believes, and on that basis alleges, that Edwards denies this contention.

25.     Edwards contends, and EBCE denies, that Edwards was prevented from building EBCE's "portion of the Project."  EBCE contends that the Project was in fact built and that Terra-Gen decided for purely financial reasons to reduce the Project's size to one incapable of meeting the requirements of all contracted off-takers.

26.     EBCE contends, and Edwards, on information and belief, denies, that Edwards' proffered reasons for refusing to sell power pursuant to the terms of the PPA – *i.e.*, permitting issues and increased cost – run counter to the express terms of the PPA:

- Permitting – PPA § 10(c)(ii) expressly states that "the term "Force Majeure Event" does not include . . . Seller's inability to obtain permits or approvals of any type for the construction, operation, or maintenance of the Facility, except to the extent such inability is caused by [an otherwise recognized] Force Majeure Event."

- Increased Cost – PPA § 10(c)(i) expressly states that "the term "Force Majeure Event" does not include . . . economic conditions that render a Party's performance of this Agreement at the Contract Price unprofitable or otherwise uneconomic."

27.     Edwards contends, on information and belief, that no breach of the PPA occurred because the PPA was not a power purchase agreement as such but rather an agreement akin to a construction contract for geographic-specific construction.  EBCE maintains this contention fails because the PPA by its title and terms is for the sale and purchase of power and because, as noted, the solar power facility was in fact constructed on the APNs denominated in the PPA.

28.     Finally, Edwards contends, on information and belief, that EBCE's remedies are limited to the aforementioned "Damage Payment."  EBCE, as indicated, maintains that such a contention defies the plain terms of the PPA.

## CLAIM FOR RELIEF

### (Declaratory Judgment of the Parties' Rights and Obligations Under the PPA)

29.     EBCE incorporates by reference the allegations contained in paragraphs 1 to 28, inclusive.

30.     An actual, present and justiciable controversy exists between EBCE and Edwards regarding their respective rights and obligation under the PPA.  As alleged, this controversy relates in general terms to the question whether Edwards had legally-cognizable grounds for repudiating PPA and, if not, the nature of the contractual remedies available to EBCE.

31.     EBCE seeks a declaratory judgment that Edwards had no cognizable ground for refusing to sell power to EBCE pursuant to the PPA and that EBCE's remedies under the PPA include, at EBCE's election, the aforementioned Termination Payment or damages for breach.  For the avoidance of doubt, EBCE expressly notes that it seeks no coercive or affirmative relief (*e.g.*, damages or injunctive relief) by this claim.

## PRAYER FOR RELIEF

WHEREFORE, EBCE respectfully requests that the Court:

1.     Enter judgment according to the declaratory relief sought; and

2.     Award EBCE its costs in this action.

DATED:  August 4, 2023                    MEYERS NAVE


By:  _Eric Firstman_____
     Eric J. Firstman
     Ian Johnson
     Attorneys for EAST BAY COMMUNITY
     ENERGY AUTHORITY

5430240

COMPLAINT FOR DECLARATORY JUDGMENT (28 U.S.C. § 2201)

**EXHIBIT A**

**DRAFT EXECUTION VERSION**

**RENEWABLE POWER PURCHASE AGREEMENT**

**COVER SHEET**

<u>**Seller**</u>:  Edwards Solar II, LLC

<u>**Buyer**</u>:  East Bay Community Energy Authority, a California joint powers authority

<u>**Description of Facility**</u>:  100 MW Solar PV located on Edwards Air Force Base, as further described in <u>Exhibit A</u>; Seller has the option to incorporate an integrated energy storage facility as described in Section 2.3

<u>**Milestones**</u>:

| Milestone | Date for Completion |
|---|---|
| **Evidence of Site Control** | 05/01/2019 |
| **CEC Pre-Certification Obtained** | 02/01/2022 |
| **Financing Milestone** | 06/01/2021 |
| **Documentation of Conditional Use Permit if required: CEQA [X] Cat Ex, [ ] Neg Dec, [ ] Mitigated Neg Dec, [ ] EIR** | 02/01/2022 |
| **Seller's receipt of Phase I and Phase II Interconnection study results for Seller's Interconnection Facilities** | 09/01/2019 |
| **Executed Interconnection Agreement** | 05/01/2020 |
| **Financial Close** | 06/01/2022 |
| **Expected Construction Start Date** | 08/01/2022 |
| **Guaranteed Construction Start Date** | 08/01/2022 |
| **Full Capacity Deliverability Status Obtained** | 12/31/2022 |
| **Initial Synchronization** | 11/01/2022 |
| **Network Upgrades completed** | 11/01/2022 |
| **Expected Commercial Operation Date** | 12/31/2022 |
| **Guaranteed Commercial Operation Date** | 12/31/2022 |

**Delivery Term**:  The period for Product delivery will be for fifteen (15) Contract Years.

**Expected Energy**:

| Contract Year | Expected Energy (MWh) |
|:---:|:---:|
| 1 | █ |
| 2 | █ |
| 3 | █ |
| 4 | █ |
| 5 | █ |
| 6 | █ |
| 7 | █ |
| 8 | █ |
| 9 | █ |
| 10 | █ |
| 11 | █ |
| 12 | █ |
| 13 | █ |
| 14 | █ |
| 15 | █ |

**Guaranteed Capacity**: 100 MW

**Contract Price**:

The Contract Price of the Product shall be:

| Contract Year | Contract Price |
|:---:|:---:|
| 1-15 | █ |

**Product**:

- ☒ PV Energy
- ☒ Green Attributes (Portfolio Content Category 1)
- ☒ Generating Facility Capacity Attributes (select options below as applicable)
    - ☐      Energy Only Status
    - ☒      Full Capacity Deliverability Status and Expected FCDS Date:  12/31/2022
- ☒ Generating Facility Ancillary Services

**Scheduling Coordinator**:  Seller/Seller Third Party

**Security, Damage Payment, and Guarantor**

Development Security:  ████████

Performance Security:  ████████████████████

Damage Payment:  ████████████████████

Guarantor:  ██████████

# TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINITIONS .................................................................................................... 1

    1.1    CONTRACT DEFINITIONS. .................................................................................. 1
    1.2    RULES OF INTERPRETATION. ............................................................................ 20

ARTICLE 2 TERM; CONDITIONS PRECEDENT ............................................................ 21

    2.1    CONTRACT TERM. ........................................................................................... 21
    2.2    CONDITIONS PRECEDENT. ............................................................................... 22
    2.3    DEVELOPMENT; CONSTRUCTION; PROGRESS REPORTS ................................... 22
    2.4    REMEDIAL ACTION PLAN ................................................................................ 23

ARTICLE 3 PURCHASE AND SALE .................................................................................. 23

    3.1    PURCHASE AND SALE OF PRODUCT. ................................................................ 23
    3.2    SALE OF GREEN ATTRIBUTES. ......................................................................... 27
    3.3    IMBALANCE ENERGY. ...................................................................................... 27
    3.4    OWNERSHIP OF RENEWABLE ENERGY INCENTIVES. .......................................... 27
    3.5    FUTURE ENVIRONMENTAL ATTRIBUTES. ......................................................... 27
    3.6    TEST ENERGY. ................................................................................................. 27
    3.7    CAPACITY ATTRIBUTES. .................................................................................. 28
    3.8    RESOURCE ADEQUACY FAILURE. ..................................................................... 30
    3.9    CEC CERTIFICATION AND VERIFICATION. ....................................................... 30
    3.10   ELIGIBILITY. .................................................................................................... 30
    3.11   CALIFORNIA RENEWABLES PORTFOLIO STANDARD. .......................................... 30
    3.12   COMPLIANCE EXPENDITURE CAP. .................................................................... 31

ARTICLE 4 OBLIGATIONS AND DELIVERIES ............................................................. 31

    4.1    DELIVERY. ....................................................................................................... 31
    4.2    TITLE AND RISK OF LOSS. ............................................................................... 32
    4.3    FORECASTING ................................................................................................... 32
    4.4    RESERVED. ....................................................................................................... 33
    4.5    RESERVED. ....................................................................................................... 33
    4.6    REDUCTION IN DELIVERY OBLIGATION. ........................................................... 33
    4.7    GUARANTEED ENERGY PRODUCTION. ............................................................... 34
    4.8    WREGIS. ......................................................................................................... 34
    4.9    GREEN-E CERTIFICATION. ................................................................................ 36

ARTICLE 5 TAXES .............................................................................................................. 36

    5.1    ALLOCATION OF TAXES AND CHARGES. ........................................................... 36
    5.2    COOPERATION. ................................................................................................. 36

ARTICLE 6 MAINTENANCE OF THE FACILITY .......................................................... 37

    6.1    MAINTENANCE OF THE FACILITY. .................................................................... 37
    6.2    MAINTENANCE OF HEALTH AND SAFETY ......................................................... 37
    6.3    SHARED FACILITIES. ........................................................................................ 37

ARTICLE 7 METERING ...................................................................................................... 37

    7.1    METERING. ...................................................................................................... 37
    7.2    METER VERIFICATION. ..................................................................................... 37

ARTICLE 8 INVOICING AND PAYMENT; CREDIT ................................................................ 38

8.1 INVOICING. ................................................................................................................ 38
8.2 PAYMENT. .................................................................................................................. 38
8.3 BOOKS AND RECORDS. ............................................................................................. 38
8.4 PAYMENT ADJUSTMENTS; BILLING ERRORS. ......................................................... 39
8.5 BILLING DISPUTES. ................................................................................................... 39
8.6 NETTING OF PAYMENTS. ........................................................................................... 39
8.7 SELLER'S DEVELOPMENT SECURITY. ....................................................................... 39
8.8 SELLER'S PERFORMANCE SECURITY. ....................................................................... 40
8.9 FIRST PRIORITY SECURITY INTEREST IN CASH OR CASH EQUIVALENT COLLATERAL. ............ 40
8.10 FINANCIAL STATEMENTS. ....................................................................................... 41

ARTICLE 9 NOTICES ..................................................................................................... 41

9.1 ADDRESSES FOR THE DELIVERY OF NOTICES ........................................................... 41
9.2 ACCEPTABLE MEANS OF DELIVERING NOTICE. ......................................................... 41

ARTICLE 10 FORCE MAJEURE ..................................................................................... 42

10.1 DEFINITION. ............................................................................................................ 42
10.2 NO LIABILITY IF A FORCE MAJEURE EVENT OCCURS. .............................................. 42
10.3 NOTICE. .................................................................................................................. 43
10.4 TERMINATION FOLLOWING FORCE MAJEURE EVENT .............................................. 43

ARTICLE 11 DEFAULTS; REMEDIES; TERMINATION ................................................. 43

11.1 EVENTS OF DEFAULT.  AN "EVENT OF DEFAULT" SHALL MEAN, ............................. 43
11.2 REMEDIES; DECLARATION OF EARLY TERMINATION DATE. ..................................... 46
11.3 TERMINATION PAYMENT. ....................................................................................... 47
11.4 NOTICE OF PAYMENT OF TERMINATION PAYMENT. ................................................. 47
11.5 DISPUTES WITH RESPECT TO TERMINATION PAYMENT. ........................................... 47
11.6 RIGHTS AND REMEDIES ARE CUMULATIVE ............................................................. 47

ARTICLE 12 LIMITATION OF LIABILITY AND EXCLUSION OF WARRANTIES. ............ 48

12.1 NO CONSEQUENTIAL DAMAGES. ............................................................................. 48
12.2 WAIVER AND EXCLUSION OF OTHER DAMAGES. ...................................................... 48

ARTICLE 13 REPRESENTATIONS AND WARRANTIES; AUTHORITY ........................... 49

13.1 SELLER'S REPRESENTATIONS AND WARRANTIES. ................................................... 49
13.2 BUYER'S REPRESENTATIONS AND WARRANTIES ...................................................... 49
13.3 GENERAL COVENANTS ............................................................................................ 50
13.4 PREVAILING WAGE. ................................................................................................ 51
13.5 COMMUNITY INVESTMENT. ..................................................................................... 51

ARTICLE 14 ASSIGNMENT ........................................................................................... 51

14.1 GENERAL PROHIBITION ON ASSIGNMENTS .............................................................. 51
14.2 COLLATERAL ASSIGNMENT .................................................................................... 51
14.3 PERMITTED ASSIGNMENT BY SELLER ..................................................................... 53
14.4 SHARED FACILITIES; PORTFOLIO FINANCING ......................................................... 54

ARTICLE 15 DISPUTE RESOLUTION ............................................................................ 54

15.1 GOVERNING LAW .................................................................................................... 54
15.2 DISPUTE RESOLUTION. ........................................................................................... 54

ARTICLE 16 INDEMNIFICATION ................................................................................. 55

16.1   MUTUAL INDEMNITY. .......................................................................... 55
16.2   NOTICE OF CLAIM. .............................................................................. 55
16.3   DEFENSE OF CLAIMS. ........................................................................... 55
16.4   SUBROGATION OF RIGHTS. ................................................................... 56
16.5   RIGHTS AND REMEDIES ARE CUMULATIVE. ......................................... 56

ARTICLE 17 INSURANCE ............................................................................................ 56

17.1   INSURANCE ......................................................................................... 56

ARTICLE 18 CONFIDENTIAL INFORMATION ........................................................ 58

18.1   DEFINITION OF CONFIDENTIAL INFORMATION. .................................. 58
18.2   DUTY TO MAINTAIN CONFIDENTIALITY. ............................................. 58
18.3   IRREPARABLE INJURY; REMEDIES. ...................................................... 58
18.4   DISCLOSURE TO LENDERS, ETC. .......................................................... 59
18.5   PRESS RELEASES. ................................................................................ 59

ARTICLE 19 MISCELLANEOUS ................................................................................. 59

19.1   ENTIRE AGREEMENT; INTEGRATION; EXHIBITS. ................................. 59
19.2   AMENDMENTS. .................................................................................... 59
19.3   NO WAIVER. ........................................................................................ 59
19.4   NO AGENCY, PARTNERSHIP, JOINT VENTURE OR LEASE. ..................... 59
19.5   SEVERABILITY. ................................................................................... 59
19.6   MOBILE-SIERRA. ................................................................................. 60
19.7   COUNTERPARTS. ................................................................................. 60
19.8   FACSIMILE OR ELECTRONIC DELIVERY. .............................................. 60
19.9   BINDING EFFECT. ................................................................................ 60
19.10  NO RECOURSE TO MEMBERS OF BUYER. ............................................. 60
19.11  FORWARD CONTRACT. ........................................................................ 60
19.12  FURTHER ASSURANCES ....................................................................... 60

**Exhibits:**

| | |
|---|---|
| Exhibit A | Facility Description |
| Exhibit B | Major Project Development Milestones and Commercial Operation |
| Exhibit C | Compensation |
| Exhibit D | Scheduling Coordinator Responsibilities |
| Exhibit E | Progress Reporting Form |
| Exhibit F-1 | Form of Average Expected Energy Report |
| Exhibit F-2 | Form of Monthly Available Capacity Report |
| Exhibit G | Guaranteed Energy Production Damages Calculation |
| Exhibit H | Form of Commercial Operation Date Certificate |
| Exhibit I | Form of Installed Capacity Certificate |
| Exhibit J | Form of Construction Start Date Certificate |
| Exhibit K | Form of Letter of Credit |
| Exhibit L | Form of Guaranty |
| Exhibit M | Form of Replacement RA Notice |
| Exhibit N | Notices |
| Exhibit O | Operating Restrictions |
| Exhibit P | Metering Diagram |
| Exhibit Q | Community Investment |

## RENEWABLE POWER PURCHASE AGREEMENT

This Renewable Power Purchase Agreement ("**Agreement**") is entered into as of _____, 2019 (the "**Effective Date**"), between Buyer and Seller.  Buyer and Seller are sometimes referred to herein individually as a "**Party**" and jointly as the "**Parties**."  All capitalized terms used in this Agreement are used with the meanings ascribed to them in Article 1 to this Agreement.

## RECITALS

WHEREAS, Seller intends to develop, design, permit, construct, own, and operate the Facility, which may include an integrated energy storage facility; and

WHEREAS, Seller desires to sell, and Buyer desires to purchase, on the terms and conditions set forth in this Agreement, the Product;

NOW THEREFORE, in consideration of the mutual covenants and agreements herein contained, and for other good and valuable consideration, the sufficiency and adequacy of which are hereby acknowledged, the Parties agree to the following:

## ARTICLE 1
## DEFINITIONS

1.1    **Contract Definitions**.  The following terms, when used herein with initial capitalization, shall have the meanings set forth below:

"**AC**" means alternating current.

"**Accepted Compliance Costs**" has the meaning set forth in Section 3.12.

"**Adjusted Energy Production**" has the meaning set forth in Exhibit G.

"**Affiliate**" means, with respect to any Person, each Person that directly or indirectly controls, is controlled by, or is under common control with such designated Person.  For purposes of this definition and the definition of "Permitted Transferee", "control", "controlled by", and "under common control with", as used with respect to any Person, shall mean (a) the direct or indirect right to cast at least fifty percent (50%) of the votes exercisable at an annual general meeting (or its equivalent) of such Person or, if there are no such rights, ownership of at least fifty percent (50%) of the equity or other ownership interest in such Person, or (b) the right to direct the policies or operations of such Person.

"**Agreement**" has the meaning set forth in the Preamble and includes any Exhibits, schedules and any written supplements hereto, the Cover Sheet, and any designated collateral, credit support or similar arrangement between the Parties.

"**Ancillary Services**" has the meaning set forth in the CAISO Tariff.

"**Available Generating Capacity**" means the capacity of the Generating Facility, expressed in whole MWs, that is mechanically available to generate Energy.

"**Bankrupt**" means with respect to any entity, such entity that (a) files a petition or otherwise commences, authorizes or acquiesces in the commencement of a proceeding or cause of action under any bankruptcy, insolvency, reorganization or similar Law, (b) has any such petition filed or commenced against it which remains unstayed or undismissed for a period of ninety (90) days, (c) makes an assignment or any general arrangement for the benefit of creditors, (d) otherwise becomes bankrupt or insolvent (however evidenced), (e) has a liquidator, administrator, receiver, trustee, conservator or similar official appointed with respect to it or any substantial portion of its property or assets, or (f) is generally unable to pay its debts as they fall due.

"**Business Day**" means any day except a Saturday, Sunday, or a Federal Reserve Bank holiday in California.  A Business Day begins at 8:00 a.m. and ends at 5:00 p.m. Eastern Standard Time (EST) for the Party sending a Notice, or payment, or performing a specified action.

"**Buyer**" means East Bay Community Energy Authority, a California joint powers authority.

"**Buyer Default**" means an Event of Default of Buyer.

"**Buyer's WREGIS Account**" has the meaning set forth in Section 4.8(a).

"**CAISO**" means the California Independent System Operator Corporation.

"**CAISO Approved Meter**" means a CAISO approved revenue quality meter or meters, CAISO approved data processing gateway or remote intelligence gateway, telemetering equipment and data acquisition services sufficient for monitoring, recording and reporting, in real time, all Facility Energy delivered to the Delivery Point.

"**CAISO Grid**" has the same meaning as "CAISO Controlled Grid" as defined in the CAISO Tariff.

"**CAISO Operating Order**" means the "operating order" defined in Section 37.2.1.1 of the CAISO Tariff.

"**CAISO Tariff**" means the California Independent System Operator Corporation Agreement and Tariff, Business Practice Manuals (BPMs), and Operating Procedures, including the rules, protocols, procedures and standards attached thereto, as the same may be amended or modified from time-to-time and approved by FERC.

"**California Renewables Portfolio Standard**" or "**RPS**" means the renewable energy program and policies established by California State Senate Bills 1038 (2002), 1078 (2002), 107 (2008), X-1 2 (2011), 350 (2015), and 100 (2018) as codified in, *inter alia*, California Public Utilities Code Sections 399.11 through 399.31 and California Public Resources Code Sections 25740 through 25751, as such provisions are amended or supplemented from time to time.

"**Capacity Attribute**" means any current or future defined characteristic, certificate, tag, credit, or accounting construct associated with the amount of power that the Facility can generate and deliver to the Delivery Point at a particular moment and that can be purchased and sold under CAISO market rules, including Resource Adequacy Benefits.

"**Capacity Damages**" has the meaning set forth in Exhibit B.

"**CEC**" means the California Energy Commission, or any successor agency performing similar statutory functions.

"**CEC Certification and Verification**" means that the CEC has certified (or, with respect to periods before the date that is one hundred eighty (180) days following the Commercial Operation Date, that the CEC has pre-certified) that the Facility is an Eligible Renewable Energy Resource for purposes of the California Renewables Portfolio Standard and that all Facility Energy delivered to the Delivery Point qualifies as generation from an Eligible Renewable Energy Resource.

"**CEC Precertification**" means that the CEC has issued a precertification for the Facility indicating that the planned operations of the Facility would comply with applicable CEC requirements for CEC Certification and Verification.

"**CEQA**" means the California Environmental Quality Act.

"**Change of Control**" means, except in connection with public market transactions of equity interests or capital stock of Seller's Ultimate Parent, any circumstance in which Ultimate Parent ceases to own, directly or indirectly through one or more intermediate entities, more than fifty percent (50%) of the outstanding equity interests in Seller; provided that in calculating ownership percentages for all purposes of the foregoing:

(a)     any ownership interest in Seller held by Ultimate Parent indirectly through one or more intermediate entities shall not be counted towards Ultimate Parent's ownership interest in Seller unless Ultimate Parent directly or indirectly owns more than fifty percent (50%) of the outstanding equity interests in each such intermediate entity; and

(b)     ownership interests in Seller owned directly or indirectly by any Lender (including any tax equity provider) shall be excluded from the total outstanding equity interests in Seller.

"**Charging Energy**" means the as-available Energy produced by the Generating Facility that is delivered to the Storage Facility.

"**Claim**" has the meaning set forth in Section 16.2.

"**COD Certificate**" has the meaning set forth in Exhibit B.

"**Commercial Operation**" has the meaning set forth in Exhibit B.

"**Commercial Operation Date**" has the meaning set forth in Exhibit B.

"**Commercial Operation Delay Damages**" ███████████████████████████
████████████████████████████████████████████

"**Compliance Actions**" has the meaning set forth in Section 3.12.

3

"**Compliance Expenditure Cap**" has the meaning set forth in Section 3.12.

"**Confidential Information**" has the meaning set forth in Section 18.1.

"**Construction Start**" has the meaning set forth in Exhibit B.

"**Construction Start Date**" has the meaning set forth in Exhibit B.

"**Contract Price**" has the meaning set forth on the Cover Sheet.

"**Contract Term**" has the meaning set forth in Section 2.1.

"**Contract Year**" means a period of twelve (12) consecutive months.  The first Contract Year shall commence on the Commercial Operation Date and each subsequent Contract Year shall commence on the anniversary of the Commercial Operation Date.

"**Costs**" means, with respect to the Non-Defaulting Party, brokerage fees, commissions and other similar third-party transaction costs and expenses reasonably incurred by such Party either in terminating any arrangement pursuant to which it has hedged its obligations or entering into new arrangements which replace the Agreement; and all reasonable attorneys' fees and expenses incurred by the Non-Defaulting Party in connection with terminating the Agreement.

"**Cover Sheet**" means the cover sheet to this Agreement, which is incorporated into this Agreement.

"**CPUC**" means the California Public Utilities Commission or any successor agency performing similar statutory functions.

"**Credit Rating**" means, with respect to any entity, the rating then assigned to such entity's unsecured, senior long-term debt obligations (not supported by third party credit enhancements) or if such entity does not have a rating for its senior unsecured long-term debt, then the rating then assigned to such entity as an issuer rating by S&P or Moody's.  If ratings by S&P and Moody's are not equivalent, the lower rating shall apply.

"**Curtailed Unscheduled DA Forecast Volume**" means, for each Settlement Interval, the amount of Unscheduled DA Forecast Volume for such Settlement Interval that Seller elects to curtail as described in Section 4.6(h).

"**Curtailment Order**" means any of the following:

(a)     CAISO orders, directs, alerts, or provides notice to a Party, including a CAISO Operating Order, that such Party is required to curtail deliveries of Facility Energy for the following reasons: (i) any System Emergency, or (ii) any warning of an anticipated System Emergency, or warning of an imminent condition or situation, which jeopardizes CAISO's electric system integrity or the integrity of other systems to which CAISO is connected;

(b)     a curtailment ordered by the Participating Transmission Owner for reasons including, but not limited to, (i) any situation that affects normal function of the electric system

including, but not limited to, any abnormal condition that requires action to prevent circumstances such as equipment damage, loss of load, or abnormal voltage conditions, or (ii) any warning, forecast or anticipation of conditions or situations that jeopardize the Participating Transmission Owner's electric system integrity or the integrity of other systems to which the Participating Transmission Owner is connected;

(c)      a curtailment ordered by CAISO or the Participating Transmission Owner due to scheduled or unscheduled maintenance on the Participating Transmission Owner's transmission facilities that prevents (i) Buyer from receiving or (ii) Seller from delivering Facility Energy to the Delivery Point; or

(d)      a curtailment in accordance with Seller's obligations under its Interconnection Agreement with the Participating Transmission Owner or distribution operator.

"**Curtailment Period**" means the period of time, as measured using current Settlement Intervals, during which generation from the Generating Facility is reduced pursuant to a Curtailment Order; provided that the Curtailment Period shall be inclusive of the time required for the Generating Facility to ramp down and ramp up.

"**DA Forecast Volume**" means, for each Settlement Interval, the amount of Energy expected to be generated by the Generating Facility for such Settlement Interval as reflected in the VER forecast, its equivalent or any successor, provided by the CAISO, or such other forecast as developed by Seller and approved by Buyer (such approval not to be unreasonably withheld) for participation in the Day-Ahead Market.

"**DA LMP**" means the LMP applicable to the Delivery Point in the CAISO Day-Ahead Market.

"**DA Price Floor**" means zero dollars per MWh ($0/MWh), or such lesser amount as specified by Buyer to Seller in writing, provided that such lesser amount specified by Buyer will not apply until the first day of the first calendar month commencing at least ten (10) Business Days after delivery of Buyer's notice. For the avoidance of doubt, the DA Price Floor will be a single value that applies for the entire calendar month.

"**Daily Delay Damages**" ████████████████████████████████████
████████████████████████████████████

"**Damage Payment**" means the amount of the Development Security.

"**Day-Ahead Forecast**" has the meaning set forth in Section 4.3.

"**Day-Ahead Market**" has the meaning set forth in the CAISO Tariff.

"**Day-Ahead Schedule**" has the meaning set forth in the CAISO Tariff.

"**Deemed Delivered Energy**" means the amount of Energy expressed in MWh that the Generating Facility would have produced and delivered to the Delivery Point or to the Storage Facility, but that is not produced by the Generating Facility during a Curtailment Period or Market

Curtailment Period, which amount shall be equal to the result of the equation provided by Seller to reasonably calculate the potential generation of the Generating Facility as a function of Available Capacity, temperature, and insolation and using relevant Facility availability, weather and other pertinent data for the period of time during the Curtailment Period or Market Curtailment Period (or other relevant period), less the amount of Curtailed Unscheduled DA Forecast Volume, PV Energy delivered to the Delivery Point, and Charging Energy delivered to the Storage Facility during the Curtailment Period or Market Curtailment Period (or other relevant period); *provided* that, if the applicable difference is negative, the Deemed Delivered Energy shall be zero (0).

"**Defaulting Party**" has the meaning set forth in Section 11.1(a).

"**Deficient Month**" has the meaning set forth in Section 4.8(e).

"**Delay Damages**" means Daily Delay Damages and Commercial Operation Delay Damages.

"**Delivery Point**" has the meaning set forth in Exhibit A.

"**Delivery Term**" shall mean the period of Contract Years set forth on the Cover Sheet beginning on the Commercial Operation Date, unless terminated earlier in accordance with the terms and conditions of this Agreement.

"**Development Cure Period**" has the meaning set forth in Exhibit B.

"**Development Security**" ███████████████████████████████████████ ███████████████

"**Discharging Energy**" means all Energy delivered to the Delivery Point from the Storage Facility, net of the Electrical Losses, as measured at the Storage Facility Metering Points by the Storage Facility Meter. For the avoidance of doubt, all Discharging Energy will have originally been delivered to the Storage Facility as Charging Energy.

"**Early Termination Date**" has the meaning set forth in Section 11.2(a).

"**Effective Date**" has the meaning set forth on the Preamble.

"**Effective FCDS Date**" means the date identified in Seller's Notice to Buyer (along with a Full Capacity Deliverability Status Finding from CAISO) as the date that the Facility has attained Full Capacity Deliverability Status.

"**Electrical Losses**" means all transmission or transformation losses between the Facility and the Delivery Point, including losses associated with delivery of PV Energy or Discharging Energy, as applicable, to the Delivery Point.

"**Eligible Intermittent Resource Protocol**" or "**EIRP**" has the meaning set forth in the CAISO Tariff or a successor CAISO program for intermittent resources.

"**Eligible Renewable Energy Resource**" has the meaning set forth in California Public Utilities Code Section 399.12(e) and California Public Resources Code Section 25741(a), as either code provision is amended or supplemented from time to time.

"**Energy**" means electrical energy generated by the Generating Facility.

"**Energy Supply Bid**" has the meaning set forth in the CAISO Tariff.

"**Environmental Costs**" means costs incurred in connection with acquiring and maintaining all environmental permits and licenses for the Product, and the Product's and Facility's compliance with all applicable environmental Laws, rules and regulations, including capital costs for pollution mitigation or installation of emissions control equipment required to permit or license the Product or Facility, all operating and maintenance costs for operation of pollution mitigation or control equipment, costs of permit maintenance fees and emission fees as applicable, and the costs of all emission reduction credits, marketable emission trading credits, and any costs related to greenhouse gas emissions, required by any applicable environmental Laws, rules, regulations, and permits to operate, and costs associated with the disposal and clean-up of hazardous substances introduced to a Site or the Facility.

"**Event of Default**" has the meaning set forth in Section 11.1.

"**Excess MWh**" has the meaning set forth in Exhibit C.

"**Executed Interconnection Agreement Milestone**" means the date for completion of execution of the Interconnection Agreement by Seller and the PTO as set forth on the Cover Sheet.

"**Expected Commercial Operation Date**" is the date set forth on the Cover Sheet by which Seller reasonably expects to achieve Commercial Operation.

"**Expected Construction Start Date**" is the date set forth on the Cover Sheet by which Seller reasonably expects to achieve Construction Start.

"**Expected Energy**" means the quantity of Facility Energy that Seller expects to be able to deliver to Buyer from the Facility during each Contract Year, which is the quantity specified on the Cover Sheet for each Contract Year.

"**Facility**" means the Generating Facility and, following Seller's exercise of its option to add an integrated energy storage facility pursuant to Section 2.3, the Storage Facility.

"**Facility Energy**" means the sum of PV Energy and Discharging Energy, net of Electrical Losses and Station Use, as measured by the Facility Meter, which Facility Meter will be adjusted in accordance with CAISO meter requirements and Prudent Operating Practices to account for Electrical Losses and Station Use.

"**Facility Meter**" means the CAISO Approved Meter that will measure all Facility Energy. Without limiting Seller's obligation to deliver Facility Energy to the Delivery Point, the Facility Meter will be located, and Facility Energy will be measured, at the low voltage or high voltage side of the main step up transformer and will be subject to adjustment in accordance with CAISO

meter requirements and Prudent Operating Practices to account for Electrical Losses and Station Use.

"**FERC**" means the Federal Energy Regulatory Commission.

"**Financial Close**" means Seller or one of its Affiliates has obtained debt or equity financing commitments from one or more Lenders sufficient to construct the Facility, including such financing commitments from Seller's owner(s).

"**Financing Milestone**" ███████████████████████████████████████
████████████████████████████████████████████████████████

"**Force Majeure Event**" has the meaning set forth in Section 10.1.

"**Forced Facility Outage**" means an unexpected failure of one or more components of the Facility or any outage on the Transmission System that prevents Seller from generating Energy or making Facility Energy available at the Delivery Point and that is not the result of a Force Majeure Event.

"**Forward Certificate Transfers**" has the meaning set forth in Section 4.8(a).

"**Full Capacity Deliverability Status**" has the meaning set forth in the CAISO Tariff.

"**Full Capacity Deliverability Status Finding**" means a written confirmation from the CAISO that the Facility is eligible for Full Capacity Deliverability Status.

"**Future Environmental Attributes**" shall mean any and all emissions, air quality or other environmental attributes other than Green Attributes or Renewable Energy Incentives under the RPS regulations or under any and all other international, federal, regional, state or other law, rule, regulation, bylaw, treaty or other intergovernmental compact, decision, administrative decision, program (including any voluntary compliance or membership program), competitive market or business method (including all credits, certificates, benefits, and emission measurements, reductions, offsets and allowances related thereto) that are attributable, now, or in the future, to the generation of electrical energy by the Facility.  Future Environmental Attributes do not include (i) any energy, capacity, reliability or other power attributes from the Facility, or (ii) investment tax credits or production tax credits associated with the construction or operation of the Facility, or other financial incentives in the form of credits, reductions, or allowances associated with the Facility that are applicable to a state or federal income taxation obligation.

"**Gains**" means, with respect to any Party, an amount equal to the present value of the economic benefit to it, if any (exclusive of Costs), resulting from the termination of this Agreement for the remaining Contract Term, determined in a commercially reasonable manner.  Factors used in determining the economic benefit to a Party may include, without limitation, reference to information supplied by one or more third parties, which shall exclude Affiliates of the Non-Defaulting Party, including without limitation, quotations (either firm or indicative) of relevant rates, prices, yields, yield curves, volatilities, spreads or other relevant market data in the relevant markets, comparable transactions, forward price curves based on economic analysis of the relevant markets, settlement prices for comparable transactions at liquid trading hubs (e.g., SP-15), all of

which should be calculated for the remaining Contract Term, and include the value of Green Attributes and Generating Facility Capacity Attributes.

"**Generating Facility**" means the solar photovoltaic generating facility described on the Cover Sheet and in Exhibit A, located at the Site and including mechanical equipment and associated facilities and equipment required to deliver (i) PV Energy to the Delivery Point, and (ii) Charging Energy to the Storage Facility; provided, that the "Generating Facility" does not include the Storage Facility or the Shared Facilities.

"**Generating Facility Ancillary Services**" means all Ancillary Services, if any, that the Generating Facility is capable of providing without requiring a modification of the Generating Facility and that the Generating Facility would be capable of providing independently of the Storage Facility.

"**Generating Facility Capacity Attributes**" means any Capacity Attributes attributable to the Generating Facility that the Generating Facility would be capable of providing independently of the Storage Facility.

"**Governmental Authority**" means any federal, state, provincial, local or municipal government, any political subdivision thereof or any other governmental, congressional or parliamentary, regulatory, or judicial instrumentality, authority, body, agency, department, bureau, or entity with authority to bind a Party at law, including CAISO; *provided*, *however*, that "Governmental Authority" shall not in any event include any Party.

"**Green Attributes**" means any and all credits, benefits, emissions reductions, offsets, and allowances, howsoever entitled, attributable to the generation from the Facility and its displacement of conventional energy generation. Green Attributes include but are not limited to Renewable Energy Credits, as well as: (1) any avoided emissions of pollutants to the air, soil or water such as sulfur oxides (SOx), nitrogen oxides (NOx), carbon monoxide (CO) and other pollutants; (2) any avoided emissions of carbon dioxide (CO2), methane (CH4), nitrous oxide, hydrofluorocarbons, perfluorocarbons, sulfur hexafluoride and other greenhouse gases (GHGs) that have been determined by the United Nations Intergovernmental Panel on Climate Change, or otherwise by law, to contribute to the actual or potential threat of altering the Earth's climate by trapping heat in the atmosphere; (3) the reporting rights to these avoided emissions, such as Green Tag Reporting Rights. Green Tags are accumulated on a MWh basis and one Green Tag represents the Green Attributes associated with one (1) MWh of Facility Energy. Green Attributes do not include (i) any energy, capacity, reliability or other power attributes from the Facility, (ii) production tax credits associated with the construction or operation of the Facility and other financial incentives in the form of credits, reductions, or allowances associated with the Facility that are applicable to a state or federal income taxation obligation, (iii) fuel-related subsidies or "tipping fees" that may be paid to Seller to accept certain fuels, or local subsidies received by the generator for the destruction of particular preexisting pollutants or the promotion of local environmental benefits, or (iv) emission reduction credits encumbered or used by the Facility for compliance with local, state, or federal operating or air quality permits. If the Facility is a biomass or landfill gas facility and Seller receives any tradable Green Attributes based on the greenhouse gas reduction benefits or other emission offsets attributed to its fuel usage, it shall provide Buyer

with sufficient Green Attributes to ensure that there are zero net emissions associated with the production of electricity from the Facility.

"**Green Tag Reporting Rights**" means the right of a purchaser of renewable energy to report ownership of accumulated "green tags" in compliance with and to the extent permitted by applicable Law and include, without limitation, rights under Section 1605(b) of the Energy Policy Act of 1992, and any present or future federal, state or local certification program or emissions trading program, including pursuant to the WREGIS Operating Rules.

"**Guaranteed Capacity**" means the amount of generating capacity of the Generating Facility, as measured in MW at the Delivery Point, set forth on the Cover Sheet, as may be modified pursuant to Exhibit A.

"**Guaranteed Commercial Operation Date**" means the Expected Commercial Operation Date, as such date may be extended by the Development Cure Period.

"**Guaranteed Construction Start Date**" means the Expected Construction Start Date, as such date may be extended by the Development Cure Period.

"**Guaranteed Energy Production**" ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮

"**Guarantor**" means, with respect to Seller, a Person that is reasonably acceptable to Buyer or any Person that (a) does not already have any material credit exposure to Buyer under any other agreements, guarantees, or other arrangements at the time its Guaranty is issued, (b) is an Affiliate of Seller, or other third party reasonably acceptable to Buyer, (c) has a Credit Rating of BBB- or better from S&P or a Credit Rating of Baa3 or better from Moody's, (d) ▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, (e) is incorporated or organized in a jurisdiction of the United States and is in good standing in such jurisdiction, and (f) executes and delivers a Guaranty for the benefit of Buyer.

"**Guaranty**" means a guaranty from a Guarantor provided for the benefit of Buyer substantially in the form attached as Exhibit L.

"**Hazardous Substance**" means, collectively, (a) any chemical, material or substance that is listed or regulated under applicable Laws as a "hazardous" or "toxic" substance or waste, or as a "contaminant" or "pollutant" or words of similar import, (b) any petroleum or petroleum products, flammable materials, explosives, radioactive materials, asbestos, urea formaldehyde foam insulation, and transformers or other equipment that contain polychlorinated biphenyls, and (c) any other chemical or other material or substance, exposure to which is prohibited, limited or regulated by any Laws.

"**Imbalance Energy**" means the amount of energy in MWh, in any given Settlement Period or Settlement Interval, by which the amount of Facility Energy deviates from the amount of Scheduled Energy.

"**Incremental RT Volume**" means, for each Settlement Interval, the positive difference, if any, of (a) the amount of PV Energy for such Settlement Interval, minus (b) the amount equal to (i) the DA Forecast Volume for such Settlement Interval, minus (ii) the Curtailed Unscheduled DA Forecast Volume for such Settlement Interval, if any.

"**Indemnifiable Loss(es)**" has the meaning set forth in Section 16.1.

"**Initial Synchronization**" means the initial delivery of Facility Energy to the Delivery Point.

"**Installed Capacity**" means the actual generating capacity of the Generating Facility, as measured in MW(ac) at the Delivery Point, that achieves Commercial Operation, adjusted for ambient conditions on the date of the performance test, and as evidenced by a certificate substantially in the form attached as Exhibit I hereto.

"**Interconnection Agreement**" means the interconnection agreement entered into by Seller pursuant to which the Facility will be interconnected with the Transmission System, and pursuant to which Seller's Interconnection Facilities and any other Interconnection Facilities will be constructed, operated and maintained during the Contract Term.

"**Interconnection Facilities**" means the interconnection facilities, control and protective devices and metering facilities required to connect the Facility with the Transmission System in accordance with the Interconnection Agreement.

"**Interest Rate**" has the meaning set forth in Section 8.2.

"**Interim Deliverability Status**" has the meaning set forth in the CAISO Tariff.

"**Inter-SC Trade**" or "**IST**" has the meaning set forth in the CAISO Tariff.

"**Investment Grade Credit Rating**" means a Credit Rating of BBB- or higher by S&P or Baa3 or higher by Moody's.

"**ITC**" means the investment tax credit established pursuant to Section 48 of the United States Internal Revenue Code of 1986.

"**Joint Powers Act**" means the Joint Exercise of Powers Act of the State of California (Government Code Section 6500 et seq.).

"**Joint Powers Agreement**" means that certain Joint Powers Agreement dated December 1, 2016, as amended from time to time, under which Buyer is organized as a Joint Powers Authority in accordance with the Joint Powers Act.

"**kW**" means kilowatts in alternating current, unless expressly stated in terms of direct current.

"**kWh**" means kilowatt-hour measured in alternating current, unless expressly stated in terms of direct current.

"**Law**" means any applicable law, statute, rule, regulation, decision, writ, order, decree or judgment, permit or any interpretation thereof, promulgated or issued by a Governmental Authority.

"**Lender**" means, collectively, any Person (i) providing senior or subordinated construction, interim, back leverage or long-term debt, equity or tax equity financing or refinancing for or in connection with the development, construction, purchase, installation or operation of the Facility, whether that financing or refinancing takes the form of private debt (including back-leverage debt), equity (including tax equity), public debt or any other form (including financing or refinancing provided to a member or other direct or indirect owner of Seller), including any equity or tax equity investor directly or indirectly providing financing or refinancing for the Facility or purchasing equity ownership interests of Seller or its Affiliates, and any trustee or agent or similar representative acting on their behalf, (ii) providing Interest Rate or commodity protection under an agreement hedging or otherwise mitigating the cost of any of the foregoing obligations or (iii) participating in a lease financing (including a sale leaseback or leveraged leasing structure) with respect to the Facility.

"**Letter(s) of Credit**" means one or more irrevocable, standby letters of credit issued by a U.S. commercial bank or a foreign bank with a U.S. branch with such bank having a Credit Rating of at least A- with an outlook designation of "stable" from S&P or A3 with an outlook designation of "stable" from Moody's, in a form substantially similar to the letter of credit set forth in Exhibit K.

"**Licensed Professional Engineer**" means an independent, professional engineer selected by Seller and reasonably acceptable to Buyer, licensed in the State of California.

"**Local Capacity Area Resources**" has the meaning set forth in the CAISO Tariff.

"**Locational Marginal Price**" or "**LMP**" has the meaning set forth in the CAISO Tariff.

"**Losses**" means, with respect to any Party, an amount equal to the present value of the economic loss to it, if any (exclusive of Costs), resulting from termination of this Agreement for the remaining Contract Term, determined in a commercially reasonable manner. Factors used in determining economic loss to a Party may include, without limitation, reference to information supplied by one or more third parties, which shall exclude Affiliates of the Non-Defaulting Party, including without limitation, quotations (either firm or indicative) of relevant rates, prices, yields, yield curves, volatilities, spreads or other relevant market data in the relevant markets, comparable transactions, forward price curves based on economic analysis of the relevant markets, settlement prices for comparable transactions at liquid trading hubs (e.g., SP-15), all of which should be calculated for the remaining Contract Term and must include the value of Green Attributes, Generating Facility Capacity Attributes, and Renewable Energy Incentives.

"**Lost Output**" has the meaning set forth in Section 4.7.

"**Major Project Development Milestone**" has the meaning set forth in in Exhibit B.

"**Market Curtailment Period**" means the period of time, as measured using current Settlement Intervals, during which Seller reduces generation of Energy during a Settlement Period

or Settlement Interval in which (i) the DA LMP at the Facility's PNode for such Settlement Interval or Settlement Period is less than the DA Price Floor, or (ii) the LMP for the Real-Time Market at the Facility's PNode for such Settlement Interval or Settlement Period is less than the RT Price Floor.

"**Master File**" has the meaning set forth in the CAISO Tariff.

"**Milestones**" means the development activities for significant permitting, interconnection, financing and construction milestones set forth on the Cover Sheet.

"**Monthly Delivery Forecast**" has the meaning set forth in Section 4.3(b).

"**Moody's**" means Moody's Investors Service, Inc.

"**MW**" means megawatts in alternating current, unless expressly stated in terms of direct current.

"**MWh**" means megawatt-hour measured in alternating current, unless expressly stated in terms of direct current.

"**NERC**" means the North American Electric Reliability Corporation or any successor entity performing similar functions.

"**Net Qualifying Capacity**" has the meaning set forth in the CAISO Tariff.

"**Network Upgrades**" has the meaning set forth in the CAISO Tariff.

"**Non-Defaulting Party**" has the meaning set forth in Section 11.2.

"**Notice**" shall, unless otherwise specified in the Agreement, mean written communications by a Party to be delivered by hand delivery, United States mail, overnight courier service, or electronic messaging (e-mail).

"**Notice of Claim**" has the meaning set forth in Section 16.2.

"**NP-15**" means the Existing Zone Generation Trading Hub for Existing Zone region NP15 as set forth in the CAISO Tariff.

"**On-Peak Hour**" means any hour from hour-ending 0700 to hour-ending 2200 (i.e., 6:00 AM to 9:59 PM) on Monday through Saturday, Pacific Prevailing Time, excluding North American Electric Reliability Council (NERC) holidays.

"**Operating Restrictions**" means those rules, requirements, and procedures set forth on Exhibit O.

"**Participating Transmission Owner**" or "**PTO**" means an entity that owns, operates and maintains transmission or distribution lines and associated facilities or has entitlements to use certain transmission or distribution lines and associated facilities where the Facility is

interconnected.  For purposes of this Agreement, the Participating Transmission Owner is set forth in <u>Exhibit A</u>.

"**Party**" or "**Parties**" has the meaning set forth in the Preamble.

"**Performance Measurement Period**" means each two (2) consecutive Contract Year period during the Delivery Term.

"**Performance Security**" ███████████████████████████████████████
███████████████████████

"**Permitted Transferee**" means any entity that satisfies, or is controlled by another Person that satisfies, the following requirements:

        (a)     A tangible net worth of not less than ██████████████████████ ████████ or a Credit Rating of at least BBB- from S&P, BBB- from Fitch, or Baa3 from Moody's; and

        (b)     At least two (2) years of experience in the ownership and operations of power generation facilities similar to the Generating Facility, or has retained a third-party with such experience to operate the Generating Facility.

"**Person**" means any individual, sole proprietorship, corporation, limited liability company, limited or general partnership, joint venture, association, joint-stock company, trust, incorporated organization, institution, public benefit corporation, unincorporated organization, government entity or other entity.

"**Planned Outage**" has the meaning set forth in Section 4.6(a).

"**PNode**" has the meaning set forth in the CAISO Tariff.

"**Portfolio**" means the single portfolio of electrical energy generating or other assets and entities, including the Facility (or the interests of Seller or Seller's Affiliates or the interests of their respective direct or indirect parent companies), that is pledged as collateral security in connection with a Portfolio Financing.

"**Portfolio Content Category**" means PCC1, PCC2 or PCC3, as applicable.

"**Portfolio Content Category 1**" or "**PCC1**" means any Renewable Energy Credit associated with the generation of electricity from an Eligible Renewable Energy Resource consisting of the portfolio content set forth in California Public Utilities Code Section 399.16(b)(1), as may be amended from time to time or as further defined or supplemented by Law.

"**Portfolio Content Category 2**" or "**PCC2**" means any Renewable Energy Credit associated with the generation of electricity from an Eligible Renewable Energy Resource consisting of the portfolio content set forth in California Public Utilities Code

Section 399.16(b)(2), as may be amended from time to time or as further defined or supplemented by Law.

"**Portfolio Content Category 3**" or "**PCC3**" means any Renewable Energy Credit associated with the generation of electricity from an Eligible Renewable Energy Resource consisting of the portfolio content set forth in California Public Utilities Code Section 399.16(b)(3), as may be amended from time to time or as further defined or supplemented by Law.

"**Portfolio Financing**" means any debt incurred by an Affiliate of Seller that is secured only by a Portfolio.

"**Portfolio Financing Entity**" means any Affiliate of Seller that incurs debt in connection with any Portfolio Financing.

"**Product**" means the Facility Energy, Generating Facility capacity, Generating Facility Ancillary Services, and all products, services and/or attributes similar to the foregoing which are or can be produced by or associated with the Generating Facility, including renewable attributes, Renewable Energy Credits, Generating Facility Capacity Attributes and Green Attributes.

"**Progress Report**" means a progress report including the items set forth in Exhibit E.

"**Prudent Operating Practice**" means (a) the applicable practices, methods and acts required by or consistent with applicable Laws and reliability criteria, and otherwise engaged in or approved by a significant portion of the electric utility and independent power producer industry during the relevant time period with respect to grid-interconnected, utility-scale generating facilities with integrated storage (if applicable) in the Western United States, or (b) any of the practices, methods and acts which, in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices, reliability, safety and expedition.  Prudent Operating Practice is not intended to be limited to the optimum practice, method or act to the exclusion of all others, but rather to acceptable practices, methods or acts generally accepted in the industry with respect to grid-interconnected, utility-scale generating facilities with integrated storage (if applicable) in the Western United States. Prudent Operating Practice includes compliance with applicable Laws, applicable reliability criteria, and the criteria, rules and standards promulgated in the National Electric Safety Code and the National Electrical Code, as they may be amended or superseded from time to time, including the criteria, rules and standards of any successor organizations.

"**PTC**" means the production tax credit established pursuant to Section 45 of the United States Internal Revenue Code of 1986.

"**PV Energy**" means the as-available Energy produced by the Generating Facility that is delivered directly to the Delivery Point and is not Discharging Energy.

"**Qualifying Capacity**" has the meaning set forth in the CAISO Tariff.

"**RA Capacity**" has the meaning set forth in the CAISO Tariff.

"**RA Deficiency Amount**" means the liquidated damages payment that Seller shall pay to Buyer for an applicable RA Shortfall Month as calculated in accordance with Section 3.8(b).

"**RA Guarantee Date**" ███████████████████████████████████████ ████████████

"**RAR**" means the resource adequacy requirements established for load serving entities by the CPUC pursuant to the Resource Adequacy Rulings, by CAISO under the CAISO Tariff, or by any other Governmental Authority having jurisdiction over resource adequacy.

"**RAR Showing**" means the RAR compliance showings (or similar or successor showings) a load-serving entity is required to make to the CPUC (and/or, to the extent authorized by the CPUC, to the CAISO), pursuant to the Resource Adequacy Rulings.

"**RA Shortfall Month**" means, for purposes of calculating an RA Deficiency Amount under Section 3.8(b), any month commencing after the RA Guarantee Date during which the Net Qualifying Capacity of the Facility for such month was less than the Stand-Alone Qualifying Capacity for such month.

"**Real-Time Market**" has the meaning set forth in the CAISO Tariff.

"**Real-Time Price**" means the Resource-Specific Settlement Interval LMP as defined in the CAISO Tariff.  If there is more than one applicable Real-Time Price for the same period of time, Real-Time Price shall mean the price associated with the smallest time interval.

"**Remedial Action Plan**" has the meaning in Section 2.4.

"**Renewable Energy Credit**" has the meaning set forth in California Public Utilities Code Section 399.12(h), as may be amended from time to time or as further defined or supplemented by Law.

"**Renewable Energy Incentives**" means: (a) all federal, state, or local Tax credits or other Tax benefits associated with the construction, ownership, or production of electricity from the Facility (including credits under Sections 38, 45, 46 and 48 of the Internal Revenue Code of 1986, as amended); (b) any federal, state, or local grants, subsidies or other like benefits relating in any way to the Facility; and (c) any other form of incentive relating in any way to the Facility that is not a Green Attribute or a Future Environmental Attribute.

"**Replacement Energy**" has the meaning set forth in Exhibit G.

"**Replacement RA**" means Resource Adequacy Benefits, if any, equivalent to those that would have been provided by the Generating Facility with respect to the applicable month in which a RA Deficiency Amount is due to Buyer, and located within SP-15.

"**Resource Adequacy Benefits**" means the rights and privileges attached to the Facility that satisfy any entity's resource adequacy obligations, as those obligations are set forth in any Resource Adequacy Rulings and includes any local, zonal or otherwise locational attributes associated with the Facility, in addition to flex attributes.

"**Resource Adequacy Rulings**" means CPUC Decisions 04-01-050, 04-10-035, 05-10-042, 06-04-040, 06-06-064, 06-07-031 06-07-031, 07-06-029, 08-06-031, 09-06-028, 10-06-036, 11-06-022, 12-06-025, 13-06-024 and any other existing or subsequent ruling or decision, or any other resource adequacy Law, however described, as such decisions, rulings, Laws, rules or regulations may be amended or modified from time-to-time throughout the Delivery Term.

"**RT Price Floor**" means zero dollars per MWh ($0/MWh), or such lesser amount as specified by Buyer to Seller in writing, provided that such lesser amount specified by Buyer will not apply until the first day of the first calendar month commencing at least ten (10) Business Days after delivery of Buyer's notice. For the avoidance of doubt, the RT Price Floor will be a single value that applies for the entire calendar month.

"**S&P**" means the Standard & Poor's Financial Services, LLC (a subsidiary of The McGraw-Hill Companies, Inc.).

"**Schedule**" has the meaning set forth in the CAISO Tariff, and "**Scheduled**" has a corollary meaning.

"**Scheduled DA Forecast Volume**" means, for each Settlement Interval, the lesser of (a) the DA Forecast Volume for such Settlement Interval or (b) the volume specified in the Day-Ahead Schedule for such Settlement Interval.

"**Scheduled Energy**" means the Facility Energy that clears under the applicable CAISO market based on the final Day-Ahead Schedule, FMM Schedule (as defined in the CAISO Tariff), or any other financially binding Schedule, market instruction or dispatch for the Facility for a given period of time implemented in accordance with the CAISO Tariff.

"**Scheduling Coordinator**" or "**SC**" means an entity certified by the CAISO as qualifying as a Scheduling Coordinator pursuant to the CAISO Tariff for the purposes of undertaking the functions specified in "Responsibilities of a Scheduling Coordinator," of the CAISO Tariff, as amended from time to time.

"**Security Interest**" has the meaning set forth in Section 8.9.

"**Self-Schedule**" has the meaning set forth in the CAISO Tariff.

"**Seller**" has the meaning set forth on the Cover Sheet.

"**Seller's WREGIS Account**" has the meaning set forth in Section 4.8(a).

"**Settlement Amount**" means the Non-Defaulting Party's Costs and Losses, on the one hand, netted against its Gains, on the other. If the Non-Defaulting Party's Costs and Losses exceed its Gains, then the Settlement Amount shall be an amount owing to the Non-Defaulting Party. If the Non-Defaulting Party's Gains exceed its Costs and Losses, then the Settlement Amount shall be zero dollars ($0). The Settlement Amount does not include consequential, incidental, punitive, exemplary or indirect or business interruption damages.

"**Settlement Interval**" has the meaning set forth in the CAISO Tariff.

"**Settlement Period**" has the meaning set forth in the CAISO Tariff.

"**Shared Facilities**" means the gen-tie lines, transformers, substations, or other equipment, permits, contract rights, and other assets and property (real or personal), in each case, as necessary to enable delivery of energy from the Facility (which is excluded from Shared Facilities) to the point of interconnection, including the Interconnection Agreement itself, that are used in common with third parties.

"**Showing Month**" means the calendar month of the Delivery Term that is the subject of Buyer's compliance with the requirements of the CPUC for Buyer's resource adequacy requirements. For illustrative purposes only, pursuant to the applicable CPUC decisions in effect as of the Effective Date, the monthly compliance showing made in June is for the Showing Month of August.

"**Site**" means the real property on which the Facility is or will be located, as further described in Exhibit A, and as shall be updated by Seller at the time Seller provides an executed Construction Start Date certificate in the form of Exhibit J to Buyer.

"**Site Control**" means that, for the Contract Term, Seller (or, prior to the Delivery Term, its Affiliate): (a) owns or has the option to purchase the Site; (b) is the lessee or has the option to lease the Site; or (c) is the holder of an easement or an option for an easement, right-of-way grant, or similar instrument with respect to the Site.

"**SP-15**" means the Existing Zone Generation Trading Hub for Existing Zone region SP15 as set forth in the CAISO Tariff.

"**Stand-Alone Qualifying Capacity**" means the Qualifying Capacity value that would be attributed to a stand-alone (without an integrated energy storage facility) electric generating facility employing the same technology as the Generating Facility and with a nameplate generating capacity equal to the Guaranteed Capacity. By way of example, as of the Effective Date, the Stand-Alone Qualifying Capacity for each month would be obtained by multiplying the Guaranteed Capacity of 100 MW (as of the Effective Date) by the corresponding ELCC factor for such month for solar electric generating facilities as set forth in the CAISO's "Final Net Qualifying Capacity Report for Compliance Year 2019" (as of the Effective Date, available at http://www.caiso.com/planning/Pages/ReliabilityRequirements/Default.aspx).

"**Station Use**" means:

(a)     The Energy produced by the Facility that is used within the Facility to power the lights, motors, control systems and other electrical loads that are necessary for operation of the Facility; and

(b)     The Energy produced by the Facility that is consumed within the Facility's electric energy distribution system as losses.

"**Storage Facility**" means, following Seller's exercise of its option to add an integrated energy storage facility pursuant to Section 2.3, the energy storage facility described in Exhibit A (including the operational requirements of the energy storage facility), located at the Site and including mechanical equipment and associated facilities and equipment required to deliver Discharging Energy to the Delivery Point (but excluding any Shared Facilities), and as such storage facility may be expanded or otherwise modified from time to time.

"**Storage Facility Ancillary Services**" means all Ancillary Services, if any, that the Storage Facility is capable of providing.

"**Storage Facility Capacity Attributes**" means any Capacity Attributes attributable to the Storage Facility, but excluding Storage Facility Ancillary Services.  For the avoidance of doubt, any Capacity Attributes attributable to the Facility in excess of the Generating Facility Capacity Attributes will be deemed to be Storage Facility Capacity Attributes.

"**Storage Facility Meter**" means the bi-directional revenue quality meter or meters (with a 0.3 accuracy class), along with a compatible data processing gateway or remote intelligence gateway, telemetering equipment and data acquisition services sufficient for monitoring, recording and reporting, in real time, the amount of Charging Energy delivered to the Storage Facility Metering Points and the amount of Discharging Energy discharged from the Storage Facility at the Storage Facility Metering Points to the Delivery Point for the purpose of invoicing in accordance with Section 8.1.  For clarity, the Facility will contain multiple measurement devices that will make up the Storage Facility Meter, and, unless otherwise indicated, references to the Storage Facility Meter shall mean all such measurement devices and the aggregated data of all such measurement devices, taken together.

"**Storage Facility Metering Points**" means the locations of the Storage Facility Meters shown on Exhibit P.

"**System Emergency**" means any condition that requires, as determined and declared by CAISO or the PTO, automatic or immediate action to (i) prevent or limit harm to or loss of life or property, (ii) prevent loss of transmission facilities or generation supply in the immediate vicinity of the Facility, or (iii) to preserve Transmission System reliability.

"**Tax**" or "**Taxes**" means all U.S. federal, state and local and any foreign taxes, levies, assessments, surcharges, duties and other fees and charges of any nature imposed by a Governmental Authority, whether currently in effect or adopted during the Contract Term, including ad valorem,  excise, franchise, gross receipts, import/export, license, property, sales and use, stamp,  transfer,  payroll, unemployment, income, and any and all items of withholding, deficiency, penalty, additions, interest or assessment related thereto.

"**Tax Credits**" means the PTC, ITC and any other state, local or federal production tax credit, depreciation benefit, tax deduction or investment tax credit specific to the production of renewable energy or investments in renewable energy facilities.

"**Terminated Transaction**" has the meaning set forth in Section 11.2(a).

"**Termination Payment**" has the meaning set forth in Section 11.3.

"**Test Energy**" means Facility Energy delivered (a) commencing on the later of (i) the first date that the CAISO informs Seller in writing that Seller may deliver Facility Energy to the CAISO and (ii) the first date that the PTO informs Seller in writing that Seller has conditional or temporary permission to parallel and (b) ending upon the occurrence of the Commercial Operation Date.

"**Transmission Provider**" means any entity or entities transmitting or transporting the Facility Energy on behalf of Seller or Buyer to or from the Delivery Point.

"**Transmission System**" means the transmission facilities operated by the CAISO, now or hereafter in existence, which provide energy transmission service downstream from the Delivery Point.

"**Ultimate Parent**" means _____, a [State of organization] [Type of entity].

"**Unscheduled DA Forecast Volume**" means, for each Settlement Interval, the positive difference, if any, of (a) the DA Forecast Volume for such Settlement Interval, minus (b) the volume specified in the Day-Ahead Schedule for such Settlement Interval.

"**Variable Energy Resource**" or "**VER**" has the meaning set forth in the CAISO Tariff.

"**WREGIS**" means the Western Renewable Energy Generation Information System or any successor renewable energy tracking program.

"**WREGIS Certificate Deficit**" has the meaning set forth in Section 4.8(e).

"**WREGIS Certificates**" has the same meaning as "Certificate" as defined by WREGIS in the WREGIS Operating Rules and are designated as eligible for complying with the California Renewables Portfolio Standard.

"**WREGIS Operating Rules**" means those operating rules and requirements adopted by WREGIS as of May 1, 2018, as subsequently amended, supplemented or replaced (in whole or in part) from time to time.

1.2     **Rules of Interpretation**.  In this Agreement, except as expressly stated otherwise or unless the context otherwise requires:

(a)     headings and the rendering of text in bold and italics are for convenience and reference purposes only and do not affect the meaning or interpretation of this Agreement;

(b)     words importing the singular include the plural and vice versa and the masculine, feminine and neuter genders include all genders;

(c)     the words "hereof", "herein", and "hereunder" and words of similar import shall refer to this Agreement as a whole and not to any particular provision of this Agreement;

(d)     a reference to an Article, Section, paragraph, clause, Party, or Exhibit is a reference to that Section, paragraph, clause of, or that Party or Exhibit to, this Agreement unless otherwise specified;

(e)     a reference to a document or agreement, including this Agreement means such document, agreement or this Agreement including any amendment or supplement to, or replacement, novation or modification of this Agreement, but disregarding any amendment, supplement, replacement, novation or modification made in breach of such document, agreement or this Agreement;

(f)     a reference to a Person includes that Person's successors and permitted assigns;

(g)     the term "including" means "including without limitation" and any list of examples following such term shall in no way restrict or limit the generality of the word or provision in respect of which such examples are provided;

(h)     references to any statute, code or statutory provision are to be construed as a reference to the same as it may have been, or may from time to time be, amended, modified or reenacted, and include references to all bylaws, instruments, orders and regulations for the time being made thereunder or deriving validity therefrom unless the context otherwise requires;

(i)     in the event of a conflict, a mathematical formula or other precise description of a concept or a term shall prevail over words providing a more general description of a concept or a term;

(j)     references to any amount of money shall mean a reference to the amount in United States Dollars;

(k)     words, phrases or expressions not otherwise defined herein that (i) have a generally accepted meaning in Prudent Operating Practice shall have such meaning in this Agreement or (ii) do not have well known and generally accepted meaning in Prudent Operating Practice but that have well known and generally accepted technical or trade meanings, shall have such recognized meanings; and

(l)     each Party acknowledges that it was represented by counsel in connection with this Agreement and that it or its counsel reviewed this Agreement and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

**ARTICLE 2**
**TERM; CONDITIONS PRECEDENT**

2.1     **Contract Term**.

(a)     The term of this Agreement shall commence on the Effective Date and shall remain in full force and effect until the conclusion of the Delivery Term, subject to any early termination provisions set forth herein ("**Contract Term**"); provided, however, that Buyer's obligations to pay for or accept any Product are subject to Seller's completion of the conditions precedent pursuant to Section 2.2.

(b)     Applicable provisions of this Agreement shall continue in effect after termination, including early termination, to the extent necessary to enforce or complete the duties, obligations or responsibilities of the Parties arising prior to termination.  The confidentiality obligations of the Parties under Article 18 and all indemnity and audit rights shall remain in full force and effect for five (5) years following the termination of this Agreement.

2.2     **Conditions Precedent**.  The Delivery Term shall not commence until Seller completes each of the following conditions:

(a)     Seller has delivered to Buyer (i) a completion certificate from a Licensed Professional Engineer substantially in the form of Exhibit H and (ii) a certificate from a Licensed Professional Engineer substantially in the form of Exhibit I setting forth the Installed Capacity on the Commercial Operation Date;

(b)     A Participating Generator Agreement and a Meter Service Agreement between Seller and CAISO shall have been executed and delivered and be in full force and effect, and a copy of each such agreement delivered to Buyer;

(c)     An Interconnection Agreement between Seller and the PTO shall have been executed and delivered and be in full force and effect and a copy of the Interconnection Agreement delivered to Buyer;

(d)     All applicable regulatory authorizations, approvals and permits for the operation of the Facility have been obtained (or if not obtained, applied for and reasonably expected to be received within 90 days) and all conditions thereof that are capable of being satisfied on the Commercial Operation Date have been satisfied and shall be in full force and effect;

(e)     Seller has received CEC Precertification of the Facility (and reasonably expects to receive final CEC Certification and Verification for the Facility in no more than one hundred eighty (180) days from the Commercial Operation Date);

(f)     Seller (with the reasonable participation of Buyer) shall have completed all applicable WREGIS registration requirements, including the completion and submittal of all applicable registration forms and supporting documentation, which may include applicable interconnection agreements, informational surveys related to the Facility, QRE service agreements, and other appropriate documentation required to effect Facility registration with WREGIS and to enable Renewable Energy Credit transfers related to the Facility within the WREGIS system;

(g)     Seller has delivered the Performance Security to Buyer in accordance with Section 8.8; and

(h)     Seller has paid Buyer for all amounts owing under this Agreement as of the Commercial Operation Date, if any, including Daily Delay Damages, and Commercial Operation Delay Damages.

2.3     **Development; Construction; Progress Reports**.  Within fifteen (15) days after the close of (i) each calendar quarter from the first calendar quarter following the Effective Date

until the Construction Start Date, and (ii) each calendar month from the first calendar month following the Construction Start Date until the Commercial Operation Date, Seller shall provide to Buyer a Progress Report and agree to regularly scheduled meetings between representatives of Buyer and Seller to review such monthly reports and discuss Seller's construction progress. The form of the Progress Report is set forth in Exhibit E. Seller shall also provide Buyer with any reasonable requested documentation (subject to confidentiality restrictions) directly related to the achievement of Milestones within ten (10) Business Days of receipt of such request by Seller.  For the avoidance of doubt, Seller is solely responsible for the design and construction of the Facility, including the location of the Site, obtaining all permits and approvals to build the Facility, the Facility layout, and the selection and procurement of the equipment comprising the Facility.  Seller has the right, but not the obligation, in its sole discretion, to incorporate an integrated energy storage facility into the Facility.  Prior to commencing construction on the Storage Facility, Seller will provide notice to Buyer with a revised Exhibit A and a revised Exhibit P reflecting the addition of the Storage Facility and the Storage Facility Meter, which will automatically supersede the prior version of Exhibit A and Exhibit P.

2.4    **Remedial Action Plan**.  If Seller misses three (3) or more Milestones, or misses any one (1) by more than ninety (90) days, except as the result of a Force Majeure Event or Buyer Default, Seller shall submit to Buyer, within ten (10) Business Days of such missed Milestone completion date (or the ninetieth (90th) day after the missed Milestone completion date, as applicable), a remedial action plan ("**Remedial Action Plan**"), which will describe in detail any delays (actual or anticipated) beyond the scheduled Milestone dates, including the cause of the delay (e.g., governmental approvals, financing, property acquisition, design activities, equipment procurement, project construction, interconnection, or any other factor), Seller's detailed description of its proposed course of action to achieve the missed Milestones and all subsequent Milestones by the Guaranteed Commercial Operation Date; provided, that delivery of any Remedial Action Plan shall not relieve Seller of its obligation to provide Remedial Action Plans with respect to any subsequent Milestones and to achieve the Guaranteed Commercial Operation Date in accordance with the terms of this Agreement.  Subject to the provisions of Exhibit B, so long as Seller complies with its obligations under this Section 2.4, Seller shall not be considered in default of its obligations under this Agreement solely as a result of missing any Milestone.

# ARTICLE 3
# PURCHASE AND SALE

3.1    **Purchase and Sale of Product**.

(a)    Subject to the terms and conditions of this Agreement, during the Delivery Term, Buyer will purchase and receive all the Product produced by or associated with the Facility at the Contract Price and in accordance with Exhibit C, and Seller shall supply and deliver to Buyer all the Product produced by or associated with the Facility. At its sole discretion, Buyer may during the Delivery Term re-sell or use for another purpose all or a portion of the Product, provided that no such re-sale or use shall relieve Buyer of any obligations hereunder. During the Delivery Term, Buyer will have exclusive rights to offer, bid, or otherwise submit the Product, or any component thereof but excluding Facility Energy, from the Facility after the Delivery Point for resale in the market or to any third party, and retain and receive any and all related revenues. Without limiting Buyer's obligation to make payments based on Charging Energy volume as described in Exhibit

C, Buyer has no obligation to purchase from Seller any Product for which the associated Facility Energy is not or cannot be delivered to the Delivery Point as a result of an outage of the Facility, a Force Majeure Event, or a Curtailment Order.  For the avoidance of doubt, the Product does not include any products, including Storage Facility Capacity Attributes and Storage Facility Ancillary Services, associated with the Storage Facility, except for the Discharging Energy and associated Green Attributes and except as provided in Section 3.7(e).

(b)     In addition to the Parties' rights and obligations under this Agreement with respect to the Facility, Seller agrees to sell and deliver and Buyer agrees to purchase and receive energy and associated environmental attributes (the "**Portfolio Product**") from one or more wind energy or solar photovoltaic electricity generating facilities (each, a "**Project**" and, collectively, the "**Portfolio**") in accordance with the following terms and conditions:

(i)     The "**Portfolio Product Delivery Term**" shall commence on ███████████ ████████████████████████████████████████ or the termination of this Agreement in accordance with its terms (the "**Delivery Cessation Date**"); provided that the Portfolio Product Delivery Term shall be extended solely for the purpose of transferring the WREGIS Certificates associated with the energy and environmental attributes delivered to Buyer prior to the Delivery Cessation Date, and such WREGIS Certificate transfers shall occur no later than April 15, 2023.

(ii)    The "**Contract Quantity of Portfolio Product**" is equal to the amount set forth in the table below for each applicable calendar year.

| Contract Quantity of Portfolio Product | 2020 (GWh) | 2021 (GWh) | 2022 (GWh) |
|---|---|---|---|
| | ██ | ██ | ██ |

(iii)   The "**Contract Price for Portfolio Product**" is equal to $██████ .

(iv)    If the aggregate Portfolio Product delivered by Seller for a calendar year in the Portfolio Product Delivery Term is less than the Contract Quantity of Portfolio Product for such calendar year, then Seller will pay Buyer liquidated damages in an amount equal to ████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████

(v)     Other terms and conditions regarding the Portfolio Product:

A.      The Portfolio Product shall meet the RPS compliance requirements for Category 1 as set forth in California Public Utilities Code Section

24

399.16(b)(1)(A) and California Public Utilities Commission ("CPUC") Decision 11-12-052.

B.   Each Project in the Portfolio shall be either a wind energy or solar photovoltaic electricity generating facility, and each Project either;

   1.   has a first point of interconnection with a California balancing authority; or

   2.   has its first point of interconnection with distribution facilities used to serve end users within a California balancing authority area; or

   3.   the generation from the Project is scheduled into a California balancing authority without substituting electricity from any other source, provided that, if another source provides real-time ancillary services required to maintain an hourly or subhourly import schedule into the California balancing authority only the fraction of the schedule actually generated by the Project from which the electricity is procured may count toward this Portfolio Product; or

   4.   the generation from the Project is scheduled into a California balancing authority pursuant to a dynamic transfer agreement between the balancing authority where the Project is located and the California balancing authority into which the generation is scheduled.

C.   The Parties acknowledge and agree that the Portfolio consists of a pool of Projects and that Seller will, in its sole discretion, utilize one or more of the Projects in order to satisfy its obligations hereunder during the Portfolio Product Delivery Term.  The Parties further acknowledge and agree that, during the Portfolio Product Delivery Term, Portfolio Product shall solely be limited to the actual Portfolio Product identified in advance by Seller in accordance with this paragraph, generated by the Portfolio, and delivered by Seller to satisfy the Contract Quantity of Portfolio Product, and that Buyer is not entitled to any additional energy and associated environmental attributes or other products produced by the Portfolio above and beyond the Contract Quantity of Portfolio Product or prior to or after the Portfolio Product Delivery Term.  During the Portfolio Product Delivery Term, Seller will deliver (I) the energy to the CAISO on Buyer's behalf at the CAISO interconnection point applicable to the Project from which the Portfolio Product is being delivered, and (II) the associated environmental attributes to Buyer through the transfer of WREGIS Certificates through WREGIS in accordance with Section 4.8. On a day ahead basis, Seller shall provide a notice via e-mail to Buyer at [Buyer email] identifying the volume of Portfolio Product to be provided by each Project comprising the Portfolio for the following day, which may be expressed as a percentage of the applicable Project's output for such

25

day.

D.   Seller has not sold the Renewable Energy Credits originally associated with the Portfolio Product to any other person or entity;

E.   Seller receives compensation directly from the CAISO for energy associated with the Portfolio Product that is imported or scheduled to the CAISO in real-time on Buyer's behalf, and Buyer acknowledges and agrees that Seller is entitled to retain all such CAISO compensation;

F.   If and to the extent that the Portfolio Product sold by Seller is a resale of part or all of a contract between Seller and one or more third parties, Seller represents, warrants and covenants that the resale complies with the following conditions in (1) through (5) throughout the Portfolio Product Delivery Term:

1.   The original upstream third-party contract(s) through which Seller acquires the Portfolio Product resold to Buyer meets the criteria of California Public Utilities Code Section 399.16(b)(1);

2.   This Agreement transfers only electricity and Renewable Energy Credits that have not yet been generated prior to the Effective Date;

3.   The electricity transferred by this Agreement is transferred to Buyer in real time;

4.   If the Product is scheduled from a Project that is not interconnected to a California balancing authority into a California balancing authority without substituting electricity from another source, the original hourly or subhourly schedule is maintained, and the three preceding conditions are met; and

5.   If the Project has an agreement to dynamically transfer electricity to a California balancing authority, the transactions implemented under this Agreement are not contrary to any condition imposed by a balancing authority participating in the dynamic transfer arrangement.

G.   Seller, or its designated scheduling coordinator, will perform all scheduling requirements applicable to the Portfolio Product.   All scheduling shall be performed consistent with all applicable CAISO and WECC prevailing protocols.

H.   For each month during the Portfolio Product Delivery Term, Buyer will pay Seller an amount equal to the Contract Price for Portfolio Product as multiplied by the portion of the Contract Quantity of Portfolio Product, as evidenced by WREGIS Certificates, transferred from Seller to Buyer through WREGIS in such month.   Invoicing and payment for Portfolio

Product shall be in accordance with Article 8.

      3.2    **Sale of Green Attributes**. During the Delivery Term, Seller shall sell and deliver to Buyer, and Buyer shall purchase and receive from Seller, all Green Attributes attributable to the Facility Energy generated by the Facility.

      3.3    **Imbalance Energy**. During the Delivery Term, CAISO payments and charges arising from Imbalance Energy shall be for the account of Seller.

      3.4    **Ownership of Renewable Energy Incentives**. Seller shall have all right, title and interest in and to all Renewable Energy Incentives.  Buyer acknowledges that any Renewable Energy Incentives belong to Seller.  If any Renewable Energy Incentives, or values representing the same, are initially credited or paid to Buyer, Buyer shall cause such Renewable Energy Incentives or values relating to same to be assigned or transferred to Seller without delay.  Buyer shall reasonably cooperate with Seller, at Seller's sole expense, in Seller's efforts to meet the requirements for any certification, registration, or reporting program relating to Renewable Energy Incentives.

      3.5    **Future Environmental Attributes**.

      (a)    The Parties acknowledge and agree that as of the Effective Date, environmental attributes sold under this Agreement are restricted to Green Attributes; however, Future Environmental Attributes may be created by a Governmental Authority through Laws enacted after the Effective Date. Subject to the final sentence of this Section 3.5, and Sections 3.5(b) and 3.12, in such event, Buyer shall bear all costs associated with the transfer, qualification, verification, registration and ongoing compliance for such Future Environmental Attributes, but there shall be no increase in the Contract Price. Upon Seller's receipt of Notice from Buyer of Buyer's intent to claim such Future Environmental Attributes, the Parties shall determine the necessary actions and additional costs associated with such Future Environmental Attributes. Seller shall have no obligation to alter the Facility or the operation of the Facility unless the Parties have agreed on all necessary terms and conditions relating to such alteration or change in operation and Buyer has agreed to reimburse Seller for all costs, losses, and liabilities associated with such alteration or change in operation.

      (b)    If Buyer elects to receive Future Environmental Attributes pursuant to Section 3.5, the Parties agree to negotiate in good faith with respect to the development of further agreements and documentation necessary to effectuate the transfer of such Future Environmental Attributes, including agreement with respect to (i) appropriate transfer, delivery and risk of loss mechanisms, and (ii) appropriate allocation of any additional costs to Buyer, as set forth above; *provided*, that the Parties acknowledge and agree that such terms are not intended to alter the other material terms of this Agreement.

      3.6    **Test Energy**.   Except to the extent that Seller elects, in its sole discretion to deliver Test Energy as part of the Portfolio Product, prior to the Commercial Operation Date, Buyer will have no obligation to purchase and Seller will have the right to sell all or any portion of the Product, including any Test Energy, to one or more third parties and retain all resulting revenue.

     3.7    **Capacity Attributes**. Seller shall request Full Capacity Deliverability Status in the CAISO generator interconnection process. As between Buyer and Seller, Seller shall be responsible for the cost and installation of any Network Upgrades associated with obtaining such Full Capacity Deliverability Status.

     (a)    Throughout the Delivery Term, subject to Section 3.12, Seller grants, pledges, assigns and otherwise commits to Buyer all the Generating Facility Capacity Attributes from the Generating Facility.

     (b)    Throughout the Delivery Term, Seller shall use commercially reasonable efforts to maintain eligibility for Full Capacity Deliverability Status or Interim Deliverability Status for the Facility from the CAISO and shall perform all actions necessary to ensure that the Facility qualifies to provide Resource Adequacy Benefits to Seller.

     (c)    Throughout the Delivery Term, Seller hereby covenants and agrees to transfer all Resource Adequacy Benefits and other Generating Facility Capacity Attributes associated with the Generating Facility to Buyer.

     (d)    For the duration of the Delivery Term, Seller shall take all reasonable actions, including complying with all applicable registration and reporting requirements, and execute all documents or instruments necessary to enable Buyer to use all of the Generating Facility Capacity Attributes committed by Seller to Buyer pursuant to this Agreement.

     (e)    No later than one (1) year prior to the Guaranteed Commercial Operation Date, Seller will provide notice to Buyer (the "**Storage Facility Capacity Notice**") describing the expected discharge capacity (in MW) of the Storage Facility that can be sustained for four (4) hours ("**Storage Capacity**"), if any.  For the avoidance of doubt, Seller has no obligation to develop a Storage Facility, and the expected Storage Capacity specified by Seller in the Storage Facility Capacity Notice may be zero (0) MW. Following Seller's delivery of the Storage Facility Capacity Notice, Buyer will have the right for ninety (90) days to elect to purchase the Resource Adequacy Benefits and other Storage Facility Capacity Attributes associated with the Storage Facility at a price ("**Storage Facility RA Capacity Price**") and corresponding delivery term ("**Storage Facility RA Capacity Delivery Term**")

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

The Storage Facility RA Capacity Price shall be multiplied by the amount of RA Capacity associated with the Storage Facility that Buyer can claim in its RAR Showing for the applicable Showing Month ("**Monthly Storage Facility RA Payment**"), and such payment will be made by Buyer to Seller in arrears following the Showing Month.  If Buyer elects to purchase the Resource Adequacy Benefits and other Storage Facility Capacity Attributes associated with the Storage Facility, Buyer must exercise this right by providing written notice of such election to Seller ("**Buyer Exercise Notice**") no later than ninety (90) days after Seller delivers the Storage Facility Capacity Notice, which Buyer Exercise Notice must specify the Storage Facility Capacity Price and corresponding Storage Facility Capacity Delivery Term selected by Buyer.  If Buyer does not deliver its Buyer Exercise Notice to Seller within ninety (90) days after Seller delivers the Storage Facility Capacity Notice, then Buyer will be deemed to have declined to purchase the Resource

Adequacy Benefits and other Storage Facility Capacity Attributes associated with the Storage Facility and Seller will no longer have any obligation to offer or sell such Resource Adequacy Benefits and other Storage Facility Capacity Attributes associated with the Storage Facility to Buyer.  If Buyer timely delivers a valid Buyer Exercise Notice in accordance with this Section 3.7(e), then:

    i.    Prior to the start of the Storage Facility Capacity Delivery Term, Seller will deliver to Buyer a certificate from a Licensed Professional Engineer stating the actual tested Storage Capacity of the Storage Facility ("Initial Storage Capacity").

    ii.    Throughout the Storage Facility Capacity Delivery Term, subject to Section 3.12, Seller grants, pledges, assigns and otherwise commits to Buyer all the Storage Facility Capacity Attributes from the Storage Facility.  Buyer acknowledges that the amount of RA Capacity associated with the Storage Facility may change over time, and Seller's obligation to provide RA Capacity from the Storage Facility for any Showing Month is limited to the amount of RA Capacity associated with the Storage Facility that is available for such Showing Month.

    iii.    Throughout the Storage Facility Capacity Delivery Term, Seller shall use commercially reasonable efforts to maintain eligibility for Full Capacity Deliverability Status or Interim Deliverability Status for the Facility from the CAISO and shall perform all actions necessary to ensure that the Facility qualifies to provide Resource Adequacy Benefits to Seller.

    iv.    Throughout the Storage Facility Capacity Delivery Term, Seller hereby covenants and agrees to transfer all Resource Adequacy Benefits and other Storage Facility Capacity Attributes associated with the Storage Facility to Buyer.

    v.    For the duration of the Storage Facility Capacity Delivery Term, Seller shall take all reasonable actions, including complying with all applicable registration and reporting requirements, and execute all documents or instruments necessary to enable Buyer to use all of the Storage Facility Capacity Attributes committed by Seller to Buyer pursuant to this Agreement.

    vi.    For each month of the Storage Facility Capacity Delivery Term, Buyer will pay Seller the Monthly Storage Facility RA Payment.  Invoicing and payment for the Monthly Storage Facility RA Payment shall be in accordance with Article 8.

    vii.    To the extent necessary to implement this Section 3.7(e), the Parties will work in good faith to negotiate a separate agreement or addendum for the purchase and sale of Resource Adequacy Benefits and other Storage Facility Capacity Attributes associated with capacity from the Storage Facility.

3.8   **Resource Adequacy Failure**.

(a)   RA Deficiency Determination.  For each RA Shortfall Month, Seller shall pay to Buyer the RA Deficiency Amount as liquidated damages or provide Replacement RA, in each case, as the sole and exclusive remedy for the Generating Facility Capacity Attributes Seller failed to convey to Buyer.

(b)   RA Deficiency Amount Calculation.   Commencing on the Commercial Operation Date, for each RA Shortfall Month, Seller shall pay to Buyer an amount (the "**RA Deficiency Amount**") equal to the product of the difference, expressed in kW, of (i) the Stand-Alone Qualifying Capacity for such month, minus (ii) the Net Qualifying Capacity of the Facility for such month, ████████████████████████████████████████████████████ ████████  *provided* that Seller may, as an alternative to paying RA Deficiency Amounts, provide Replacement RA in the amount of (X) the Stand-Alone Qualifying Capacity with respect to such month, minus (Y) the Net Qualifying Capacity of the Facility with respect to such month, provided that any Replacement RA capacity is communicated by Seller to Buyer with Replacement RA product information in a written notice substantially in the form of Exhibit M at least seventy-five (75) days before the applicable CPUC operating month for the purpose of monthly RA reporting.

3.9   **CEC Certification and Verification**. Subject to Section 3.12, Seller shall take all necessary steps including, but not limited to, making or supporting timely filings with the CEC to obtain and maintain CEC Certification and Verification for the Facility throughout the Delivery Term, including compliance with all applicable requirements for certified facilities set forth in the current version of the *RPS Eligibility Guidebook* (or its successor).  Seller shall obtain CEC Precertification by the Commercial Operation Date. Within thirty (30) days after the Commercial Operation Date, Seller shall apply with the CEC for final CEC Certification and Verification. Subject to Section 3.12, within one hundred eighty (180) days after the Commercial Operation Date, Seller shall obtain and maintain throughout the remainder of the Delivery Term the final CEC Certification and Verification.  Seller must promptly notify Buyer and the CEC of any changes to the information included in Seller's application for CEC Certification and Verification for the Facility.

3.10   **Eligibility**. Seller, and, if applicable, its successors, represents and warrants that throughout the Delivery Term of this Agreement that:  (i) the Facility qualifies and is certified by the CEC as an Eligible Renewable Energy Resource as such term is defined in Public Utilities Code Section 399.12 or Section 399.16; and (ii) the Facility's output delivered to Buyer qualifies under the requirements of the California Renewables Portfolio Standard.  To the extent a change in law occurs after execution of this Agreement that causes this representation and warranty to be materially false or misleading, it shall not be an Event of Default if Seller has used commercially reasonable efforts to comply with such change in law. The term "commercially reasonable efforts" as used in this Section 3.10 means efforts consistent with and subject to Section 3.12.

3.11   **California Renewables Portfolio Standard**. Subject to Section 3.12, Seller shall also take all other actions necessary to ensure that the Facility Energy is tracked for purposes of satisfying the California Renewables Portfolio Standard requirements, as may be amended or supplemented by the CPUC or CEC from time to time.

3.12    **Compliance Expenditure Cap**. If a change in Laws occurring after the Effective Date has increased Seller's known or reasonably expected costs to comply with Seller's obligations under this Agreement with respect to obtaining, maintaining, conveying or effectuating Buyer's use of (as applicable) any Product (including any obligations set forth in Section, 4.3 or 4.4, 4.5), then the Parties agree that the maximum aggregate amount of out-of-pocket costs and expenses ("**Compliance Costs**") Seller shall be required to bear during the Delivery Term to comply with all of such obligations shall be capped at ███████████████████ ██████████████ ("**Compliance Expenditure Cap**").  Seller's internal administrative costs associated with obtaining, maintaining, conveying or effectuating Buyer's use of (as applicable) any Product are excluded from the Compliance Expenditure Cap.

Any actions required for Seller to comply with its obligations set forth in the first paragraph above, the Compliance Costs of which will be included in the Compliance Expenditure Cap, shall be referred to collectively as the "**Compliance Actions**."

If Seller reasonably anticipates the need to incur Compliance Costs in excess of the Compliance Expenditure Cap in order to take any Compliance Action Seller shall provide Notice to Buyer of such anticipated Compliance Costs.

Buyer will have sixty (60) days to evaluate such Notice (during which time period Seller is not obligated to take any Compliance Actions described in the Notice) and shall, within such time, either (1) agree to reimburse Seller for all or some portion of the Compliance Costs that exceed the Compliance Expenditure Cap (such Buyer-agreed upon costs, the "**Accepted Compliance Costs**"), or (2) waive Seller's obligation to take such Compliance Actions, or any part thereof for which Buyer has not agreed to reimburse Seller. If Buyer does not respond to a Notice given by Seller under this Section 3.12 within sixty (60) days after Buyer's receipt of same, Buyer shall be deemed to have waived its rights to require Seller to take the Compliance Actions that are the subject of the Notice, and Seller shall have no further obligation to take, and no liability for any failure to take, these Compliance Actions for the remainder of the Term.

If Buyer agrees to reimburse Seller for the Accepted Compliance Costs, then Seller shall take such Compliance Actions covered by the Accepted Compliance Costs as agreed upon by the Parties and Buyer shall reimburse Seller for Seller's actual costs to effect the Compliance Actions, not to exceed the Accepted Compliance Costs, within sixty (60) days from the time that Buyer receives an invoice and documentation of such costs from Seller.

## ARTICLE 4
## OBLIGATIONS AND DELIVERIES

4.1    **Delivery**.

(a)    Energy.  Subject to the provisions of this Agreement, commencing on the Commercial Operation Date and through the end of the Contract Term, Seller shall supply and deliver the Product to Buyer at the Delivery Point, and Buyer shall take delivery of the Product at the Delivery Point in accordance with the terms of this Agreement. Seller will be responsible for paying or satisfying when due any costs or charges imposed in connection with the delivery of Facility Energy to the Delivery Point, including without limitation, Station Use, Electrical Losses,

and any operation and maintenance charges imposed on Seller by the Transmission Provider directly relating to the Facility's operations. Buyer shall be responsible for all costs, charges and penalties, if any, imposed in connection with the delivery of Facility Energy at and after the Delivery Point, including without limitation transmission costs and transmission line losses. The Facility Energy will be scheduled with the CAISO by Seller (or Seller's designated Scheduling Coordinator for the Facility) in accordance with <u>Exhibit D</u>.

(b)     <u>Green Attributes</u>.  All Green Attributes associated with the Facility during the Delivery Term are exclusively dedicated to and will be conveyed to Buyer. Seller represents and warrants that Seller holds the rights to all Green Attributes from the Facility, and Seller agrees to convey and hereby conveys all such Green Attributes to Buyer as included in the delivery of the Product from the Facility.

4.2     **<u>Title and Risk of Loss</u>**.

(a)     <u>Energy</u>.  Title to and risk of loss related to the Facility Energy, shall pass and transfer from Seller to Buyer at the Delivery Point. Seller warrants that all Product delivered to Buyer is free and clear of all liens, security interests, claims and encumbrances of any kind.

(b)     <u>Green Attributes</u>.  Title to and risk of loss related to the Green Attributes shall pass and transfer from Seller to Buyer upon the transfer of such Green Attributes in accordance with WREGIS.

4.3     **<u>Forecasting</u>**.  Seller shall provide the forecasts described below at its sole expense and in a format acceptable to Buyer (or Buyer's designee). Seller shall use reasonable efforts to provide forecasts that are accurate and, to the extent not inconsistent with the requirements of this Agreement, shall prepare such forecasts, or cause such forecasts to be prepared, in accordance with Prudent Operating Practices.

(a)     <u>Annual Forecast of Energy</u>.  No less than forty-five (45) days before (i) the first day of the first Contract Year of the Delivery Term and (ii) at the beginning of each calendar year for every subsequent Contract Year during the Delivery Term, Seller shall provide to Buyer a non-binding forecast of each month's average-day expected Energy and Facility Energy, by hour, for the following calendar year in a form substantially similar to the table found in <u>Exhibit F-1</u>, or as reasonably requested by Buyer.

(b)     <u>Monthly Forecast of Energy and Available Generating Capacity</u>.  No less than thirty (30) days before the Commercial Operation Date, and thereafter ten (10) Business Days before the beginning of each month during the Delivery Term, Seller shall provide to Buyer a non-binding forecast of the hourly expected Energy, Facility Energy, and Available Generating Capacity for each day of the following month in a form substantially similar to the table found in <u>Exhibit F-2</u> ("**<u>Monthly Delivery Forecast</u>**").

(c)     <u>Day-Ahead Forecast</u>.  By 5:30 AM Pacific Prevailing Time on the Business Day immediately preceding the date of delivery, or as otherwise specified by Buyer consistent with Prudent Operating Practice, Seller shall provide Buyer with a non-binding forecast of (i) Available Generating Capacity and (ii) hourly expected Energy, in each case, for each hour of the immediately succeeding day ("**<u>Day-Ahead Forecast</u>**"). A Day-Ahead Forecast provided in a

day prior to any non-Business Day(s) shall include non-binding forecasts for the immediate day, each succeeding non-Business Day and the next Business Day. Each Day-Ahead Forecast shall clearly identify, for each hour, Seller's non-binding best estimate of (i) the Available Generating Capacity and (ii) the hourly expected Energy.

4.4     **Reserved**.

4.5     **Reserved**.

4.6     **Reduction in Delivery Obligation**.  For the avoidance of doubt, and in no way limiting Section 3.1 or Exhibit G:

(a)     Facility Maintenance.  Seller shall be permitted to reduce deliveries of Product during any period of scheduled maintenance on the Facility, provided that, Seller shall provide Buyer one-hundred twenty (120) days' prior Notice of any scheduled maintenance and, between June 1st and September 30th, Seller shall not schedule non-emergency maintenance that reduces the Energy generation of the Facility by more than ten percent (10%), in each case, unless (i) such outage is required to avoid damage to the Facility, (ii) such maintenance is necessary to maintain equipment warranties and cannot be scheduled outside the period of June 1st to September 30th, (iii) such outage is required in accordance with prudent electrical practices, or (iv) the Parties agree otherwise in writing (each of the foregoing, a "**Planned Outage**").

(b)     Forced Facility Outage.  Seller shall be permitted to reduce deliveries of Product during any Forced Facility Outage.  Seller shall provide Buyer with Notice and expected duration (if known) of any Forced Facility Outage.

(c)     System Emergencies and other Interconnection Events.  Seller shall be permitted to reduce deliveries of Product during any period of System Emergency or upon Notice of a Curtailment Order pursuant to the terms of this Agreement, the Interconnection Agreement or applicable tariff.

(d)     Force Majeure Event. Seller shall be permitted to reduce deliveries of Product during any Force Majeure Event.

(e)     Buyer Default. Seller shall be permitted to reduce deliveries of Product during any period in which there is Buyer Default.

(f)     Market Curtailment Period.



(g)     Charging Energy.  Seller shall be permitted, but not obligated, in its sole discretion to reduce deliveries of PV Energy in order to provide Charging Energy to the Storage Facility; provided, however, that if Seller is required to reduce Facility Energy pursuant to a Curtailment Order or because the total Facility Energy output would otherwise exceed the capacity

limits of the Interconnection Facilities, Seller shall not allow Discharging Energy to displace PV Energy.

       (h)      Unscheduled DA Forecast Volume.



       (i)      <u>Health and Safety</u>.  Seller shall be permitted to reduce deliveries of Product as necessary to maintain health and safety pursuant to Section 6.2.

     4.7    **<u>Guaranteed Energy Production</u>**.  Seller shall be required to deliver to Buyer no less than the Guaranteed Energy Production in each Performance Measurement Period.  Seller shall be excused from achieving the Guaranteed Energy Production during any Performance Measurement Period only to the extent of any Force Majeure Events, System Emergency, Buyer's Default or other failure to perform, Curtailment Periods, or Market Curtailment Periods. For purposes of determining whether Seller has achieved the Guaranteed Energy Production, in addition to the Facility Energy and Replacement Energy delivered by Seller during the applicable Performance Measurement Period, Seller shall be deemed to have delivered to Buyer (1) any Deemed Delivered Energy, (2) Energy in the amount it could reasonably have delivered to Buyer but was prevented from delivering to Buyer by reason of any Force Majeure Events, System Emergency, Buyer's Default or other failure to perform, or Curtailment Periods ("**<u>Lost Output</u>**") during the applicable Performance Measurement Period, and (3) the amount of Energy during such Performance Measurement Period with respect to which Seller has already paid liquidated damages in accordance with <u>Exhibit G</u>.  If Seller fails to achieve the Guaranteed Energy Production amount in any Performance Measurement Period, Seller shall pay Buyer damages calculated in accordance with <u>Exhibit G</u>.

     4.8    **<u>WREGIS</u>**.  Seller shall, at its sole expense, but subject to Section 3.12, take all actions and execute all documents or instruments necessary to ensure that all WREGIS Certificates associated with all Renewable Energy Credits corresponding to all Facility Energy are issued and tracked for purposes of satisfying the requirements of the California Renewables Portfolio Standard and transferred in a timely manner to Buyer for Buyer's sole benefit.  Seller shall transfer the Renewable Energy Credits to Buyer.  Seller shall comply with all Laws, including the WREGIS Operating Rules, regarding the certification and transfer of such WREGIS Certificates to Buyer and Buyer shall be given sole title to all such WREGIS Certificates.  Seller shall be deemed to have satisfied the warranty in Section 4.8(g), provided that Seller fulfills its obligations under Sections 4.8(a) through 4.8(g) below. In addition:

       (a)     Prior to the Commercial Operation Date, Seller shall register the Facility with WREGIS and establish an account with WREGIS ("**<u>Seller's WREGIS Account</u>**"), which Seller shall maintain until the end of the Delivery Term.  Seller shall transfer the WREGIS Certificates using "**<u>Forward Certificate Transfers</u>**" (as described in the WREGIS Operating Rules) from Seller's WREGIS Account to the WREGIS account(s) of Buyer or the account(s) of

a designee that Buyer identifies by Notice to Seller ("**Buyer's WREGIS Account**").  Seller shall be responsible for all expenses associated with registering the Facility with WREGIS, establishing and maintaining Seller's WREGIS Account, paying WREGIS Certificate issuance and transfer fees, and transferring WREGIS Certificates from Seller's WREGIS Account to Buyer's WREGIS Account.

(b)     Seller shall cause Forward Certificate Transfers to occur on a monthly basis in accordance with the certification procedure established by the WREGIS Operating Rules.  Since WREGIS Certificates will only be created for whole MWh amounts of Facility Energy generated, any fractional MWh amounts (i.e., kWh) will be carried forward until sufficient generation is accumulated for the creation of a WREGIS Certificate.

(c)     Seller shall, at its sole expense, ensure that the WREGIS Certificates for a given calendar month correspond with the Facility Energy for such calendar month as evidenced by the Facility's metered data.

(d)     Due to the ninety (90) day delay in the creation of WREGIS Certificates relative to the timing of invoice payment under Section 8.2, Buyer shall make an invoice payment for a given month in accordance with Section 8.2 before the WREGIS Certificates for such month are formally transferred to Buyer in accordance with the WREGIS Operating Rules and this Section 4.8.  Notwithstanding this delay, Buyer shall have all right and title to all such WREGIS Certificates upon payment to Seller in accordance with Section 8.2.

(e)     A "**WREGIS Certificate Deficit**" means any deficit or shortfall in WREGIS Certificates delivered to Buyer for a calendar month as compared to the Facility Energy for the same calendar month ("**Deficient Month**") caused by an error or omission of Seller. If any WREGIS Certificate Deficit is caused, or the result of any action or inaction by Seller, then the amount of PV Energy in the Deficient Month shall be reduced by the amount of the WREGIS Certificate Deficit for purposes of (i) calculating Buyer's payment to Seller under Article 8, which shall result in a credit to Buyer equal to the product of the WREGIS Certificate Deficit multiplied by the Contract Price, and (ii) the Guaranteed Energy Production for the applicable Contract Year; provided, however, that such adjustment shall not apply to the extent that Seller either (x) resolves the WREGIS Certificate Deficit as to such Deficient Month so that it takes effect for the calendar year during which Deficient Month occurred, but no later than May 1 of the following calendar year, or (y) provides Replacement Energy including associated WREGIS Certificates within the same calendar year during which the Deficient Month occurred, and such WREGIS Certificates are delivered to Buyer no later than May 1 of the following calendar year. Without limiting Seller's obligations under this Section 4.8, if a WREGIS Certificate Deficit is caused solely by an error or omission of WREGIS, the Parties shall cooperate in good faith to cause WREGIS to correct its error or omission.

(f)     If WREGIS changes the WREGIS Operating Rules after the Effective Date or applies the WREGIS Operating Rules in a manner inconsistent with this Section 4.8 after the Effective Date, the Parties promptly shall modify this Section 4.8 as reasonably required to cause and enable Seller to transfer to Buyer's WREGIS Account a quantity of WREGIS Certificates for each given calendar month that corresponds to the Facility Energy in the same calendar month.

(g)     Seller and, if applicable, its successors, represents and warrants that throughout the Delivery Term of this Agreement the renewable energy credits transferred to Buyer conform to the definition and attributes required for compliance with the California Renewables Portfolio Standard, as set forth in California Public Utilities Commission Decision 08-08-028, and as may be modified by subsequent decision of the California Public Utilities Commission or by subsequent legislation.  To the extent a change in law occurs after execution of this Agreement that causes this representation and warranty to be materially false or misleading, it shall not be an Event of Default if Seller has used commercially reasonable efforts to comply with such change in law. The term "commercially reasonable efforts" as used in this Section 4.8(g) means efforts consistent with and subject to Section 3.12.

(h)     Seller warrants that all necessary steps to allow the Renewable Energy Credits transferred to Buyer to be tracked in WREGIS will be taken prior to the first delivery under this Agreement.

4.9     **Green-e Certification**. Seller shall, at its sole expense, but subject to Section 3.12, take all actions and execute all documents or instruments necessary to ensure that the Facility is eligible for Green-e certification.

## ARTICLE 5
## TAXES

5.1     **Allocation of Taxes and Charges**. Seller shall pay or cause to be paid all Taxes on or with respect to the Facility or on or with respect to the sale and making available of Product to Buyer, that are imposed on Product prior to its delivery to Buyer at the time and place contemplated under this Agreement.  Buyer shall pay or cause to be paid all Taxes on or with respect to the delivery to and purchase by Buyer of Product that are imposed on Product at and after its delivery to Buyer at the time and place contemplated under this Agreement (other than withholding or other Taxes imposed on Seller's income, revenue, receipts or employees), if any. If a Party is required to remit or pay Taxes that are the other Party's responsibility hereunder, such Party shall promptly pay the Taxes due and then seek and receive reimbursement from the other for such Taxes. In the event any sale of Product hereunder is exempt from or not subject to any particular Tax, Buyer shall provide Seller with all necessary documentation within thirty (30) days after the Effective Date to evidence such exemption or exclusion. If Buyer does not provide such documentation, then Buyer shall indemnify, defend, and hold Seller harmless from any liability with respect to Taxes from which Buyer claims it is exempt.

5.2     **Cooperation**. Each Party shall use reasonable efforts to implement the provisions of and administer this Agreement in accordance with the intent of the Parties to minimize all Taxes, so long as no Party is materially adversely affected by such efforts. The Parties shall cooperate to minimize Tax exposure; *provided*, *however*, that neither Party shall be obligated to incur any financial or operational burden to reduce Taxes for which the other Party is responsible hereunder without receiving due compensation therefor from the other Party. All Product delivered by Seller to Buyer hereunder shall be a sale made at wholesale, with Buyer reselling such Product.

## ARTICLE 6
## MAINTENANCE OF THE FACILITY

6.1   **Maintenance of the Facility**. Seller shall comply with Law and Prudent Operating Practice relating to the operation and maintenance of the Facility and the generation and sale of Product.

6.2   **Maintenance of Health and Safety**. Seller shall take reasonable safety precautions with respect to the operation, maintenance, repair and replacement of the Facility.  If Seller becomes aware of any circumstances relating to the Facility that create an imminent risk of damage or injury to any Person or any Person's property, Seller shall take prompt action to prevent such damage or injury and shall give Notice to Buyer's emergency contact identified on Exhibit N of such condition.  Such action may include, to the extent reasonably necessary, disconnecting and removing all or a portion of the Facility, or suspending the supply of Facility Energy to Buyer.

6.3   **Shared Facilities**. The Parties acknowledge and agree that certain of the Shared Facilities and Interconnection Facilities, and Seller's rights and obligations under the Interconnection Agreement, may be subject to certain shared facilities or co-tenancy agreements to be entered into among Seller, the Participating Transmission Owner, Seller's Affiliates, or third parties pursuant to which certain Interconnection Facilities may be subject to joint ownership and shared maintenance and operation arrangements; *provided* that such agreements (i) shall permit Seller to perform or satisfy, and shall not purport to limit, its obligations hereunder and (ii) provide for separate metering of the Facility.

## ARTICLE 7
## METERING

7.1   **Metering**.  Seller shall measure the amount of Facility Energy using the Facility Meter, which will be subject to adjustment in accordance with applicable CAISO meter requirements and Prudent Operating Practices, including to account for Electrical Losses and Station Use. Seller shall measure the Charging Energy and the Discharging Energy using the Storage Facility Meters.  All meters will be operated pursuant to applicable CAISO-approved calculation methodologies and maintained as Seller's cost.  Subject to meeting any applicable CAISO requirements, the meters shall be programmed to adjust for all losses from such meter to the Delivery Point in a manner subject to Buyer's prior written approval, not to be unreasonably withheld.  Metering will be consistent with the Metering Diagram set forth as Exhibit P, as such exhibit may be updated from time to time by Seller subject to Buyer's prior written approval, not to be unreasonably withheld.  Each meter shall be kept under seal, such seals to be broken only when the meters are to be tested, adjusted, modified or relocated. In the event Seller breaks a seal, Seller shall notify Buyer as soon as practicable. In addition, Seller hereby agrees to provide all meter data to Buyer in a form reasonably acceptable to Buyer, and consents to Buyer obtaining from CAISO the CAISO meter data directly relating to the Facility and all inspection, testing and calibration data and reports. Seller and Buyer, or Buyer's Scheduling Coordinator, shall cooperate to allow both Parties to retrieve the meter reads from the CAISO Operational Meter Analysis and Reporting (OMAR) web or directly from the CAISO meter(s) at the Facility.

7.2   **Meter Verification**.  Annually, if Seller has reason to believe there may be a meter

malfunction, or upon Buyer's reasonable request, Seller shall test the meter. The tests shall be conducted by independent third parties qualified to conduct such tests. Buyer shall be notified seven (7) days in advance of such tests and have a right to be present during such tests. If a meter is inaccurate it shall be promptly repaired or replaced.

**ARTICLE 8**
**INVOICING AND PAYMENT; CREDIT**

8.1    **Invoicing**. Seller shall make good faith efforts to deliver an invoice to Buyer within ten (10) Business Days after the end of the prior monthly delivery period. Each invoice shall reflect (a) records of metered data, including CAISO metering and transaction data sufficient to document and verify the amount of Product delivered by the Facility, or the amount of Portfolio Product or Replacement Energy, as applicable, for any Settlement Period during the preceding month, including the amount of PV Energy delivered from the Generating Facility, Charging Energy supplied to the Storage Facility from the Generating Facility (if applicable), and the amount of Discharging Energy delivered from the Storage Facility (if applicable), the amount of Portfolio Product, Replacement RA and Replacement Energy delivered to Buyer (if any), the calculation of Deemed Delivered Energy, Lost Output, and Adjusted Energy Production, the LMP prices at the Delivery Point for each Settlement Interval, and the Contract Price applicable to such Product in accordance with Exhibit C, the Contract Price for Portfolio Product applicable to the Portfolio Product in accordance with Section 3.1(b), or the Replacement Green Attributes Price applicable to Replacement Green Attributes in accordance with Exhibit G; (b) access to any records, including invoices or settlement data from the CAISO, necessary to verify the accuracy of any amount; and (c) be in a format reasonably specified by Buyer, covering the services provided in the preceding month determined in accordance with the applicable provisions of this Agreement. Buyer shall, and shall cause its Scheduling Coordinator to, provide Seller with all reasonable access (including, in real time, to the maximum extent reasonably possible) to any records, including invoices or settlement data from the CAISO, forecast data and other information, all as may be necessary from time to time for Seller to prepare and verify the accuracy of all invoices.

8.2    **Payment**. Buyer shall make payment to Seller for Product by wire transfer or ACH payment to the bank account provided on each monthly invoice. Buyer shall pay undisputed invoice amounts within forty-five (45) days after receipt of the invoice, or the end of the prior monthly delivery period, whichever is later. If such due date falls on a weekend or legal holiday, such due date shall be the next Business Day. Payments made after the due date will be considered late and will bear interest on the unpaid balance. If the amount due is not paid on or before the due date or if any other payment that is due and owing from one Party to another is not paid on or before its applicable due date, a late payment charge shall be applied to the unpaid balance and shall be added to the next billing statement. Such late payment charge shall be calculated based on the 3-Month LIBOR rate published on the date of the invoice in The Wall Street Journal (or, if The Wall Street Journal is not published on that day, the next succeeding date of publication), plus two percent (2%) (the "**Interest Rate**"). If the due date occurs on a day that is not a Business Day, the late payment charge shall begin to accrue on the next succeeding Business Day.

8.3    **Books and Records**. To facilitate payment and verification, each Party shall maintain all books and records necessary for billing and payments, including copies of all invoices under this Agreement, for a period of at least three (3) years or as otherwise required by Law.

38

Upon five (5) Business Days' Notice to the other Party, either Party shall be granted access to the accounting books and records within the possession or control of the other Party pertaining to all invoices generated pursuant to this Agreement. Seller acknowledges that in accordance with California Government Code Section 8546.7, Seller may be subject to audit by the California State Auditor with regard to Seller's performance of this Agreement because the compensation under this Agreement exceeds $10,000.

8.4     **Payment Adjustments; Billing Errors**. Payment adjustments shall be made if Buyer or Seller discovers there have been good faith inaccuracies in invoicing that are not otherwise disputed under Section 8.5 or an adjustment to an amount previously invoiced or paid is required due to a correction of data by the CAISO; provided, that there shall be no adjustments to prior invoices based upon meter inaccuracies that are corrected more than one (1) calendar year after the end of the period subject to correction. If the required adjustment is in favor of Buyer, Buyer's next monthly payment shall be credited in an amount equal to the adjustment. If the required adjustment is in favor of Seller, Seller shall add the adjustment amount to Buyer's next monthly invoice. Adjustments in favor of either Buyer or Seller shall bear interest, until settled in full, in accordance with Section 8.2, accruing from the date on which the adjusted amount should have been due.

8.5     **Billing Disputes**. A Party may, in good faith, dispute the correctness of any invoice or any adjustment to an invoice rendered under this Agreement or adjust any invoice for any arithmetic or computational error within twelve (12) months of the date the invoice, or adjustment to an invoice, was rendered. In the event an invoice or portion thereof, or any other claim or adjustment arising hereunder, is disputed, payment of the undisputed portion of the invoice shall be required to be made when due. Any invoice dispute or invoice adjustment shall be in writing and shall state the basis for the dispute or adjustment. Payment of the disputed amount shall not be required until the dispute is resolved. Upon resolution of the dispute, any required payment shall be made within five (5) Business Days of such resolution along with interest accrued at the Interest Rate from and including the original due date to but excluding the date paid. Inadvertent overpayments shall be returned via adjustments in accordance with Section 8.4. Any dispute with respect to an invoice is waived if the other Party is not notified in accordance with this Section 8.5 within twelve (12) months after the invoice is rendered or subsequently adjusted, except to the extent any misinformation was from a third party not affiliated with any Party and such third party corrects its information after the twelve-month period. If an invoice is not rendered within twelve (12) months after the close of the month during which performance occurred, the right to payment for such performance is waived.

8.6     **Netting of Payments**. The Parties hereby agree that they shall discharge mutual debts and payment obligations due and owing to each other on the same date through netting, in which case all amounts owed by each Party to the other Party for the purchase and sale of Product during the monthly billing period under this Agreement or otherwise arising out of this Agreement, including any related damages calculated pursuant to Exhibit B, interest, and payments or credits, shall be netted so that only the excess amount remaining due shall be paid by the Party who owes it.

8.7     **Seller's Development Security**. ███████████████████████████████████████

Upon the earlier of (i) Seller's delivery of the Performance Security, or (ii) sixty (60) days after termination of this Agreement, Buyer shall return the Development Security to Seller, less the amounts drawn in accordance with this Agreement.  If the Development Security is a Letter of Credit and the issuer of such Letter of Credit (i) fails to maintain the minimum Credit Rating specified in the definition of Letter of Credit, (ii) indicates its intent not to renew such Letter of Credit and such Letter of Credit expires prior to the Commercial Operation Date, or (iii) fails to honor Buyer's properly documented request to draw on such Letter of Credit by such issuer, Seller shall have ten (10) Business Days to either post cash or deliver a substitute Letter of Credit that meets the requirements set forth in the definition of Development Security.

8.8    <u>**Seller's Performance Security**</u>. To secure its obligations under this Agreement, Seller shall deliver Performance Security to Buyer on or before the Commercial Operation Date. If the Performance Security is not in the form of cash or Letter of Credit, it shall be substantially in the form set forth in <u>Exhibit L</u>. Seller shall maintain the Performance Security in full force and effect, subject to any draws made by Buyer in accordance with this Agreement, until the following have occurred:  (A) the Delivery Term has expired or terminated early; and (B) all payment obligations of Seller then due and payable under this Agreement, including compensation for penalties, Termination Payment, indemnification payments or other damages are paid in full (whether directly or indirectly such as through set-off or netting). Following the occurrence of both events, Buyer shall promptly return to Seller the unused portion of the Performance Security. If the Performance Security is a Letter of Credit and the issuer of such Letter of Credit (i) fails to maintain the minimum Credit Rating set forth in the definition of Letter of Credit, (ii) indicates its intent not to renew such Letter of Credit and such Letter of Credit expires prior to the Commercial Operation Date, or (iii) fails to honor Buyer's properly documented request to draw on such Letter of Credit by such issuer, Seller shall have ten (10) Business Days to either post cash or deliver a substitute Letter of Credit that meets the requirements set forth in the definition of Performance Security.

8.9    <u>**First Priority Security Interest in Cash or Cash Equivalent Collateral**</u>. To secure its obligations under this Agreement, and until released as provided herein, Seller hereby grants to Buyer a present and continuing first-priority security interest ("<u>**Security Interest**</u>") in, and lien on (and right to net against), and assignment of the Development Security, Performance Security, any other cash collateral and cash equivalent collateral posted pursuant to Sections 8.7 and 8.8 and any and all interest thereon or proceeds resulting therefrom or from the liquidation thereof, whether now or hereafter held by, on behalf of, or for the benefit of Buyer, and Seller agrees to take all action as Buyer reasonably requires in order to perfect Buyer's Security Interest in, and lien on (and right to net against), such collateral and any and all proceeds resulting therefrom or from the liquidation thereof.

Upon or any time after the occurrence of an Event of Default caused by Seller, an Early Termination Date resulting from an Event of Default caused by Seller, or an occasion provided for in this Agreement where Buyer is authorized to retain all or a portion of the Development Security or Performance Security, Buyer may do any one or more of the following (in each case subject to

the final sentence of this Section 8.9):

(a)     Exercise any of its rights and remedies with respect to the Development Security and Performance Security, including any such rights and remedies under Law then in effect;

(b)     Draw on any outstanding Letter of Credit issued for its benefit and retain any cash held by Buyer as Development Security or Performance Security; and

(c)     Liquidate all Development Security or Performance Security (as applicable) then held by or for the benefit of Buyer free from any claim or right of any nature whatsoever of Seller, including any equity or right of purchase or redemption by Seller.

Buyer shall apply the proceeds of the collateral realized upon the exercise of any such rights or remedies to reduce Seller's obligations under this Agreement (Seller remains liable for any amounts owing to Buyer after such application), subject to Buyer's obligation to return any surplus proceeds remaining after these obligations are satisfied in full.

8.10     **Financial Statements**. In the event a Guaranty is provided as Performance Security in lieu of cash or a Letter of Credit, Seller shall provide to Buyer, or cause the Guarantor to provide to Buyer, unaudited quarterly and annual audited financial statements of the Guarantor (including a balance sheet and statements of income and cash flows), all prepared in accordance with generally accepted accounting principles in the United States, consistently applied.

## ARTICLE 9
## NOTICES

9.1     **Addresses for the Delivery of Notices**   Any Notice required, permitted, or contemplated hereunder shall be in writing, shall be addressed to the Party to be notified at the address set forth on Exhibit N or at such other address or addresses as a Party may designate for itself from time to time by Notice hereunder.

9.2     **Acceptable Means of Delivering Notice**.   Each Notice required, permitted, or contemplated hereunder shall be deemed to have been validly served, given or delivered as follows:  (a) if sent by United States mail with proper first class postage prepaid, three (3) Business Days following the date of the postmark on the envelope in which such Notice was deposited in the United States mail; (b) if sent by a regularly scheduled overnight delivery carrier with delivery fees either prepaid or an arrangement with such carrier made for the payment of such fees, the next Business Day after the same is delivered by the sending Party to such carrier; (c) if sent by electronic communication (including electronic mail or other electronic means) and if concurrently with the transmittal of such electronic communication the sending Party provides a copy of such electronic Notice by hand delivery or express courier, at the time indicated by the time stamp upon delivery; or (d) if delivered in person, upon receipt by the receiving Party.  Notwithstanding the foregoing, Notices of outages or other scheduling or dispatch information or requests, may be sent by electronic communication and shall be considered delivered upon successful completion of such transmission.

## ARTICLE 10
## FORCE MAJEURE

10.1 __Definition__.

(a) "**Force Majeure Event**" means any act or event that delays or prevents a Party from timely performing all or a portion of its obligations under this Agreement or from complying with all or a portion of the conditions under this Agreement if such act or event, despite the exercise of reasonable efforts, cannot be avoided by and is beyond the reasonable control (whether direct or indirect) of and without the fault or negligence of the Party relying thereon as justification for such delay, nonperformance, or noncompliance.

(b) Without limiting the generality of the foregoing, so long as the following events, despite the exercise of reasonable efforts, cannot be avoided by, and are beyond the reasonable control (whether direct or indirect) of and without the fault or negligence of the Party relying thereon as justification for such delay, nonperformance or noncompliance, a Force Majeure Event may include an act of God or the elements, such as flooding, lightning, hurricanes, tornadoes, or ice storms; explosion; fire; volcanic eruption; flood; epidemic; landslide; mudslide; sabotage; terrorism; earthquake; or other cataclysmic events; an act of public enemy; war; blockade; civil insurrection; riot; civil disturbance; or strikes or other labor difficulties caused or suffered by a Party or any third party except as set forth below.

(c) Notwithstanding the foregoing, the term "**Force Majeure Event**" does not include (i) economic conditions that render a Party's performance of this Agreement at the Contract Price unprofitable or otherwise uneconomic (including an increase in component costs for any reason, including foreign or domestic tariffs, Buyer's ability to buy electric energy at a lower price, or Seller's ability to sell the Product, or any component thereof, at a higher price, than under this Agreement); (ii) Seller's inability to obtain permits or approvals of any type for the construction, operation, or maintenance of the Facility, except to the extent such inability is caused by a Force Majeure Event; (iii) the inability of a Party to make payments when due under this Agreement, unless the cause of such inability is an event that would otherwise constitute a Force Majeure Event as described above that disables physical or electronic facilities necessary to transfer funds to the payee Party; (iv) a Curtailment Order; (v) Seller's inability to obtain sufficient labor, equipment, materials, or other resources to build or operate the Facility except to the extent such inability is caused by a Force Majeure Event; (vi) any equipment failure except if such equipment failure is caused by a Force Majeure Event; or (vii) Seller's inability to achieve Construction Start of the Facility following the Guaranteed Construction Start Date or achieve Commercial Operation following the Guaranteed Commercial Operation Date; it being understood and agreed, for the avoidance of doubt, that the occurrence of a Force Majeure Event may give rise to a Development Cure Period.

10.2 __No Liability If a Force Majeure Event Occurs__. Neither Seller nor Buyer shall be liable to the other Party in the event it is prevented from performing its obligations hereunder in whole or in part due to a Force Majeure Event. The Party rendered unable to fulfill any obligation by reason of a Force Majeure Event shall take reasonable actions necessary to promptly remove such inability. Nothing herein shall be construed as permitting that Party to continue to fail to perform after said cause has been removed. Neither Party shall be considered in breach or

default of this Agreement if and to the extent that any failure or delay in the Party's performance of one or more of its obligations hereunder is caused by a Force Majeure Event.  Notwithstanding the foregoing, the occurrence and continuation of a Force Majeure Event shall not (a) suspend or excuse the obligation of a Party to make any payments due hereunder, (b) suspend or excuse the obligation of Seller to achieve the Guaranteed Construction Start Date or the Guaranteed Commercial Operation Date beyond the extensions provided in a Development Cure Period, or (c) limit Buyer's right to declare an Event of Default pursuant to Section 11.1(b)(ii) or (iv) and receive a Damage Payment upon exercise of Buyer's rights pursuant to Section 11.2.

10.3   **Notice**.  In the event of any delay or nonperformance resulting from a Force Majeure Event, the Party suffering the Force Majeure Event shall (a) promptly notify the other Party in writing of the nature, cause, estimated date of commencement thereof, and the anticipated extent of any delay or interruption in performance, and (b) promptly notify the other Party in writing of the cessation or termination of such Force Majeure Event, all as known or estimated in good faith by the affected Party; *provided*, *however*, that a Party's failure to give timely Notice shall not affect such Party's ability to assert that a Force Majeure Event has occurred unless the delay in giving Notice materially prejudices the other Party.

10.4   **Termination Following Force Majeure Event.**



## ARTICLE 11
## DEFAULTS; REMEDIES; TERMINATION

11.1   **Events of Default**.  An "**Event of Default**" shall mean,

(a)   with respect to a Party (the "**Defaulting Party**") that is subject to the Event of Default the occurrence of any of the following:

(i)   the failure by such Party to make, when due, any payment required pursuant to this Agreement and such failure is not remedied within ten (10) Business Days after Notice thereof;

(ii)   any representation or warranty made by such Party herein is false or misleading in any material respect when made or when deemed made or repeated, and such default is not remedied within thirty (30) days after Notice thereof (or such longer additional period, not to exceed an additional sixty (60) days, if the Defaulting Party is unable to remedy such default within such initial thirty (30) days period despite exercising commercially reasonable efforts);

(iii)   the failure by such Party to perform any material covenant or obligation set forth in this Agreement (except to the extent constituting a separate Event of Default

43

set forth in this Section 11.1; and except for (1) a Portfolio Product shortfall, the exclusive remedies for which are set forth in Section 3.1(b)(iv), (2) the occurrence of an RA Shortfall Month, the exclusive remedies for which are set forth in Section 3.8, and (3) failures to achieve the Guaranteed Energy Production that do not trigger the provisions of Section 11.1(b)(iii), the exclusive remedies for which are set forth in Section 4.8) and such failure is not remedied within thirty (30) days after Notice thereof (or such longer additional period, not to exceed an additional ninety (90) days, if the Defaulting Party is unable to remedy such default within such initial thirty (30) days period despite exercising commercially reasonable efforts);

(iv)      such Party becomes Bankrupt;

(v)      such Party assigns this Agreement or any of its rights hereunder other than in compliance with Section 14.2 or 14.3, as applicable; or

(vi)      such Party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all of its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer, the resulting, surviving or transferee entity fails to assume all the obligations of such Party under this Agreement to which it or its predecessor was a party by operation of Law or pursuant to an agreement reasonably satisfactory to the other Party.

(b)      with respect to Seller as the Defaulting Party, the occurrence of any of the following:

(i)      if at any time during the Delivery Term, Seller delivers or attempts to deliver electric energy to the Delivery Point for sale under this Agreement that was not generated or discharged by the Facility, except for Replacement Energy;

(ii)      

(iii)      if not remedied within ten (10) days after Notice thereof, the failure by Seller to deliver a Remedial Action Plan prepared in accordance with Prudent Operating Practices, as required under Section 2.4;

(iv)      

(v)      

(vi) 

(vii)     failure by Seller to satisfy the collateral requirements pursuant to Sections 8.7 or 8.8 after Notice and expiration of the cure periods set forth therein, including the failure to replenish the Development Security or Performance Security amount in accordance with this Agreement in the event Buyer draws against either for any reason other than to satisfy a Damage Payment or a Termination Payment;

(viii)     with respect to any Guaranty provided for the benefit of Buyer, the failure by Seller to provide for the benefit of Buyer either (1) cash, (2) a replacement Guaranty from a different Guarantor meeting the criteria set forth in the definition of Guarantor, or (3) a replacement Letter of Credit from an issuer meeting the criteria set forth in the definition of Letter of Credit, in each case, in the amount required hereunder within ten (10) Business Days after Seller receives Notice of the occurrence of any of the following events:

(A)     if any representation or warranty made by the Guarantor in connection with this Agreement is false or misleading in any material respect when made or when deemed made or repeated, and such default is not remedied within thirty (30) days after Notice thereof;

(B)     the failure of the Guarantor to make any payment required or to perform any other material covenant or obligation in any Guaranty;

(C)     the Guarantor becomes Bankrupt;

(D)     the Guarantor shall fail to meet the criteria for an acceptable Guarantor as set forth in the definition of Guarantor;

(E)     the failure of the Guaranty to be in full force and effect (other than in accordance with its terms) prior to the indefeasible satisfaction of all obligations of Seller hereunder; or

(F)     the Guarantor shall repudiate, disaffirm, disclaim, or reject, in whole or in part, or challenge the validity of any Guaranty.

(ix)     with respect to any outstanding Letter of Credit provided for the benefit of Buyer that is not then required under this Agreement to be canceled or returned, the failure by Seller to provide for the benefit of Buyer either (1) cash, or (2) a substitute Letter of Credit from a different issuer meeting the criteria set forth in the definition of Letter of Credit, in

each case, in the amount required hereunder within five (5) Business Days after Seller receives Notice of the occurrence of any of the following events:

>> (A)     the issuer of the outstanding Letter of Credit shall fail to maintain a Credit Rating of at least A- by S&P or A3 by Moody's;

>> (B)     the issuer of such Letter of Credit becomes Bankrupt;

>> (C)     the issuer of the outstanding Letter of Credit shall fail to comply with or perform its obligations under such Letter of Credit and such failure shall be continuing after the lapse of any applicable grace period permitted under such Letter of Credit;

>> (D)     the issuer of the outstanding Letter of Credit shall fail to honor a properly documented request to draw on such Letter of Credit;

>> (E)     the issuer of the outstanding Letter of Credit shall disaffirm, disclaim, repudiate or reject, in whole or in part, or challenge the validity of, such Letter of Credit;

>> (F)     such Letter of Credit fails or ceases to be in full force and effect at any time; or

>> (G)     Seller shall fail to renew or cause the renewal of each outstanding Letter of Credit on a timely basis as provided in the relevant Letter of Credit and as provided in accordance with this Agreement, and in no event less than sixty (60) days prior to the expiration of the outstanding Letter of Credit.

11.2   **Remedies; Declaration of Early Termination Date**.  If an Event of Default with respect to a Defaulting Party shall have occurred and be continuing, the other Party ("**Non-Defaulting Party**") shall have the following rights:

> (a)     to send Notice, designating a day, no earlier than the day such Notice is deemed to be received and no later than twenty (20) days after such Notice is deemed to be received, as an early termination date of this Agreement ("**Early Termination Date**") that terminates this Agreement (the "**Terminated Transaction**") and ends the Delivery Term effective as of the Early Termination Date;

> (b)     to accelerate all amounts owing between the Parties, and to collect as liquidated damages (i) the Damage Payment (in the case of an Event of Default by Seller occurring before the Commercial Operation Date, including an Event of Default under Section 11.1(b)(ii)) or (ii) the Termination Payment calculated in accordance with Section 11.3 below (in the case of any other Event of Default by either Party);

> (c)     to withhold any payments due to the Defaulting Party under this Agreement;

> (d)     to suspend performance; or

(e)      to exercise any other right or remedy available at law or in equity, including specific performance or injunctive relief, except to the extent such remedies are expressly limited under this Agreement;

provided, that payment by the Defaulting Party of the Damage Payment or Termination Payment, as applicable, shall constitute liquidated damages and the Non-Defaulting Party's sole and exclusive remedy for any Terminated Transaction and the Event of Default related thereto.

11.3      **Termination Payment**.  The Termination Payment ("**Termination Payment**") for a Terminated Transaction shall be the aggregate of all Settlement Amounts plus any or all other amounts due to or from the Non-Defaulting Party (as of the Early Termination Date) netted into a single amount.  The Non-Defaulting Party shall calculate, in a commercially reasonable manner, a Settlement Amount for the Terminated Transaction as of the Early Termination Date.  Third parties supplying information for purposes of the calculation of Gains or Losses may include, without limitation, dealers in the relevant markets, end-users of the relevant product, information vendors and other sources of market information.  The Settlement Amount shall not include consequential, incidental, punitive, exemplary, indirect or business interruption damages. Without prejudice to the Non-Defaulting Party's duty to mitigate, the Non-Defaulting Party shall not have to enter into replacement transactions to establish a Settlement Amount.  Each Party agrees and acknowledges that (a) the actual damages that the Non-Defaulting Party would incur in connection with a Terminated Transaction would be difficult or impossible to predict with certainty, (b) the Damage Payment or Termination Payment described in Section 11.2 or this Section 11.3 (as applicable) is a reasonable and appropriate approximation of such damages, and (c) the Damage Payment or Termination Payment described in Section 11.2 or this Section 11.3 (as applicable) is the exclusive remedy of the Non-Defaulting Party in connection with a Terminated Transaction but shall not otherwise act to limit any of the Non-Defaulting Party's rights or remedies if the Non-Defaulting Party does not elect a Terminated Transaction as its remedy for an Event of Default by the Defaulting Party.

11.4      **Notice of Payment of Termination Payment**.  As soon as practicable after a Terminated Transaction, Notice shall be given by the Non-Defaulting Party to the Defaulting Party of the amount of the Damage Payment or Termination Payment, as applicable, and whether the Termination Payment, if applicable, is due to or from the Non-Defaulting Party. The Notice shall include a written statement explaining in reasonable detail the calculation of such amount and the sources for such calculation. The Termination Payment shall be made to or from the Non-Defaulting Party, as applicable, within ten (10) Business Days after such Notice is effective.

11.5      **Disputes With Respect to Termination Payment**.  If the Defaulting Party disputes the Non-Defaulting Party's calculation of the Termination Payment, in whole or in part, the Defaulting Party shall, within five (5) Business Days of receipt of the Non-Defaulting Party's calculation of the Termination Payment, provide to the Non-Defaulting Party a detailed written explanation of the basis for such dispute. Disputes regarding the Termination Payment shall be determined in accordance with Article 15.

11.6      **Rights And Remedies Are Cumulative**.  Except where an express and exclusive remedy or measure of damages is provided, the rights and remedies of a Party pursuant to this

Article 11 shall be cumulative and in addition to the rights of the Parties otherwise provided in this Agreement.

## ARTICLE 12
## LIMITATION OF LIABILITY AND EXCLUSION OF WARRANTIES.

12.1 **No Consequential Damages**. EXCEPT TO THE EXTENT PART OF AN EXPRESS REMEDY OR MEASURE OF DAMAGES HEREIN, OR PART OF AN ARTICLE 16 INDEMNITY CLAIM, OR INCLUDED IN A LIQUIDATED DAMAGES CALCULATION, OR ARISING FROM FRAUD OR INTENTIONAL MISREPRESENTATION, NEITHER PARTY SHALL BE LIABLE TO THE OTHER OR ITS INDEMNIFIED PERSONS FOR ANY SPECIAL, PUNITIVE, EXEMPLARY, INDIRECT, OR CONSEQUENTIAL DAMAGES, OR LOSSES OR DAMAGES FOR LOST REVENUE OR LOST PROFITS, WHETHER FORESEEABLE OR NOT, ARISING OUT OF, OR IN CONNECTION WITH THIS AGREEMENT.

12.2 **Waiver and Exclusion of Other Damages**. EXCEPT AS EXPRESSLY SET FORTH HEREIN, THERE IS NO WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND ANY AND ALL IMPLIED WARRANTIES ARE DISCLAIMED. THE PARTIES CONFIRM THAT THE EXPRESS REMEDIES AND MEASURES OF DAMAGES PROVIDED IN THIS AGREEMENT SATISFY THE ESSENTIAL PURPOSES HEREOF. ALL LIMITATIONS OF LIABILITY CONTAINED IN THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, THOSE PERTAINING TO SELLER'S LIMITATION OF LIABILITY AND THE PARTIES' WAIVER OF CONSEQUENTIAL DAMAGES, SHALL APPLY EVEN IF THE REMEDIES FOR BREACH OF WARRANTY PROVIDED IN THIS AGREEMENT ARE DEEMED TO "FAIL OF THEIR ESSENTIAL PURPOSE" OR ARE OTHERWISE HELD TO BE INVALID OR UNENFORCEABLE.

FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS AND EXCLUSIVE REMEDY OR MEASURE OF DAMAGES IS PROVIDED, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY, THE OBLIGOR'S LIABILITY SHALL BE LIMITED AS SET FORTH IN SUCH PROVISION, AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. IF NO REMEDY OR MEASURE OF DAMAGES IS EXPRESSLY PROVIDED HEREIN, THE OBLIGOR'S LIABILITY SHALL BE LIMITED TO DIRECT DAMAGES ONLY.

TO THE EXTENT ANY DAMAGES REQUIRED TO BE PAID HEREUNDER ARE LIQUIDATED, INCLUDING UNDER SECTIONS 3.1(b)(iv), 3.8, 4.7, 4.8, 11.2 AND 11.3, AND AS PROVIDED IN EXHIBIT B AND EXHIBIT G THE PARTIES ACKNOWLEDGE THAT THE DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE, THAT OTHERWISE OBTAINING AN ADEQUATE REMEDY IS INCONVENIENT, AND THAT THE LIQUIDATED DAMAGES CONSTITUTE A REASONABLE APPROXIMATION OF THE ANTICIPATED HARM OR LOSS. IT IS THE INTENT OF THE PARTIES THAT THE LIMITATIONS HEREIN IMPOSED ON REMEDIES AND THE MEASURE OF DAMAGES BE WITHOUT REGARD TO THE CAUSE OR CAUSES RELATED THERETO, INCLUDING THE NEGLIGENCE OF ANY PARTY, WHETHER SUCH NEGLIGENCE BE SOLE, JOINT

OR CONCURRENT, OR ACTIVE OR PASSIVE. THE PARTIES HEREBY WAIVE ANY RIGHT TO CONTEST SUCH PAYMENTS AS AN UNREASONABLE PENALTY.

THE PARTIES ACKNOWLEDGE AND AGREE THAT MONEY DAMAGES AND THE EXPRESS REMEDIES PROVIDED FOR HEREIN ARE AN ADEQUATE REMEDY FOR THE BREACH BY THE OTHER OF THE TERMS OF THIS AGREEMENT, AND EACH PARTY WAIVES ANY RIGHT IT MAY HAVE TO SPECIFIC PERFORMANCE WITH RESPECT TO ANY OBLIGATION OF THE OTHER PARTY UNDER THIS AGREEMENT.

## ARTICLE 13
## REPRESENTATIONS AND WARRANTIES; AUTHORITY

13.1    **Seller's Representations and Warranties**. As of the Effective Date, Seller represents and warrants as follows:

(a)    Seller is a limited liability company, duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation, and is qualified to conduct business in the state of California and each jurisdiction where the failure to so qualify would have a material adverse effect on the business or financial condition of Seller.

(b)    Seller has the power and authority to enter into and perform this Agreement and is not prohibited from entering into this Agreement or discharging and performing all covenants and obligations on its part to be performed under and pursuant to this Agreement. The execution, delivery and performance of this Agreement by Seller has been duly authorized by all necessary limited liability company action on the part of Seller and does not and will not require the consent of any trustee or holder of any indebtedness or other obligation of Seller or any other party to any other agreement with Seller.

(c)    The execution and delivery of this Agreement, consummation of the transactions contemplated herein, and fulfillment of and compliance by Seller with the provisions of this Agreement will not conflict with or constitute a breach of or a default under any Law presently in effect having applicability to Seller, subject to any permits that have not yet been obtained by Seller, the documents of formation of Seller or any outstanding trust indenture, deed of trust, mortgage, loan agreement or other evidence of indebtedness or any other agreement or instrument to which Seller is a party or by which any of its property is bound.

(d)    This Agreement has been duly executed and delivered by Seller. This Agreement is a legal, valid and binding obligation of Seller enforceable in accordance with its terms, except as limited by laws of general applicability limiting the enforcement of creditors' rights or by the exercise of judicial discretion in accordance with general principles of equity.

(e)    The Facility is located in the State of California.

(f)    Seller will be responsible for obtaining all permits necessary to construct and operate the Facility and Seller will be the applicant on any CEQA documents.

13.2    **Buyer's Representations and Warranties**.  As of the Effective Date, Buyer represents and warrants as follows:

(a)     Buyer is a joint powers authority and a validly existing community choice aggregator, duly organized, validly existing and in good standing under the laws of the State of California and the rules, regulations and orders of the California Public Utilities Commission, and is qualified to conduct business in each jurisdiction of the Joint Powers Agreement members. All Persons making up the governing body of Buyer are the elected or appointed incumbents in their positions and hold their positions in good standing in accordance with the Joint Powers Agreement and other Law.

(b)     Buyer has the power and authority to enter into and perform this Agreement and is not prohibited from entering into this Agreement or discharging and performing all covenants and obligations on its part to be performed under and pursuant to this Agreement, except where such failure does not have a material adverse effect on Buyer's performance under this Agreement. The execution, delivery and performance of this Agreement by Buyer has been duly authorized by all necessary action on the part of Buyer and does not and will not require the consent of any trustee or holder of any indebtedness or other obligation of Buyer or any other party to any other agreement with Buyer.

(c)     The execution and delivery of this Agreement, consummation of the transactions contemplated herein, and fulfillment of and compliance by Buyer with the provisions of this Agreement will not conflict with or constitute a breach of or a default under any Law presently in effect having applicability to Buyer, the documents of formation of Buyer or any outstanding trust indenture, deed of trust, mortgage, loan agreement or other evidence of indebtedness or any other agreement or instrument to which Buyer is a party or by which any of its property is bound.

(d)     This Agreement has been duly executed and delivered by Buyer. This Agreement is a legal, valid and binding obligation of Buyer enforceable in accordance with its terms, except as limited by laws of general applicability limiting the enforcement of creditors' rights or by the exercise of judicial discretion in accordance with general principles of equity.

(e)     Buyer warrants and covenants that with respect to its contractual obligations under this Agreement, it will not claim immunity on the grounds of sovereignty or similar grounds with respect to itself or its revenues or assets from (1) suit, (2) jurisdiction of court (provided that such court is located within a venue permitted in law and under the Agreement), (3) relief by way of injunction, order for specific performance or recovery of property, (4) attachment of assets, or (5) execution or enforcement of any judgment; provided, however that nothing in this Agreement shall waive the obligations or rights set forth in the California Tort Claims Act (Government Code Section 810 et seq.).

(f)     Buyer is a "local public entity" as defined in Section 900.4 of the Government Code of the State of California.

13.3    **General Covenants**.  Each Party covenants that commencing on the Effective Date and continuing throughout the Contract Term:

(a)     It shall continue to be duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation and to be qualified to conduct business in

California and each jurisdiction where the failure to so qualify would have a material adverse effect on its business or financial condition;

        (b)    It shall maintain (or obtain from time to time as required) all regulatory authorizations necessary for it to legally perform its obligations under this Agreement; and

        (c)    It shall perform its obligations under this Agreement in compliance with all terms and conditions in its governing documents and in material compliance with any Law.

13.4    **Prevailing Wage**.  Seller shall use reasonable efforts to ensure that all employees hired by Seller, and its contractors and subcontractors, that will perform construction work or provide services at the Site related to construction of the Facility are paid wages at rates not less than those prevailing for workers performing similar work in the locality as provided by applicable California law, if any ("**Prevailing Wage Requirement**").  Nothing herein shall require Seller, its contractors and subcontractors to comply with, or assume liability created by other inapplicable provisions of any California labor laws.  Buyer agrees that Seller's obligations under this Section 13.4 will be satisfied upon the execution of a project labor agreement related to construction of the Facility.

13.5    **Community Investment**.  Seller shall perform the obligations related to community investment set forth in Exhibit Q.

**ARTICLE 14**
**ASSIGNMENT**

14.1    **General Prohibition on Assignments**.  Except as provided in Section 14.2 and Section 14.3 below, neither Party may voluntarily assign this Agreement or its rights or obligations under this Agreement, without the prior written consent of the other Party,



The assigning Party shall be responsible for the other Party's reasonable costs associated with the preparation, review, execution and delivery of documents in connection with any assignment of this Agreement by the assigning Party, including without limitation reasonable attorneys' fees.

14.2    **Collateral Assignment**.  Subject to the provisions of this Section 14.2, Seller has the right to assign this Agreement as collateral for any financing or refinancing of the Facility.

In connection with any financing or refinancing of the Facility, Buyer shall in good faith work with Seller and Lender to agree upon a consent to collateral assignment of this Agreement ("**Collateral Assignment Agreement**"). The Collateral Assignment Agreement must be in form and substance agreed to by Buyer, Seller and Lender including with respect to the provisions set forth below, with such agreement not to be unreasonably withheld, and must include, among others, the following provisions:

(a)     Buyer shall give Notice of an Event of Default by Seller to the Person(s) to be specified by Lender in the Collateral Assignment Agreement, before exercising its right to terminate this Agreement as a result of such Event of Default; provided that such notice shall be provided to Lender at the time such notice is provided to Seller and any additional cure period of Lender agreed to in the Collateral Assignment Agreement shall not commence until Lender has received notice of such Event of Default;

(b)     Following an Event of Default by Seller under this Agreement, Buyer may require Seller or Lender to provide to Buyer a report concerning:

(i)     The status of efforts by Seller or Lender to develop a plan to cure the Event of Default;

(ii)     Impediments to the cure plan or its development;

(iii)     If a cure plan has been adopted, the status of the cure plan's implementation (including any modifications to the plan as well as the expected timeframe within which any cure is expected to be implemented); and

(iv)     Any other information which Buyer may reasonably require related to the development, implementation and timetable of the cure plan.

Seller or Lender must provide the report to Buyer within ten (10) Business Days after Notice from Buyer requesting the report. Buyer will have no further right to require the report with respect to a particular Event of Default after that Event of Default has been cured;

(c)     Lender will have the right to cure an Event of Default on behalf of Seller, only if Lender sends a written notice to Buyer before the later of (i) the expiration of any cure period, and (ii) five (5) Business Days after Lender's receipt of notice of such Event of Default from Buyer, indicating Lender's intention to cure. Lender must remedy or cure the Event of Default within the cure period under this Agreement and any additional cure periods agreed in the Collateral Assignment Agreement up to a maximum of ninety (90) days (or one hundred eighty (180) days in the event of bankruptcy of Seller or any foreclosure or similar proceeding if required by Lender to cure any Event of Default);

(d)     Lender will have the right to consent before any termination of this Agreement which does not arise out of an Event of Default;

(e)     Lender will receive prior Notice of and the right to approve material amendments to this Agreement, which approval will not be unreasonably withheld, delayed or conditioned;

(f)     If Lender, directly or indirectly, takes possession of, or title to the Facility (including possession by a receiver or title by foreclosure or deed in lieu of foreclosure), Lender must assume all of Seller's obligations arising under this Agreement and all related agreements (subject to such limits on liability as are mutually agreed to by Seller, Buyer and Lender as set forth in the Collateral Assignment Agreement); *provided*, before such assumption, if Buyer advises

Lender that Buyer will require that Lender cure (or cause to be cured) any Event of Default existing as of the possession date and capable of cure in order to avoid the exercise by Buyer (in its sole discretion) of Buyer's right to terminate this Agreement with respect to such Event of Default, then Lender at its option, and in its sole discretion, may elect to either:

(i)     Cause such Event of Default to be cured, or

(ii)    Not assume this Agreement;

(g)     If Lender elects to sell or transfer the Facility (after Lender directly or indirectly, takes possession of, or title to the Facility), or sale of the Facility occurs through the actions of Lender (for example, a foreclosure sale where a third party is the buyer, or otherwise), then Lender must cause the transferee or buyer to assume all of Seller's obligations arising under this Agreement and all related agreements as a condition of the sale or transfer. Such sale or transfer may be made only to an entity that (i) meets the definition of Permitted Transferee and (ii) is an entity that Buyer is permitted to contract with under applicable Law; and

(h)     Subject to Lender's cure of any Events of Defaults under the Agreement in accordance with Section 14.2(f), if (i) this Agreement is rejected in Seller's Bankruptcy or otherwise terminated in connection therewith Lender shall have the right to elect within forty-five (45) days after such rejection or termination, to enter into a replacement agreement with Buyer having substantially the same terms as this Agreement for the remaining term thereof, and, promptly after Lender's written request, Buyer must enter into such replacement agreement with Lender or Lender's designee, or (ii) if Lender or its designee, directly or indirectly, takes possession of, or title to, the Facility (including possession by a receiver or title by foreclosure or deed in lieu of foreclosure) after any such rejection or termination of this Agreement, promptly after Buyer's written request which must be made within forty-five (45) days after Buyer receives notice of such rejection or termination, Lender must itself or must cause its designee to promptly enter into a new agreement with Buyer having substantially the same terms as this Agreement for the remaining term thereof, provided that in the event a designee of Lender, directly or indirectly, takes possession of, or title to, the Facility (including possession by a receiver or title by foreclosure or deed in lieu of foreclosure), such designee must meet the definition of Permitted Transferee.

14.3    **Permitted Assignment by Seller**.





14.4 **Shared Facilities; Portfolio Financing** Without limiting Section 14.2, Buyer agrees and acknowledges that Seller may elect to finance all or any portion of the Facility or the Interconnection Facilities or the Shared Facilities (1) utilizing tax equity investment, or (2) through a Portfolio Financing, which may include cross-collateralization or similar arrangements. In connection with any financing or refinancing of the Facility, the Interconnection Facilities or the Shared Facilities by Seller or any Portfolio Financing, Buyer, Seller, Portfolio Financing Entity (if any), and Lender shall execute and deliver such further consents, approvals and acknowledgments as may be reasonable and necessary to facilitate such transactions provided, however, that Buyer shall not be required to agree to any terms or conditions which are reasonably expected to have a material adverse effect on Buyer and all reasonable attorney's fees incurred by Buyer in connection therewith shall be borne by Seller.

## ARTICLE 15
## DISPUTE RESOLUTION

15.1 **Governing Law**. This Agreement and the rights and duties of the Parties hereunder shall be governed by and construed, enforced and performed in accordance with the laws of the state of California, without regard to principles of conflicts of Law. To the extent enforceable at such time, each Party waives its respective right to any jury trial with respect to any litigation arising under or in connection with this Agreement. The Parties agree that any suit, action or other legal proceeding by or against any Party with respect to or arising out of this Agreement shall be brought in the federal courts of the United States or the courts of the State of California sitting in the County of Alameda, California.

15.2 **Dispute Resolution**. In the event of any dispute arising under this Agreement, within ten (10) days following the receipt of a written Notice from either Party identifying such dispute, the Parties shall meet, negotiate and attempt, in good faith, to resolve the dispute quickly, informally and inexpensively. If the Parties are unable to resolve a dispute arising hereunder within the earlier of either thirty (30) days of initiating such discussions, or within forty (40) days after Notice of the dispute, the Parties shall submit the dispute to mediation prior to seeking any and all remedies available to it at Law or in equity. The Parties will cooperate in selecting a qualified neutral mediator selected from a panel of neutrals and in scheduling the time and place of the mediation as soon as reasonably possible, but in no event later than thirty (30) days after the request for mediation is made. The Parties agree to participate in the mediation in good faith and to share the costs of the mediation, including the mediator's fee, equally, but such shared costs shall not include each Party's own attorneys' fees and costs, which shall be borne solely by such Party. If the mediation is unsuccessful, then either Party may seek any and all remedies available to it at

law or in equity, subject to the limitations set forth in this Agreement.

## ARTICLE 16
## INDEMNIFICATION

16.1 **Mutual Indemnity**. Each Party (the "**Indemnifying Party**") shall defend, indemnify and hold harmless the other Party (the "**Indemnified Party**"), its directors, officers, agents, attorneys, employees and representatives (collectively, the "**Indemnified Group**") from and against all third party claims, demands, losses, liabilities, penalties, and expenses, including reasonable attorneys' and expert witness fees, however described, which arise out of or relate to or are in any way connected with a violation of applicable Laws, negligent or tortious acts, errors, or omissions, or intentional acts or willful misconduct, in any of the foregoing cases, of the Indemnifying Party, its Affiliates, its or their directors, officers, employees, or agents, excepting only such losses, to the extent caused by the willful misconduct or gross negligence of a member of the Indemnified Group (collectively, "**Indemnifiable Losses**").

16.2 **Notice of Claim**.

(a) Notice of Claim. Subject to the terms of this Agreement and upon obtaining knowledge of an Indemnifiable Loss for which it is entitled to indemnity under this Article 16, the Party seeking indemnification hereunder (the "**Indemnitee**") will promptly Notify the Party against whom indemnification is sought (the "**Indemnitor**") in writing of any damage, claim, loss, liability or expense which the Indemnitee has determined has given or could give rise to an Indemnifiable Loss under Section 16.1 ("**Claim**"). The Notice is referred to as a "**Notice of Claim**". A Notice of Claim will specify, in reasonable detail, the facts known to the Indemnitee regarding the Indemnifiable Loss.

(b) Failure to Provide Notice. A failure to give timely Notice or to include any specified information in any Notice as provided in this Section 16.2 will not affect the rights or obligations of any Party hereunder except and only to the extent that, as a result of such failure, any Party which was entitled to receive such Notice was deprived of its right to recover any payment under its applicable insurance coverage or was otherwise materially damaged as a direct result of such failure and, provided further, the Indemnitor is not obligated to indemnify the Indemnitee for the increased amount of any Indemnifiable Loss which would otherwise have been payable to the extent that the increase resulted from the failure to deliver timely a Notice of Claim.

16.3 **Defense of Claims**. If, within ten (10) days after giving a Notice of Claim regarding a Claim to the Indemnitor pursuant to Section 16.2(b), the Indemnitee receives Notice from such Indemnitor that the Indemnitor has elected to assume the defense of such Claim as provided in the last sentence of Section 16.2(b), the Indemnitor will not be liable for any legal expenses subsequently incurred by the Indemnitee in connection with the defense thereof; provided, however, that if the Indemnitor fails to take reasonable steps necessary to defend diligently such Claim within ten (10) days after receiving Notice from the Indemnitee that the Indemnitee believes the Indemnitor has failed to take such steps, or if the Indemnitor has not undertaken fully to indemnify the Indemnitee in respect of all Indemnifiable Losses relating to the matter, the Indemnitee may assume its own defense, and the Indemnitor will be liable for all reasonable costs or expenses, including attorneys' fees, paid or incurred in connection therewith.

Without the prior written consent of the Indemnitee, the Indemnitor will not enter into any settlement of any Claim which would lead to liability or create any financial or other obligation on the part of the Indemnitee for which the Indemnitee is not entitled to indemnification hereunder; provided, however, that the Indemnitor may accept any settlement without the consent of the Indemnitee if such settlement provides a full release to the Indemnitee and no requirement that the Indemnitee acknowledge fault or culpability.  If a firm offer is made to settle a Claim without leading to liability or the creation of a financial or other obligation on the part of the Indemnitee for which the Indemnitee is not entitled to indemnification hereunder and the Indemnitor desires to accept and agrees to such offer, the Indemnitor will give Notice to the Indemnitee to that effect. If the Indemnitee fails to consent to such firm offer within ten (10) calendar days after its receipt of such Notice, the Indemnitee may continue to contest or defend such Claim and, in such event, the maximum liability of the Indemnitor to such Claim will be the amount of such settlement offer, plus reasonable costs and expenses paid or incurred by the Indemnitee up to the date of such Notice.

16.4  **Subrogation of Rights**.  Upon making any indemnity payment, the Indemnitor will, to the extent of such indemnity payment, be subrogated to all rights of the Indemnitee against any third party in respect of the Indemnifiable Loss to which the indemnity payment relates; provided that (a) the Indemnitor is in compliance with its obligations under this Agreement in respect of such Indemnifiable Loss, and (b) until the Indemnitee recovers full payment of its Indemnifiable Loss, any and all claims of the Indemnitor against any such Third Party on account of said indemnity payment are hereby made expressly subordinated and subjected in right of payment to the Indemnitee's rights against such Third Party.  Without limiting the generality or effect of any other provision hereof, the Indemnitee and Indemnitor shall execute upon request all instruments reasonably necessary to evidence and perfect the above-described subrogation and subordination rights.

16.5  **Rights and Remedies are Cumulative**.  Except for express remedies already provided in this Agreement, the rights and remedies of a Party pursuant to this Article 16 are cumulative and in addition to the rights of the Parties otherwise provided in this Agreement.

**ARTICLE 17**
**INSURANCE**

17.1  **Insurance**.

(a)  General Liability.  Seller shall maintain, or cause to be maintained at its sole expense, commercial general liability insurance, including products and completed operations and personal injury insurance, in a minimum amount of Two Million Dollars ($2,000,000) per occurrence, and an annual aggregate of not less than Five Million Dollars ($5,000,000), endorsed to provide contractual liability in said amount, specifically covering Seller's obligations under this Agreement and including Buyer as an additional insured.  Defense costs shall be provided as an additional benefit and not included within the limits of liability. Such insurance shall contain standard cross-liability and severability of interest provisions.

(b)  Employer's Liability Insurance.  Employers' Liability insurance shall not be less than One Million Dollars ($1,000,000) for injury or death occurring as a result of each

accident. With regard to bodily injury by disease, the One Million Dollar ($1,000,000) policy limit will apply to each employee.

(c)   <u>Workers Compensation Insurance</u>.  Seller, if it has employees, shall also maintain at all times during the Contract Term workers' compensation and employers' liability insurance coverage in accordance with applicable requirements of California Law.

(d)   <u>Business Auto Insurance</u>.  Seller shall maintain at all times during the Contract Term business auto insurance for bodily injury and property damage with limits of One Million Dollars ($1,000,000) per occurrence. Such insurance shall cover liability arising out of Seller's use of all owned (if any), non-owned and hired vehicles, including trailers or semi-trailers in the performance of the Agreement.

(e)   <u>Umbrella Liability Insurance</u>. Seller shall maintain umbrella liability insurance with limits of Five Million Dollars ($5,000,000) per occurrence and in the aggregate. Such insurance shall respond excess to insurance identified in Sections 17.1(a), 17.1(b) and 17.1(d) above.

(f)   <u>Construction All-Risk Insurance</u>.  Seller shall maintain or cause to be maintained during the construction of the Facility prior to the Commercial Operation Date, construction all-risk form property insurance covering the Facility during such construction periods, and naming Seller (and Lender if any) as the loss payee.

(g)   <u>Contractor's Pollution Liability</u>.  Seller shall maintain or cause to be maintained during the construction of the Facility prior to the Commercial Operation Date, pollution liability insurance in the amount of Two Million Dollars ($2,000,000) per occurrence and in the aggregate, including Seller (and Lender if any) as additional insureds.  Such insurance may be procured as a stand-alone policy or as Sudden and Accidental coverage endorsed onto the General Liability policy.

(h)   <u>Subcontractor Insurance</u>.  Seller shall require all of its subcontractors to carry the same levels of insurance as Seller, provided that Buyer may permit subcontractors to obtain and maintain insurance coverage with lower limits to the extent that such lower limits are customary for contractors providing work of the type and scope to be provided and are consistent with Prudent Operating Practices.  All subcontractors shall include Seller as an additional insured to (i) comprehensive general liability insurance; (ii) employers' liability coverage; and (iii) business auto insurance for bodily injury and property damage.  During construction, Seller shall request that subcontractors provide a primary endorsement and a waiver of subrogation to Seller for the required coverage pursuant to this Section 17.1(h).

(i)   <u>Evidence of Insurance</u>.  Within ten (10) days after execution of the Agreement and upon annual renewal thereafter, Seller shall deliver to Buyer certificates of insurance evidencing such coverage. These certificates shall specify that Buyer shall be given at least thirty (30) days' prior Notice by Seller in the event of any material modification, cancellation or termination of coverage with the exception of non-payment of premium, in which case notice shall be ten (10) days. Such insurance shall be primary coverage without right of contribution from

any insurance of Buyer. Any other insurance maintained by Seller is for the exclusive benefit of Seller and shall not in any manner inure to the benefit of Buyer.

## ARTICLE 18
## CONFIDENTIAL INFORMATION

18.1     **Definition of Confidential Information**. The following constitutes "**Confidential Information**," whether oral or written which is delivered by Seller to Buyer or by Buyer to Seller including: (a) the terms and conditions of, and proposals and negotiations related to, this Agreement, and (b) information that either Seller or Buyer stamps or otherwise identifies as "confidential" or "proprietary" before disclosing it to the other.  Confidential Information does not include (i) information that was publicly available at the time of the disclosure, other than as a result of a disclosure in breach of this Agreement; (ii) information that becomes publicly available through no fault of the recipient after the time of the delivery; (iii) information that was rightfully in the possession of the recipient (without confidential or proprietary restriction) at the time of delivery or that becomes available to the recipient from a source not subject to any restriction against disclosing such information to the recipient; and (iv) information that the recipient independently developed without a violation of this Agreement.

18.2     **Duty to Maintain Confidentiality**. Confidential Information will retain its character as Confidential Information but may be disclosed by the recipient (the "**Receiving Party**") if and to the extent such disclosure is required (a) to be made by any requirements of Law, (b) pursuant to an order of a court or (c) in order to enforce this Agreement. If the Receiving Party becomes legally compelled (by interrogatories, requests for information or documents, subpoenas, summons, civil investigative demands, or similar processes or otherwise in connection with any litigation or to comply with any applicable law, order, regulation, ruling, regulatory request, accounting disclosure rule or standard or any exchange, control area or independent system operator request or rule) to disclose any Confidential Information of the disclosing Party (the "**Disclosing Party**"), Receiving Party shall provide Disclosing Party with prompt notice so that Disclosing Party, at its sole expense, may seek an appropriate protective order or other appropriate remedy.  If the Disclosing Party takes no such action after receiving the foregoing notice from the Receiving Party, the Receiving Party is not required to defend against such request and shall be permitted to disclose such Confidential Information of the Disclosing Party, with no liability for any damages that arise from such disclosure.  Each Party hereto acknowledges and agrees that information and documentation provided in connection with this Agreement may be subject to the California Public Records Act (Government Code Section 6250 et seq.).

18.3     **Irreparable Injury; Remedies**.  Receiving Party acknowledges that its obligations hereunder are necessary and reasonable in order to protect Disclosing Party and the business of Disclosing Party, and expressly acknowledges that monetary damages would be inadequate to compensate Disclosing Party for any breach or threatened breach by Receiving Party of any covenants and agreements set forth in this Article 18. Accordingly, Receiving Party acknowledges that any such breach or threatened breach will cause irreparable injury to Disclosing Party and that, in addition to any other remedies that may be available, in law, in equity or otherwise, Disclosing Party will be entitled to obtain injunctive relief against the threatened breach of this Article 18 or the continuation of any such breach, without the necessity of proving actual damages.

18.4    **Disclosure to Lenders, Etc.**.    Notwithstanding anything to the contrary in this Article 18, Confidential Information may be disclosed by Seller to any actual or potential Lender or investor or any of its Affiliates, and Seller's actual or potential agents, consultants, contractors, or trustees, so long as the Person to whom Confidential Information is disclosed agrees in writing to be bound by the confidentiality provisions of this Article 18 to the same extent as if it were a Party.

18.5    **Press Releases**.    Neither Party shall issue (or cause its Affiliates to issue) a press release regarding the transactions contemplated by this Agreement unless both Parties have agreed upon the contents of any such public statement.

**ARTICLE 19**
**MISCELLANEOUS**

19.1    **Entire Agreement; Integration; Exhibits**.    This Agreement, together with the Cover Sheet and Exhibits attached hereto constitutes the entire agreement and understanding between Seller and Buyer with respect to the subject matter hereof and supersedes all prior agreements relating to the subject matter hereof, which are of no further force or effect.  The Exhibits attached hereto are integral parts hereof and are made a part of this Agreement by reference.  The headings used herein are for convenience and reference purposes only.  In the event of a conflict between the provisions of this Agreement and those of the Cover Sheet or any Exhibit, the provisions of first the Cover Sheet, and then this Agreement shall prevail, and such Exhibit shall be corrected accordingly.

19.2    **Amendments**.    This Agreement may only be amended, modified or supplemented by an instrument in writing executed by duly authorized representatives of Seller and Buyer; *provided*, that, for the avoidance of doubt, this Agreement may not be amended by electronic mail communications.

19.3    **No Waiver**.    Waiver by a Party of any default by the other Party shall not be construed as a waiver of any other default.

19.4    **No Agency, Partnership, Joint Venture or Lease**.    Seller and the agents and employees of Seller shall, in the performance of this Agreement, act in an independent capacity and not as officers or employees or agents of Buyer. Under this Agreement, Seller and Buyer intend to act as energy seller and energy purchaser, respectively, and do not intend to be treated as, and shall not act as, partners in, co-venturers in or lessor/lessee with respect to the Facility or any business related to the Facility. This Agreement shall not impart any rights enforceable by any third party (other than a permitted successor or assignee bound to this Agreement) or, to the extent set forth herein, any Lender.

19.5    **Severabilit**y.    In the event that any provision of this Agreement is unenforceable or held to be unenforceable, the Parties agree that all other provisions of this Agreement have force and effect and shall not be affected thereby.  The Parties shall, however, use their best endeavors to agree on the replacement of the void, illegal or unenforceable provision(s) with legally acceptable clauses which correspond as closely as possible to the sense and purpose of the affected provision and this Agreement as a whole.

19.6   **Mobile-Sierra**.  Notwithstanding any other provision of this Agreement, neither Party shall seek, nor shall they support any third party seeking, to prospectively or retroactively revise the rates, terms or conditions of service of this Agreement through application or complaint to FERC pursuant to the provisions of Section 205, 206 or 306 of the Federal Power Act, or any other provisions of the Federal Power Act, absent prior written agreement of the Parties.  Further, absent the prior written agreement in writing by both Parties, the standard of review for changes to the rates, terms or conditions of service of this Agreement proposed by a Party shall be the "public interest" standard of review set forth in United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332 (1956) and Federal Power Commission v. Sierra Pacific Power Co., 350 U.S. 348 (1956).  Changes proposed by a non-Party or FERC acting *sua sponte* shall be subject to the most stringent standard permissible under applicable law.

19.7   **Counterparts**.  This Agreement may be executed in one or more counterparts, all of which taken together shall constitute one and the same instrument and each of which shall be deemed an original.

19.8   **Facsimile or Electronic Delivery**.  This Agreement may be duly executed and delivered by a Party by execution and facsimile or electronic format (including portable document format (.pdf)) delivery of the signature page of a counterpart to the other Party, and, if delivery is made by facsimile or other electronic format, the executing Party shall promptly deliver, via overnight delivery, a complete original counterpart that it has executed to the other Party, but this Agreement shall be binding on and enforceable against the executing Party whether or not it delivers such original counterpart.

19.9   **Binding Effect**.  This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns.

19.10   **No Recourse to Members of Buyer**.  Buyer is organized as a Joint Powers Authority in accordance with the Joint Exercise of Powers Act of the State of California (Government Code Section 6500, et seq.) pursuant to its Joint Powers Agreement and is a public entity separate from its constituent members.  Buyer shall solely be responsible for all debts, obligations and liabilities accruing and arising out of this Agreement.  Seller shall have no rights and shall not make any claims, take any actions or assert any remedies against any of Buyer's constituent members, or the employees, directors, officers, consultants or advisors or Buyer or its constituent members, in connection with this Agreement.

19.11   **Forward Contract**.  The Parties acknowledge and agree that this Agreement constitutes a "forward contract" within the meaning of the U.S. Bankruptcy Code, and Buyer and Seller are "forward contract merchants" within the meaning of the U.S. Bankruptcy Code.  Each Party further agrees that, for all purposes of this Agreement, each Party waives and agrees not to assert the applicability of the provisions of 11 U.S.C. § 366 in any bankruptcy proceeding wherein such Party is a debtor.  In any such proceeding, each Party further waives the right to assert that the other Party is a provider of last resort to the extent such term relates to 11 U.S.C. §366 or another provision of 11 U.S.C. § 101-1532.

19.12   **Further Assurances**. Each of the Parties hereto agree to provide such information, execute and deliver any instruments and documents and to take such other actions as may be

necessary or reasonably requested by the other Party which are not inconsistent with the provisions of this Agreement and which do not involve the assumptions of obligations other than those provided for in this Agreement, to give full effect to this Agreement and to carry out the intent of this Agreement.

*[Signatures on following page]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the Effective Date.

**EDWARDS SOLAR II, LLC**

By: _____
Name: _____
Title: _____

**EAST BAY COMMUNITY ENERGY AUTHORITY, a California joint powers authority**

By: _____
Name: _____
Title: _____

**Approved as to form:**

By: _____
Name: _____
Title: _____

**EXHIBIT A**

**FACILITY DESCRIPTION**

**Site Name**:  Edwards Solar II

**Site includes all or some of the following APNs**: 430-011-01, 430-011-02, 430-011-03, 244-250-01, 244-250-02, 244-250-03, 244-250-04, 430-011-06, 431-010-03, 430-011-05, 430-011-04, 244-250-08, 244-250-07, 244-250-06.

**County**:  Kern

**CEQA Lead Agency:** Kern County

**Type of Generating Facility**:  Solar PV

**Operating Characteristics of Generating Facility**:

**Guaranteed Capacity**:  100 MW. ████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████

**Delivery Point**:  Windhub 230 kV

**P-node**:  Windhub 230 kV

**Participating Transmission Owner**:  Southern California Edison Company

**EXHIBIT B**

**MAJOR PROJECT DEVELOPMENT MILESTONES AND COMMERCIAL OPERATION**

1. **Major Project Development Milestones**.

   a. "**Construction Start**" will occur upon Seller's acquisition of all applicable regulatory authorizations, approvals and permits for the construction of the Generating Facility, has engaged all contractors and ordered all essential equipment and supplies as, in each case, can reasonably be considered necessary so that physical construction of the Generating Facility may begin and proceed to completion without foreseeable interruption of material duration, and has executed an engineering, procurement, and construction contract and issued thereunder a notice to proceed that authorizes the contractor to mobilize to Site and begin physical construction (including, at a minimum, excavation for foundations or the installation or erection of improvements) at the Site.  The date of Construction Start will be evidenced by and subject to Seller's delivery to Buyer of a certificate substantially in the form attached as Exhibit J hereto, and the date certified therein shall be the "**Construction Start Date**." Seller shall cause the Construction Start Date to occur no later than the Guaranteed Construction Start Date.

   b. "**Major Project Development Milestone**" means either the Guaranteed Construction Start Date or the Executed Interconnection Agreement Milestone. If Construction Start is not achieved by the Guaranteed Construction Start Date, or the Interconnection Agreement is not signed by Seller and the PTO on or before the Executed Interconnection Agreement Milestone, Seller shall pay Daily Delay Damages to Buyer for each day for which a Major Project Development Milestone has not been completed.  Daily Delay Damages will be calculated separately and accrue independently for each Major Project Development Milestone.  Daily Delay Damages shall be payable to Buyer by Seller until Seller completes both Major Project Development Milestone; provided that in no event shall Seller be obligated to pay aggregate Daily Delay Damages in excess of the Development Security amount required hereunder.  On or before the tenth (10th) day of each month, Buyer shall invoice Seller for Daily Delay Damages, if any, accrued during the prior month and, within ten (10) Business Days following Seller's receipt of such invoice, Seller shall pay Buyer the amount of the Daily Delay Damages set forth in such invoice. Daily Delay Damages shall be refundable to Seller pursuant to Section 2(b) of this Exhibit B.  The Parties agree that Buyer's receipt of Daily Delay Damages shall be Buyer's sole and exclusive remedy for Seller's unexcused delay in achieving the Major Project Development Milestones, but shall (x) not be construed as Buyer's declaration that an Event of Default has occurred under any provision of Section 11.1 and (y) not limit Buyer's right to declare an Event of Default pursuant to Section 11.1(b)(ii) and receive a Damage Payment upon exercise of Buyer's default right pursuant to Section 11.2.

2.      **Commercial Operation of the Facility**. "**Commercial Operation**" means the condition existing when (i) Seller has fulfilled all of the conditions precedent in Section 2.2 of the Agreement and provided to Buyer a completion certificate from a Licensed Professional Engineer substantially in the form of Exhibit H (the "**COD Certificate**") and (ii) Seller has notified Buyer in writing that it has provided the required documentation to Buyer and met the conditions for achieving Commercial Operation. The "**Commercial Operation Date**" shall be the later of (x) Expected Commercial Operation Date, or (y) the date on which Commercial Operation is achieved.

a.      Seller shall cause Commercial Operation for the Facility to occur by the Expected Commercial Operation Date (as such date may be extended by the Development Cure Period (defined below), the "**Guaranteed Commercial Operation Date**"). Seller shall notify Buyer that it intends to achieve Commercial Operation at least sixty (60) days before the anticipated Commercial Operation Date.

b.      If Seller achieves the Commercial Operation Date by the Guaranteed Commercial Operation Date, all Daily Delay Damages paid by Seller shall be refunded to Seller. Seller shall include a request for refund of the Daily Delay Damages with the first invoice to Buyer after Commercial Operation.

c.      If Seller does not achieve the Commercial Operation Date by the Guaranteed Commercial Operation Date, Seller shall owe Commercial Operation Delay Damages to Buyer for each day after the Guaranteed Commercial Operation Date until the Commercial Operation Date. Commercial Operation Delay Damages, if any, shall be payable to Buyer by Seller until the Commercial Operation Date. On or before the tenth (10th) day of each month, Buyer shall invoice Seller for Commercial Operation Delay Damages, if any, accrued during the prior month. The Parties agree that Buyer's receipt of Commercial Operation Delay Damages shall be Buyer's sole and exclusive remedy for the first sixty (60) days of delay in achieving the Commercial Operation Date on or before the Guaranteed Commercial Operation Date, but shall (x) not be construed as Buyer's declaration that an Event of Default has occurred under any provision of Section 11.1 and (y) not limit Buyer's right to receive a Damage Payment upon exercise of Buyer's default right pursuant to Section 11.2.

3.      **Termination for Failure to Achieve Commercial Operation**. ███████████
██████████████████████████████████████████████████████████████████
███████████████████████

4.      **Extension of the Guaranteed Dates**. The Guaranteed Construction Start Date and the Guaranteed Commercial Operation Date shall, subject to notice and documentation requirements set forth below, be automatically extended on a day-for-day basis (the "**Development Cure Period**") for the duration of any and all delays arising out of the following circumstances:



Upon request from Buyer, Seller shall provide documentation demonstrating to Buyer's reasonable satisfaction that the delays described above did not result from Seller's actions or failure to take reasonable actions.

5. **Failure to Reach Guaranteed Capacity**.  If, at Commercial Operation, the Installed Capacity is less than one hundred percent (100%) of the Guaranteed Capacity, ███████████████████████████████████████████████████████████████████████████████████ If Seller fails to construct the Guaranteed Capacity by such date, Seller shall pay **"Capacity Damages"** to Buyer, ███████████████████████████████████████████████████████████████████████████████████

6. **Buyer's Right to Draw on Development Security**.  If Seller fails to timely pay any Daily Delay Damages or Commercial Operation Delay Damages, Buyer may draw upon the Development Security to satisfy Seller's payment obligation thereof and Buyer shall replenish the Development Security to its full amount within five (5) Business Days after such draw.

**EXHIBIT C**

**COMPENSATION**

**Compensation**.

1.    Buyer shall compensate Seller for the Product in accordance with this <u>Exhibit C</u>.

(a)    <u>Contract Price</u>.  During the Delivery Term, Buyer shall pay Seller the following amounts for each MWh of PV Energy and Charging Energy during a Contract Year ███ ████████████████████████████████ of the amount of Expected Energy for such Contract Year:



(b)    <u>Excess Contract Year Deliveries Over 115%</u>.  During the Delivery Term, Buyer shall pay Seller the following amounts for each MWh of PV Energy and Charging Energy ███████████████████████████████████

(i)    For each MWh of PV Energy in each Settlement Interval, zero dollars per MWh ($0/MWh); and

(ii)    For each MWh of Charging Energy in each Settlement Interval, zero dollars per MWh ($0/MWh).

Exhibit C - 1

(c)     Excess Settlement Interval Deliveries.  During the Delivery Term, if during any Settlement Interval, Seller delivers Product amounts, as measured by the amount of PV Energy, in excess of the product of the Guaranteed Capacity and the duration of the Settlement Interval, expressed in hours ("**Excess MWh**"), then the price applicable to all such Excess MWh in such Settlement Interval shall be zero dollars ($0).

(d)



(e)     Curtailment Payments. Seller shall receive no compensation from Buyer for Deemed Delivered Energy.

(f)     CAISO Costs and CAISO Revenues.   In addition to the compensation described in this Exhibit C, Seller is responsible for CAISO costs and is entitled to retain all CAISO revenues in respect of the Facility as further described in Exhibit D.

(g)     Tax Credits. The Parties agree that the Contract Price is not subject to adjustment or amendment if Seller fails to receive any Tax Credits, or if any Tax Credits expire, are repealed or otherwise cease to apply to Seller or the Facility in whole or in part, or Seller or its investors are unable to benefit from any Tax Credits. Seller shall bear all risks, financial and otherwise, throughout the Contract Term, associated with Seller's or the Facility's eligibility to receive Tax Credits or to qualify for accelerated depreciation for Seller's accounting, reporting or Tax purposes. The obligations of the Parties hereunder, including those obligations set forth herein regarding the purchase and price for and Seller's obligation to deliver Facility Energy and Product, shall be effective regardless of whether the sale of Facility Energy is eligible for, or receives Tax Credits during the Contract Term.

Exhibit C - 2

**EXHIBIT D**

**SCHEDULING COORDINATOR RESPONSIBILITIES**

**Scheduling Coordinator Responsibilities.**

(a)      <u>Seller to be Scheduling Coordinator</u>.  During the Delivery Term, Seller shall be its own Scheduling Coordinator or designate a qualified third party to provide Scheduling Coordinator services with the CAISO to Schedule and deliver the Product to the Delivery Point, and Buyer shall be its own Scheduling Coordinator or designate a qualified third party to provide Scheduling Coordinator services with the CAISO.  Each Party shall perform all scheduling and transmission activities in compliance with (i) the CAISO Tariff, (ii) WECC scheduling practices, and (iii) Prudent Operating Practice.  The Parties agree to communicate and cooperate as necessary in order to address any scheduling or settlement issues as they may arise, and to work together in good faith to resolve them in a manner consistent with the terms of the Agreement.

(b)      <u>CAISO Market Participation</u>.  During the Delivery Term, Seller, as the party responsible for all Scheduling Coordinator activities and Imbalance Energy risk with respect to the Facility, shall (i) have the right, but not the obligation, in its sole discretion to submit Energy Supply Bids or Self-Schedules into the Day-Ahead Market, (ii) schedule in the Real-Time Market with a volume based on the VER forecast, its equivalent or any successor, provided by the CAISO, or such other forecast as developed by Seller and approved by Buyer, such approval not to be unreasonably withheld, provided, however, that Seller will have the right to elect in its sole discretion to submit either Energy Supply Bids or Self-Schedules or any combination thereof in the Real-Time Market with respect to such volume.  Seller's Day-Ahead Market and Real-Time Market participation will be conducted in accordance with this Agreement and the CAISO Tariff, including any requirements to remain in the VER program, its equivalent or any successor, and to the extent not inconsistent with the foregoing, Prudent Operating Practice.  Without in any way limiting Seller's obligations under Section 4.7 with respect to the Guaranteed Energy Production, Seller retains sole discretion to determine when the Storage Facility will accept Charging Energy and deliver Discharging Energy, except as provided in Section 4.6(g).

(c)      <u>CAISO Costs and CAISO Revenues</u>.  Seller (as Scheduling Coordinator for the Facility) shall be responsible for CAISO costs (including penalties, Imbalance Energy charges, and other charges) and shall be entitled to all CAISO revenues (including credits, Imbalance Energy payments, and other payments), including revenues associated with CAISO dispatches, bid cost recovery, Inter-SC Trade credits, or other credits in respect of the Product Scheduled or delivered from the Facility; <u>provided</u>, <u>that</u>, any net costs or charges assessed by the CAISO which are due to a failure of Buyer to perform its obligations hereunder shall be Buyer's responsibility.  The Parties agree that any Availability Incentive Payments are for the benefit of the Seller and for Seller's account and that any Non-Availability Charges are the responsibility of the Seller and for Seller's account.  In addition, if during the Delivery Term the CAISO implements or has implemented any sanction or penalty related to scheduling, outage reporting, or generator operation, the cost of such sanctions or penalties arising from the scheduling, outage reporting, or generator operation of the Facility shall be the Seller's responsibility.

**EXHIBIT E**

**PROGRESS REPORTING FORM**

**[UNDER REVIEW]**

Each Progress Report must include the following items:

1.      Facility description.

2.      Site plan of the Facility.

3.      Description of any material planned changes to the Facility or the site.

4.      Summary of material activities during the previous calendar quarter or month, as applicable, including any OSHA labor hour reports.

5.      Forecast of material activities scheduled for the current calendar quarter.

6.      List of issues that are likely to potentially affect Seller's Milestones.

7.      A status report of material start-up activities including a forecast of material activities ongoing and after start-up, a report on Facility performance including performance projections for the next twelve (12) months.

8.      [Prevailing wage reports as required by Law.]

9.      Pictures, in sufficient quantity and of appropriate detail, in order to document construction and startup progress of the Facility, the interconnection into the Transmission System and all other interconnection utility services.

10.     Supplier Diversity Reporting (if applicable). Format to be provided by Buyer.

11.     Any other documentation reasonably requested by Buyer.

**EXHIBIT F-1**

**AVERAGE EXPECTED ENERGY**

[Average Expected Energy (in MWh)]

|  | 1:00 | 2:00 | 3:00 | 4:00 | 5:00 | 6:00 | 7:00 | 8:00 | 9:00 | 10:00 | 11:00 | 12:00 | 13:00 | 14:00 | 15:00 | 16:00 | 17:00 | 18:00 | 19:00 | 20:00 | 21:00 | 22:00 | 23:00 | 24:00 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **JAN** | | | | | | | | | | | | | | | | | | | | | | | | |
| **FEB** | | | | | | | | | | | | | | | | | | | | | | | | |
| **MAR** | | | | | | | | | | | | | | | | | | | | | | | | |
| **APR** | | | | | | | | | | | | | | | | | | | | | | | | |
| **MAY** | | | | | | | | | | | | | | | | | | | | | | | | |
| **JUN** | | | | | | | | | | | | | | | | | | | | | | | | |
| **JUL** | | | | | | | | | | | | | | | | | | | | | | | | |
| **AUG** | | | | | | | | | | | | | | | | | | | | | | | | |
| **SEP** | | | | | | | | | | | | | | | | | | | | | | | | |
| **OCT** | | | | | | | | | | | | | | | | | | | | | | | | |
| **NOV** | | | | | | | | | | | | | | | | | | | | | | | | |
| **DEC** | | | | | | | | | | | | | | | | | | | | | | | | |

The foregoing table is provided for informational purposes only, and it shall not constitute, or be deemed to constitute, an obligation of any of the Parties to this Agreement.

**EXHIBIT F-2**

**AVAILABLE CAPACITY**

[Available Generating Capacity (in MW)] – [*Insert Month*]

| | 1:00 | 2:00 | 3:00 | 4:00 | 5:00 | 6:00 | 7:00 | 8:00 | 9:00 | 10:00 | 11:00 | 12:00 | 13:00 | 14:00 | 15:00 | 16:00 | 17:00 | 18:00 | 19:00 | 20:00 | 21:00 | 22:00 | 23:00 | 24:00 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Day 1** | | | | | | | | | | | | | | | | | | | | | | | | |
| **Day 2** | | | | | | | | | | | | | | | | | | | | | | | | |
| **Day 3** | | | | | | | | | | | | | | | | | | | | | | | | |
| **Day 4** | | | | | | | | | | | | | | | | | | | | | | | | |
| **Day 5** | | | | | | | | | | | | | | | | | | | | | | | | |
| **[insert additional rows for each day in the month]** | | | | | | | | | | | | | | | | | | | | | | | | |
| **Day 29** | | | | | | | | | | | | | | | | | | | | | | | | |
| **Day 30** | | | | | | | | | | | | | | | | | | | | | | | | |
| **Day 31** | | | | | | | | | | | | | | | | | | | | | | | | |

The foregoing table is provided for informational purposes only, and it shall not constitute, or be deemed to constitute, an obligation of any of the Parties to this Agreement.

**EXHIBIT G**

**GUARANTEED ENERGY PRODUCTION DAMAGES CALCULATION**

In accordance with Section 4.7, if Seller fails to achieve the Guaranteed Energy Production during any Performance Measurement Period, a liquidated damages payment shall be due from Seller to Buyer, calculated as follows:

$$[(A - B) * (C - D)]$$

where:

> $\underline{A} =$ the Guaranteed Energy Production amount for the Performance Measurement Period, in MWh

> $\underline{B} =$ the Adjusted Energy Production amount for the Performance Measurement Period, in MWh

> $\underline{C} =$ Replacement price for the Performance Measurement Period, in $/MWh, which is the sum of (a) the simple average of the Integrated Forward Market hourly price for hour-ending 0800 through hour-ending 1700 for all days in the Performance Measurement Period, as published by the CAISO, for the Existing Zone Generation Trading Hub (as defined in the CAISO Tariff) for the Delivery Point, ███████████████████ provided, however, that if Seller delivers Replacement Green Attributes pursuant to Section 2 of this Exhibit G, then the amount in clause (b) above shall be deemed to be $0.00/MWh for the portion of (A – B) above for which Seller delivered Replacement Green Attributes pursuant to this Exhibit G

> $\underline{D} =$ the Contract Price for the Performance Measurement Period, in $/MWh

1.    Definitions.

    "**Adjusted Energy Production**" shall mean the sum of the following:  Facility Energy + Deemed Delivered Energy + Lost Output + Replacement Energy.

    "**Lost Output**" has the meaning given in Section 4.7 of the Agreement. The Lost Output shall be calculated in the same manner as Deemed Delivered Energy is calculated, in accordance with the definition thereof.

    "**Replacement Energy**" means energy produced by a facility other than the Facility that, at the time delivered to Buyer, qualifies under Public Utilities Code 399.16(b)(1), and has Green Attributes that have the same or comparable value, including with respect to the timeframe for retirement of such Green Attributes, if any, as the Green Attributes that would have been generated by the Facility during the Contract Year for which the Replacement Energy is being provided.

    "**Replacement Green Attributes**" means Renewable Energy Credits of the same Portfolio Content Category (i.e., PCC1) as the Green Attributes portion of the Product and, unless otherwise

agreed by the Parties, of the same timeframe for retirement as the Renewable Energy Credits that would have been generated by the Facility during the Performance Measurement Period for which the Replacement Green Attributes are being provided.

"**Replacement Green Attributes Price**" means Index + $0.00/MWh, where "**Index**" means the CAISO LMP applicable to the energy delivered by the electric generating facility providing the Replacement Green Attributes.

2.      Delivery of Replacement Green Attributes.  For any Performance Measurement Period in which Seller reasonably expects the calculation of (A – B) above to be greater than zero (0), Seller shall have the right to deliver Replacement Green Attributes to Buyer, and Buyer will pay Seller the Replacement Green Attributes Price for such Replacement Green Attributes, provided that such Replacement Green Attributes are generated during the applicable Performance Measurement Period and the associated WREGIS Certificates are delivered to Buyer within one hundred (100) days after the end of such Performance Measurement Period.  In addition, subject to the prior written consent of Buyer, Seller may deliver Replacement Green Attributes generated after the end of the applicable Performance Measurement Period within ninety (90) days after the applicable Performance Measurement Period, or such other time frame as agreed by the Parties.  Seller, or the Scheduling Coordinator for the electric generating facility providing the Replacement Green Attributes, will receive compensation directly from the CAISO for energy associated with the Replacement Green Attributes that is scheduled to the CAISO in real-time on Buyer's behalf, and the Parties acknowledge and agree that Seller is entitled to retain all such CAISO compensation as full payment for the Index component of the Green Attributes Replacement Price.

3.      No payment shall be due if the calculation of (A - B) or (C - D) yields a negative number.

4.      Within sixty (60) days after each Contract Year, Buyer will send Seller Notice of the amount of damages owing, if any, which shall be payable to Buyer before the later of (a) thirty (30) days of such Notice and (b) ninety (90) days after each Performance Measurement Period, provided that the amount of damages owing shall be adjusted to account for Replacement Energy and Replacement Green Attributes, if any, delivered after each applicable Performance Measurement Period.

**EXHIBIT H**

**FORM OF COMMERCIAL OPERATION DATE CERTIFICATE**

This certification ("**Certification**") of Commercial Operation is delivered by _____ [*licensed professional engineer*] ("**Engineer**") to East Bay Community Energy Authority, a California joint powers authority ("**Buyer**") in accordance with the terms of that certain Renewable Power Purchase Agreement dated _____ ("**Agreement**") by and between [*Seller*] and Buyer. All capitalized terms used in this Certification but not otherwise defined herein shall have the respective meanings assigned to such terms in the Agreement.

As of _____ [DATE]_____, Engineer hereby certifies and represents to Buyer the following:

1.      The Generating Facility is fully operational, reliable and interconnected, fully integrated and synchronized with the Transmission System.

2.      Seller has installed equipment for the Generating Facility with a nameplate capacity of no less than ninety percent (90%) of the Guaranteed Capacity.

3.      Seller has commissioned all equipment in accordance with its respective manufacturer's specifications.

4.      The Generating Facility's testing included a performance test demonstrating peak electrical output of no less than ninety percent (90%) of the Guaranteed Capacity for the Generating Facility at the Delivery Point, as adjusted for ambient conditions on the date of the Facility testing, and such peak electrical output, as adjusted, was [peak output in MW].

5.      Authorization to parallel the Generating Facility was obtained by the Participating Transmission Provider, [Name of Participating Transmission Owner as appropriate] on___[DATE]_____.

6.      The Transmission Provider has provided documentation supporting full unrestricted release for Commercial Operation by [Name of Participating Transmission Owner as appropriate] on _____[DATE]_____.

7.      The CAISO has provided notification supporting Commercial Operation, in accordance with the CAISO Tariff on _____[DATE]_____.

EXECUTED by [LICENSED PROFESSIONAL ENGINEER]

this _____ day of _____, 20__.

**[LICENSED PROFESSIONAL ENGINEER]**

By: _____

Its: _____

Date: _____

**EXHIBIT I**

**FORM OF INSTALLED CAPACITY CERTIFICATE**

This certification ("**Certification**") of Installed Capacity is delivered by [licensed professional engineer] ("**Engineer**") to East Bay Community Energy Authority, a California joint powers authority ("**Buyer**") in accordance with the terms of that certain Renewable Power Purchase Agreement dated _____ ("**Agreement**") by and between [*SELLER ENTITY*] and Buyer.  All capitalized terms used in this Certification but not otherwise defined herein shall have the respective meanings assigned to such terms in the Agreement.

I hereby certify the following:

> The performance test for the Generating Facility demonstrated peak electrical output of ___ MW AC at the Delivery Point, as adjusted for ambient conditions on the date of the performance test ("**Installed Capacity**").

EXECUTED by **[LICENSED PROFESSIONAL ENGINEER]**

this _____ day of _____, 20__.

**[LICENSED PROFESSIONAL ENGINEER]**

By: _____

Its: _____

Date: _____

Exhibit I - 1

**EXHIBIT J**

**FORM OF CONSTRUCTION START DATE CERTIFICATE**

This certification of Construction Start Date ("**Certification**") is delivered by [SELLER ENTITY] ("**Seller**") to East Bay Community Energy Authority, a California joint powers authority ("**Buyer**") in accordance with the terms of that certain Renewable Power Purchase Agreement dated _____ ("**Agreement**") by and between Seller and Buyer. All capitalized terms used in this Certification but not otherwise defined herein shall have the respective meanings assigned to such terms in the Agreement.

Seller hereby certifies and represents to Buyer the following:

(1)     Construction Start (as defined in Exhibit B of the Agreement) has occurred, and a copy of the notice to proceed that Seller issued to its contractor as part of Construction Start is attached hereto;

(2)     the Construction Start Date occurred on _____ (the "**Construction Start Date**"); and

(3)     the precise Site on which the Facility is located is, which must be within the boundaries of the previously identified Site: _____.

IN WITNESS WHEREOF, the undersigned has executed this Certification on behalf of Seller as of the ____ day of _____.

[SELLER ENTITY]

By: _____

Its: _____

Date: _____

**EXHIBIT K**

**FORM OF LETTER OF CREDIT**

[Issuing Bank Letterhead and Address]


IRREVOCABLE STANDBY LETTER OF CREDIT NO. [XXXXXXX]

                                    Date:
                                      Bank Ref.:
                                      Amount:  US$[XXXXXXXX]
                                      Expiry Date:


Beneficiary:

East Bay Community Energy Authority, a California joint powers authority
1111 Broadway, Suite 300
Oakland, CA 94607


Ladies and Gentlemen:

By the order of _____ ("Applicant"), we, [insert bank name and address] ("Issuer") hereby issue our Irrevocable Standby Letter of Credit No. [XXXXXXX] (the "Letter of Credit") in favor of East Bay Community Energy Authority, a California joint powers authority ("Beneficiary"), 1111 Broadway, Suite 300, Oakland, CA 94607, for an amount not to exceed the aggregate sum of U.S. $[XXXXXX] (United States Dollars [XXXXX] and 00/100), pursuant to that certain Renewable Power Purchase Agreement dated as of _____ and as amended (the "Agreement") between Applicant and Beneficiary. This Letter of Credit shall become effective immediately and shall expire on December 31, 2024 (the "Expiration Date").

Funds under this Letter of Credit are available to Beneficiary by presentation on or before the Expiration Date of a dated statement purportedly signed by your duly authorized representative, in the form attached hereto as Exhibit A, containing one of the two alternative paragraphs set forth in paragraph 2 therein, referencing our Letter of Credit No. [XXXXXXX] ("Drawing Certificate").

The Drawing Certificate may be presented by (a) physical delivery, (b) as a PDF attachment to an e-mail to [*bank email address*]  or (c) facsimile to [bank fax number [XXX-XXX-XXXX]] confirmed by [e-mail to [*bank email address*]] Transmittal by facsimile or email shall be deemed delivered when received.

The original of this Letter of Credit (and all amendments, if any) is not required to be presented in connection with any presentment of a Drawing Certificate by Beneficiary hereunder in order to receive payment.

We hereby agree with the Beneficiary that documents presented under and in compliance with the terms of this Letter of Credit will be duly honored upon presentation to the Issuer on or before the Expiration Date. All payments made under this Letter of Credit shall be made with Issuer's own immediately available funds by means of wire transfer in immediately available United States dollars to Beneficiary's account as indicated by Beneficiary in its Drawing Certificate or in a communication accompanying its Drawing Certificate.

Partial draws are permitted under this Letter of Credit, and this Letter of Credit shall remain in full force and effect with respect to any continuing balance.

It is a condition of this Letter of Credit that the Expiration Date  shall be deemed automatically extended without an amendment for a one year period beginning on the present Expiration Date hereof and upon each anniversary for such date, unless at least one hundred twenty (120) days prior to any such  Expiration Date we have sent to you written notice by overnight courier service that we elect not to extend this Letter of Credit, in which case it will expire on  the date specified in such notice. No presentation made under this Letter of Credit after such  Expiration Date will be honored.

Notwithstanding any reference in this Letter of Credit to any other documents, instruments or agreements, this Letter of Credit contains the entire agreement between Beneficiary and Issuer relating to the obligations of Issuer hereunder.

This Letter of Credit is subject to the Uniform Customs and Practice for Documentary Credits (2007 Revision) International Chamber of Commerce Publication No. 600 (the "UCP"), except to the extent that the terms hereof are inconsistent with the provisions of the UCP, including but not limited to Articles 14(b) and 36 of the UCP, in which case the terms of this Letter of Credit shall govern. In the event of an act of God, riot, civil commotion, insurrection, war or any other cause beyond Issuer's control (as defined in Article 36 of the UCP) that interrupts Issuer's business and causes the place for presentation of the Letter of Credit to be closed for business on the last day for presentation, the  Expiration Date of the Letter of Credit will be automatically extended without amendment to a date thirty (30) calendar days after the place for presentation reopens for business.

Please address all correspondence regarding this Letter of Credit to the attention of the Letter of Credit Department at [*insert bank address information*], referring specifically to Issuer's Letter of Credit No. [XXXXXXX]. For telephone assistance, please contact Issuer's Standby Letter of Credit Department at [XXX-XXX-XXXX] and have this Letter of Credit available.

All notices to Beneficiary shall be in writing and are required to be sent by certified letter, overnight courier, or delivered in person to:  East Bay Community Energy Authority, Chief Operating Officer, 1111 Broadway, Suite 300, Oakland, CA 94607.  Only notices to Beneficiary meeting the requirements of this paragraph shall be considered valid.  Any notice to Beneficiary which is not in accordance with this paragraph shall be void and of no force or effect.

[Bank Name]


_____
[Insert officer name]
[Insert officer title]

(DRAW REQUEST SHOULD BE ON BENEFICIARY'S LETTERHEAD)

Drawing Certificate

[Insert Bank Name and Address]

Ladies and Gentlemen:

The undersigned, a duly authorized representative of East Bay Community Energy Authority, a California joint powers authority, 1111 Broadway, Suite 300, Oakland, CA 94607, as beneficiary (the "Beneficiary") of the Irrevocable Letter of Credit No. [XXXXXXX] (the "Letter of Credit") issued by [insert bank name] (the "Bank") by order of _____ (the "Applicant"), hereby certifies to the Bank as follows:

1.      Applicant and Beneficiary are party to that certain Renewable Power Purchase Agreement dated as of _____, 20__ (the "Agreement").

2.      Beneficiary is making a drawing under this Letter of Credit in the amount of U.S. $_____ because a Seller Event of Default (as such term is defined in the Agreement) or other occasion provided for in the Agreement where Beneficiary is authorized to draw on the letter of credit has occurred.

OR

Beneficiary is making a drawing under this Letter of Credit in the amount of U.S. $_____, which equals the full available amount under the Letter of Credit, because Applicant is required to maintain the Letter of Credit in force and effect beyond the Expiration Date of the Letter of Credit but has failed to provide Beneficiary with a replacement Letter of Credit or other acceptable instrument within thirty (30) days prior to such Expiration Date.

3.      The undersigned is a duly authorized representative of East Bay Community Energy Authority, a California joint powers authority and is authorized to execute and deliver this Drawing Certificate on behalf of Beneficiary.

You are hereby directed to make payment of the requested amount to East Bay Community Energy Authority, a California joint powers authority by wire transfer in immediately available funds to the following account:

[Specify account information]

East Bay Community Energy Authority

_____
Name and Title of Authorized Representative

Date_____

## EXHIBIT L

## FORM OF GUARANTY

This Guaranty (this "Guaranty") is entered into as of [_____] (the "Effective Date") by and between [_____], a [_____] ("Guarantor"), and East Bay Community Energy Authority, a California joint powers authority (together with its successors and permitted assigns, "Buyer").

### Recitals

A. Buyer and [*SELLER ENTITY*], a _____ ("Seller"), entered into that certain Renewable Power Purchase Agreement (as amended, restated or otherwise modified from time to time, the "PPA") dated as of [_____], 20___.

B. Guarantor is entering into this Guaranty as Performance Security to secure Seller's obligations under the PPA, as required by Section 8.8 of the PPA.

C. It is in the best interest of Guarantor to execute this Guaranty inasmuch as Guarantor will derive substantial direct and indirect benefits from the execution and delivery of the PPA.

D. Initially capitalized terms used but not defined herein have the meaning set forth in the PPA.

### Agreement

**1.    Guaranty**.    For value received, Guarantor does hereby unconditionally, absolutely and irrevocably guarantee, as primary obligor and not as a surety, to Buyer the full, complete and prompt payment by Seller of any and all amounts and payment obligations now or hereafter owing from Seller to Buyer under the PPA, including, without limitation, compensation for penalties, the Termination Payment, indemnification payments or other damages, as and when required pursuant to the terms of the PPA (the "Guaranteed Amount"), provided, that Guarantor's aggregate liability under or arising out of this Guaranty shall not exceed _____ Dollars ($_____).   The Parties understand and agree that any payment by Guarantor or Seller of any portion of the Guaranteed Amount shall thereafter reduce Guarantor's maximum aggregate liability hereunder on a dollar-for-dollar basis.   This Guaranty is an irrevocable, absolute, unconditional and continuing guarantee of the full and punctual payment and performance, and not of collection, of the Guaranteed Amount and, except as otherwise expressly addressed herein, is in no way conditioned upon any requirement that Buyer first attempt to collect the payment of the Guaranteed Amount from Seller, any other guarantor of the Guaranteed Amount or any other Person or entity or resort to any other means of obtaining payment of the Guaranteed Amount.  In the event Seller shall fail to duly, completely or punctually pay any Guaranteed Amount as required pursuant to the PPA, Guarantor shall promptly pay such amount as required herein.

**2.    Demand Notice**. For avoidance of doubt, a payment shall be due for purposes of this Guaranty only when and if a payment is due and payable by Seller to Buyer under the terms and conditions of the Agreement.  If Seller fails to pay any Guaranteed Amount as required pursuant to the PPA for five (5) Business Days following Seller's receipt of Buyer's written notice of such failure (the "Demand Notice"), then Buyer may elect to exercise its rights under this Guaranty and may make a demand upon Guarantor (a "Payment Demand") for such unpaid Guaranteed Amount.

Exhibit L - 1

A Payment Demand shall be in writing and shall reasonably specify in what manner and what amount Seller has failed to pay and an explanation of why such payment is due and owing, with a specific statement that Buyer is requesting that Guarantor pay under this Guaranty.  Guarantor shall, within five (5) Business Days following its receipt of the Payment Demand, pay the Guaranteed Amount to Buyer.

**3.** **Scope and Duration of Guaranty**. This Guaranty applies only to the Guaranteed Amount. This Guaranty shall continue in full force and effect from the Effective Date until the earlier of the following: (x) all Guaranteed Amounts have been paid in full (whether directly or indirectly through set-off or netting of amounts owed by Buyer to Seller), or (y) replacement Performance Security is provided in an amount and form required by the terms of the PPA.  Further, this Guaranty (a) shall remain in full force and effect without regard to, and shall not be affected or impaired by any invalidity, irregularity or unenforceability in whole or in part of this Guaranty, and (b) subject to the preceding sentence, shall be discharged only by complete performance of the undertakings herein. Without limiting the generality of the foregoing, the obligations of the Guarantor hereunder shall not be released, discharged, or otherwise affected and this Guaranty shall not be invalidated or impaired or otherwise affected for the following reasons:

(i)    the extension of time for the payment of any Guaranteed Amount, or

(ii)    any amendment, modification or other alteration of the PPA, or

(iii)    any indemnity agreement Seller may have from any party, or

(iv)    any insurance that may be available to cover any loss, except to the extent insurance proceeds are used to satisfy the Guaranteed Amount, or

(v)    any voluntary or involuntary liquidation, dissolution, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition or readjustment of, or other similar proceeding affecting, Seller or any of its assets, including but not limited to any rejection or other discharge of Seller's obligations under the PPA imposed by any court, trustee or custodian or any similar official or imposed by any law, statue or regulation, in each such event in any such proceeding, or

(vi)    the release, modification, waiver or failure to pursue or seek relief with respect to any other guaranty, pledge or security device whatsoever, or

(vii)    any payment to Buyer by Seller that Buyer subsequently returns to Seller pursuant to court order in any bankruptcy or other debtor-relief proceeding, or

(viii)    those defenses based upon (A) the legal incapacity or lack of power or authority of any Person, including Seller and any representative of Seller to enter into the PPA or perform its obligations thereunder, (B) lack of due execution, delivery, validity or enforceability, including of the PPA, or (C) Seller's inability to pay any Guaranteed Amount or perform its obligations under the PPA, or

(ix)    any other event or circumstance that may now or hereafter constitute a defense to payment of the Guaranteed Amount, including, without limitation, statute of frauds and accord and satisfaction;

Exhibit L - 2

Case 3:23-cv-03924-VC   Document 1   Filed 08/04/23   Page 100 of 110

provided that Guarantor reserves the right to assert for itself any defenses, setoffs or counterclaims that Seller is or may be entitled to assert against Buyer (except for such defenses, setoffs or counterclaims that may be asserted by Seller with respect to the PPA, but that are expressly waived under any provision of this Guaranty).

**4.      Waivers by Guarantor**. Guarantor hereby unconditionally waives as a condition precedent to the performance of its obligations hereunder, with the exception of the requirements in Paragraph 2, (a) notice of acceptance, presentment or protest with respect to the Guaranteed Amounts and this Guaranty, (b) notice of any action taken or omitted to be taken by Buyer in reliance hereon, (c) any requirement that Buyer exhaust any right, power or remedy or proceed against Seller under the PPA, and (d) any event, occurrence or other circumstance which might otherwise constitute a legal or equitable discharge of a surety.  Without limiting the generality of the foregoing waiver of surety defenses, it is agreed that the occurrence of any one or more of the following shall not affect the liability of Guarantor hereunder:

(i)      at any time or from time to time, without notice to Guarantor, the time for payment of any Guaranteed Amount shall be extended, or such performance or compliance shall be waived;

(ii)      the obligation to pay any Guaranteed Amount shall be modified, supplemented or amended in any respect in accordance with the terms of the PPA;

(iii)      subject to Section 10, any (a) sale, transfer or consolidation of Seller into or with any other entity, (b) sale of substantial assets by, or restructuring of the corporate existence of, Seller or (c) change in ownership of any membership interests of, or other ownership interests in, Seller; or

(iv)      the failure by Buyer or any other Person to create, preserve, validate, perfect or protect any security interest granted to, or in favor of, Buyer or any Person.

**5.      Subrogation**. Notwithstanding any payments that may be made hereunder by the Guarantor, Guarantor hereby agrees that until the earlier of payment in full of all Guaranteed Amounts or expiration of the Guaranty in accordance with Section 3, it shall not be entitled to, nor shall it seek to, exercise any right or remedy arising by reason of its payment of any Guaranteed Amount under this Guaranty, whether by subrogation or otherwise, against Seller or seek contribution or reimbursement of such payments from Seller.

**6.      Representations and Warranties**. Guarantor hereby represents and warrants that (a) it has all necessary and appropriate [*limited liability company*][*corporate*] powers and authority and the legal right to execute and deliver, and perform its obligations under, this Guaranty, (b) this Guaranty constitutes its legal, valid and binding obligations enforceable against it in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, moratorium and other similar laws affecting enforcement of creditors' rights or general principles of equity, (c) the execution, delivery and performance of this Guaranty does not and will not contravene Guarantor's organizational documents, any applicable Law or any contractual provisions binding on or affecting Guarantor, (d) there are no actions, suits or proceedings pending before any court, governmental agency or arbitrator, or, to the knowledge of the Guarantor, threatened, against or affecting Guarantor or any of its properties or revenues which may, in any one case or in the

Exhibit L - 3

aggregate, adversely affect the ability of Guarantor to enter into or perform its obligations under this Guaranty, and (e) no consent or authorization of, filing with, or other act by or in respect of, any arbitrator or Governmental Authority, and no consent of any other Person (including, any stockholder or creditor of the Guarantor), that has not heretofore been obtained is required in connection with the execution, delivery, performance, validity or enforceability of this Guaranty by Guarantor.

7.    **Notices**. Notices under this Guaranty shall be deemed received if sent to the address specified below: (i) on the day received if served by overnight express delivery, and (ii) four Business Days after mailing if sent by certified, first class mail, return receipt requested.  If transmitted by facsimile, such notice shall be deemed received when the confirmation of transmission thereof is received by the party giving the notice.  Any party may change its address or facsimile to which notice is given hereunder by providing notice of the same in accordance with this Paragraph 8.

    If delivered to Buyer, to it at            [____]
                                               Attn:  [____]
                                               Fax:   [____]


    If delivered to Guarantor, to it at        [____]
                                               Attn:  [____]
                                               Fax:   [____]

8.    **Governing Law and Forum Selection**. This Guaranty shall be governed by, and interpreted and construed in accordance with, the laws of the United States and the State of California, excluding choice of law rules.  The Parties agree that any suit, action or other legal proceeding by or against any party (or its affiliates or designees) with respect to or arising out of this Guaranty shall be brought in the federal courts of the United States or the courts of the State of California sitting in the City and County of Alameda, California.

9.    **Miscellaneous**. This Guaranty shall be binding upon Guarantor and its successors and assigns and shall inure to the benefit of Buyer and its successors and permitted assigns pursuant to the PPA.  No provision of this Guaranty may be amended or waived except by a written instrument executed by Guarantor and Buyer.  This Guaranty is not assignable by Guarantor without the prior written consent of Buyer.  No provision of this Guaranty confers, nor is any provision intended to confer, upon any third party (other than Buyer's successors and permitted assigns) any benefit or right enforceable at the option of that third party.  This Guaranty embodies the entire agreement and understanding of the parties hereto with respect to the subject matter hereof and supersedes all prior or contemporaneous agreements and understandings of the parties hereto, verbal or written, relating to the subject matter hereof.  If any provision of this Guaranty is determined to be illegal or unenforceable (i) such provision shall be deemed restated in accordance with applicable Laws to reflect, as nearly as possible, the original intention of the parties hereto and (ii) such determination shall not affect any other provision of this Guaranty and all other provisions shall remain in full force and effect.  This Guaranty may be executed in any number of separate counterparts, each of which when so executed shall be deemed an original, and all of said counterparts taken together shall be

Exhibit L - 4

deemed to constitute one and the same instrument.  This Guaranty may be executed and delivered by electronic means with the same force and effect as if the same was a fully executed and delivered original manual counterpart.

*[Signature on next page]*

Exhibit L - 5

       IN WITNESS WHEREOF, the undersigned has caused this Guaranty to be duly executed and delivered by its duly authorized representative on the date first above written.

GUARANTOR:

**[_____]**

By: _____

Printed Name: _____

Title: _____

BUYER:

**[_____]**

By: _____

Printed Name: _____

Title: _____

By: _____

Printed Name: _____

Title: _____

Exhibit L - 6

**EXHIBIT M**

**FORM OF REPLACEMENT RA NOTICE**

This Replacement RA Notice (this "**Notice**") is delivered by [*SELLER ENTITY*] ("**Seller**") to East Bay Community Energy Authority, a California joint powers authority ("**Buyer**") in accordance with the terms of that certain Renewable Power Purchase Agreement dated _____ ("**Agreement**") by and between Seller and Buyer.  All capitalized terms used in this Notice but not otherwise defined herein shall have the respective meanings assigned to such terms in the Agreement.

Pursuant to Section 3.8(b) of the Agreement, Seller hereby provides the below Replacement RA product information:

**Unit Information[1]**

| | |
|---|---|
| Name | |
| Location | |
| CAISO Resource ID | |
| Unit SCID | |
| Prorated Percentage of Unit Factor | |
| Resource Type | |
| Point of Interconnection with the CAISO Controlled Grid ("substation or transmission line") | |
| Path 26 (North or South) | |
| LCR Area (if any) | |
| Deliverability restrictions, if any, as described in most recent CAISO deliverability assessment | |
| Run Hour Restrictions | |
| Delivery Period | |

| Month | Unit CAISO NQC (MW) | Unit Contract Quantity (MW) |
|---|---|---|
| January | | |
| February | | |
| March | | |
| April | | |
| May | | |
| June | | |
| July | | |
| August | | |
| September | | |
| October | | |
| November | | |
| December | | |

---

[1] To be repeated for each unit if more than one.

Exhibit M - 1

[*SELLER ENTITY*]

By: _____

Its: _____

Date: _____

**EXHIBIT N**

**NOTICES**

| *[SELLER'S NAME]* ("Seller") | **EAST BAY COMMUNITY ENERGY AUTHORITY, a California joint powers authority** ("Buyer") |
|---|---|
| **All Notices:**<br><br>Street:<br>City:<br>Attn:<br><br>Phone:<br>Facsimile:<br>Email: | **All Notices:**<br><br>Street: 1111 Broadway, Suite 300<br>City: Oakland, CA 94607<br>Attn: Howard Chang, Chief Operating Officer<br>Phone: (510) 809-7458<br>Email: hchang@ebce.org<br><br>With a copy to:<br><br>EBCE General Counsel<br>1111 Broadway, Suite 300<br>Oakland, CA 94607<br>Email: legal@ebce.org<br><br>With an additional copy to:<br><br>Hall Energy Law PC<br>Attn: Stephen Hall<br>Phone: (503) 313-0755<br>Email: steve@hallenergylaw.com |
| **Reference Numbers:**<br>Duns:<br>Federal Tax ID Number: | **Reference Numbers:**<br>Duns: ▮▮▮▮▮▮▮<br>Federal Tax ID Number: ▮▮▮▮▮▮ |
| **Invoices:**<br>Attn:<br>Phone:<br>Facsimile:<br>E-mail: | **Invoices:**<br>Attn: Power Resources<br>Phone:<br>E-mail: powerresources@ebce.org; ap@ebce.org |
| **Scheduling:**<br>Attn:<br>Phone:<br>Facsimile:<br>Email: | **Scheduling:**<br>Attn: NCPA c/o Ken Goeke, Manager, Portfolio and Administration<br>Phone: (916) 781-4290<br>Email: ken.goeke@ncpa.com |

| *[SELLER'S NAME]* ("Seller") | **EAST BAY COMMUNITY ENERGY AUTHORITY, a California joint powers authority** ("Buyer") |
|---|---|
| **Confirmations:**<br>Attn:<br>Phone:<br>Facsimile:<br>Email: | **Confirmations:**<br>Attn: Power Resources<br>Phone:<br>E-mail: powerresources@ebce.org |
| **Payments:**<br>Attn:<br>Phone:<br>Facsimile:<br>E-mail: | **Payments:**<br>Attn: Jason Bartlett, Finance Manager<br>Phone:  510-650-7584<br>E-mail: AP@ebce.org; jbartlett@ebce.org |
| **Wire Transfer:**<br>BNK:<br>ABA:<br>ACCT: | **Wire Transfer:**<br>BNK: River City Bank<br>ABA: 121133416<br>ACCT: ******3199 |
| **With additional Notices of an Event of Default to:**<br><br>Attn:<br>Phone:<br>Facsimile:<br>E-mail: | **With additional Notices of an Event of Default to:**<br><br>Howard Chang, Chief Operating Officer<br>1111 Broadway, Suite 300<br>Oakland, CA 94607<br>Phone: (510) 809-7458<br>Email: hchang@ebce.org<br><br>With a copy to:<br><br>EBCE, General Counsel<br>1111 Broadway, Suite 300<br>Oakland, CA 94607<br>Phone: (510) 838-5266<br>Email: legal@ebce.org |
| **Emergency Contact:**<br>Attn:<br>Phone:<br>Facsimile:<br>Email: | **Emergency Contact:**<br>Attn: Howard Chang, Chief Operating Officer<br>Phone: (510) 809-7458<br>E-mail: hchang@ebce.org |

**EXHIBIT O**

**OPERATING RESTRICTIONS**

The Parties will develop and finalize the Operating Restrictions prior to the Commercial Operation Date, <u>provided</u> that the Operating Restrictions will, at a minimum, include the rules, requirements and procedures set forth in this <u>Exhibit O</u>.

1. XXXX

2. XXXX

**EXHIBIT P**

**METERING DIAGRAM**

**EXHIBIT Q**

**COMMUNITY INVESTMENT**

Seller agrees to fund a "Community Investment Fund" ("CI Fund") through a 

Seller's Affiliate has engaged D.H. Blattner & Sons, Inc. ("Primary Employer") to construct the Facility.  Primary Employer entered into that certain Project Labor Agreement with Operating Engineers Local 12, Southwest Regional Council of Carpenters, Southern California District Council of Laborers and its affiliated Laborers Local 220, IBEW Local 428, and Ironworkers Locals 416 and 433 on April 8, 2018.